Linda FREW, et al., Plaintiffs,

v.

Albert HAWKINS, et al., Defendants.

No. CIVA3:93CA065WWJ.

United States District Court,
E.D. Texas,
Paris Division.

Aug. 22, 2005.

Joaquin Amaya, Jr, Texas Rural Legal Aid, Plainview, for All Plaintiffs, Plaintiff.

Edward Bradbury Cloutman, III, Law Offices of Ed Cloutman, Dallas, for All Plaintiffs, Class Members, Charlotte Garvin, Linda Frew, Maria Ayala, Mary. Fisher, Mary Jane Garza, Shannon Garcia, Plaintiffs.

Gregory Scott Coleman, Weil Gotshal & Manges, Austin, for Bridgett Cook, Linda Wertz, MD Susan Penfield, Dr William Archer, Richard Ladd, MD Beverly Koops, Defendants.

Linda Ann Halpern, Attorney General's Office, Austin, for All Defendants, Defendant.

Mark J Hanna, Mark J Hanna PC, Austin, for Texas Dental Association, Movant.

John Robert Heard, Heard & Smith, San Antonio, for All Plaintiffs, Class Members, Carla Frew, Charlotte Garvin, Linda Frew, Maria Ayala, Mary. Fisher, Mary Jane Garza, Shannon Garcia, Plaintiffs.

Edwin N Horne, Attorney General's Office, Austin, for All Defendants, Dr Eduardo Sanchez, Michael. McKinney, Marina Henderson, Defendants.

Jeffrey S Levin, Texas Rural Legal Aid, Plainview, for Carla Frew, Linda Frew, Maria Ayala, Mary. Fisher, Mary Jane Garza, Crystal Noelevol Brown, James Curtis Brown, Jeremiah DeMark Phillips, Russell Kline Walton, All Plaintiffs, Plaintiffs.

Israel Morales Reyna, Texas Rural Legal Aid, Laredo, for All Plaintiffs, Plaintiff.

Sharon E Reynerson, Lone Star Legal Aid, Paris, for Dominique Shantel Frazar, Jeneva Frazar, Carla Frew, Linda Frew, Crystal Noelevol Brown, James Curtis Brown, Jeremiah DeMark Phillips, Russell Kline Walton, Gloria Padilla, Martha Doe, Maria Ayala, Mary. Fisher, Mary Jane Garza, Plaintiffs.

Richard E Salisbury, Office of the Attorney General, Austin, for All Defendants, Defendant.

Rodolfo David Sanchez, Texas Rural Legal Aid, Inc, Weslaco, for All Plaintiffs, Plaintiff.

Melanie Plowman Sarwal, Weil Gotshal & Manges—Austin, Austin, for Bridgett Cook, Don Gilbert, Linda Wertz, MD Susan Penfield, Dr William Archer, Richard Ladd, MD Beverly Koops, Defendants.

Matthew F Stowe, Office of the Attorney General, Austin, for All Defendants, Defendant.

Peter J Strelitz, Segal McCambridge Singer & Mahoney, Austin, for Bridgett Cook, Linda Wertz, MD Susan Penfield, Dr William Archer, Richard Ladd, Charles E Bell, Defendants.

Jane Kathryn Swanson, Attorney at Law, The Woodlands, for All Plaintiffs, Carla Frew, Linda Frew, Maria Ayala, Mary. Fisher, Mary Jane Garza, Crystal

Noelevol Brown, James Curtis Brown, Jeremiah DeMark Phillips, Russell Kline Walton, Class Members, Charlotte Garvin, Shannon Garcia, Plaintiffs.

Susan Finkelstein Zinn, Attorney at Law, San Antonio, for Carla Frew, Linda Frew, Dominique Shantel Frazar, Crystal Noelevol Brown, James Curtis Brown, Jeremiah DeMark Phillips, Russell Kline Walton, Jeneva Frazar, Maria Ayala, Mary. Fisher, Mary Jane Garza, Gloria Padilla, Martha Doe, Dr William Archer, All Plaintiffs, Class Members, Charlotte Garvin, Shannon Garcia, Plaintiffs.

## ORDER

JUSTICE, Senior District Judge.

Defendants' Rule 60(b) Motion for Relief From Judgment (Docket No. 406) has been presented for adjudication.

1. The plaintiff class, as of 2004, consists of 2,706,903 children. D. Ex. 96.

2. Title 42 U.S.C. § 1396a(a) provides:

A State plan for medical assistance must—
. . .
(43) provide for—
(A) informing all persons in the State who are under the age of 21 and who have been determined to be eligible for medical assistance including services described in section 1396d(a)(4)(B) of this title, of the availability of early and periodic screening, diagnostic, and treatment services as described in section 1396d(r) of this title and the need for age-appropriate immunizations against vaccine-preventable diseases,
(B) providing or arranging for the provision of such screening services in all cases where they are requested,
(C) arranging for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment the need for which is disclosed by such child health screening services, and
(D) reporting to the Secretary (in a uniform form and manner established by the Secretary, by age group and by basis of eligibility

## Background and Procedural History

Filed on September 1, 1993, this civil action concerns the alleged failure of the State of Texas to implement a Medicaid program that assures that indigent · children and youth receive timely, comprehensive health care. The action was brought by a class of more than one and one-half million indigent children in Texas who are entitled to health benefits through the Early Periodic Screening, Diagnosis and Treatment ("EPSDT") program.[1] *See* Docket No. . 1, 93; *see also* 42 U.S.C. §§ 1396a(a)(43),[2] 1396d(r).[3] In Texas, the program is referred to as "Texas Health Steps," which is administered jointly by the federal government and the Texas. Health and Human Services Commission. EPSDT is intended to be "the nation's largest preventive health program for children." H.R. 3299, 101st Cong. § 4213 (1989). It is "among the most important programs that the Texas Department of

for medical assistance, and by not later than April 1 after the end of each fiscal year, beginning with fiscal year 1990) the following information relating to early and periodic screening, diagnostic, and treatment services provided under the plan during each fiscal year
. . . .

3. This provision of federal law sets forth the minimum services which the state must provide under the EPSDT program, including: (1) screening services, including comprehensive health and developmental histories, comprehensive unclothed physical exams, appropriate immunizations, laboratory tests (including appropriate lead blood level assessments), and health education; (2) vision services, including diagnosis and treatment for vision defects; (3) dental services, including "relief of pain and infections, restoration of teeth, and maintenance of dental health;" (4) hearing services, including diagnosis and treatment for defects in hearing; and (5) "such other necessary health care ... to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered by the State plan."

Health runs." Docket No. 133 at 8 (internal quotes omitted).

The purpose of the EPSDT program is to ensure that poor children receive comprehensive health care at an early age, in order that they will develop fewer health problems as they grow older. EPSDT is designed to provide health education, preventive care, and effective follow-up care for conditions identified during check-ups. Preventive health care identifies health problems that may respond to early treatment but, if left untreated, may instead lead to serious health conditions. For example, a heart murmur detected during an EPSDT screening, if untreated, could lead to heart failure. Severe anemia, if untreated, could result in behavioral problems and reduced mental capacity. Other important components of the EPSDT program include immunizations, parental education, assistance with scheduling appointments, transportation assistance, and coordination of EPSDT and other programs serving Medicaid-eligible children.

After two years of extensive negotiation following the filing of this case, the parties proposed the Consent Decree to the Court in July of 1995. During a fairness hearing held in December of that year, the parties urged the Court to approve the proposed decree. The Court approved the Consent Decree as fair, reasonable, and adequate on February 16, 1996. Docket No. 135. Per the agreement of the parties, the Consent Decree expressly retains the Court's jurisdiction to rectify violations of its terms, and provides a mechanism to invoke this jurisdiction.[4] On November 10, 1998, Plaintiffs filed their first Motion to Enforce Consent Decree. Docket No. 208.

After nearly a year and a half of discovery and jurisdictional challenges, the Court held a hearing in March of 2000 on Plaintiffs' motion (the "2000 Hearing"). Evidence was presented on multiple issues, including, *inter alia:* (1) proper implementation of the outreach program and delivery of required outreach reports; (2) operation of the State's managed care system; (3) Defendants' operation of toll-free numbers; and (4) provision of case management to all class members who need it, statewide. In a lengthy memorandum opinion and order, the Court found that the State had failed to comply with numerous provisions of the Consent Decree and that the Consent Decree is enforceable. *See Frew v. Gilbert,* 109 F.Supp.2d 579 (E.D.Tex.2000) (the "2000 Opinion"). In an attempt to judiciously consider the recommendations of state officials, the Court requested that the parties submit proposed corrective action plans, rather than the Court's unilaterally entering a comprehensive order of enforcement. Before submitting the proposed corrective action plans, however, Defendants brought two interlocutory appeals; and the Fifth Circuit stayed the Court's order requesting proposed corrective action plans during the pendency of the appeals. *See Frazar v. Gilbert,* 300 F.3d 530 (5th Cir.2002).

One of the appeals involved Defendants' argument that a federal court's jurisdiction over a state official is limited by the Eleventh Amendment to requiring compliance with federal law. Defendants argued that the Consent Decree may not be enforced against them, to the extent that it goes beyond the scope of simple compliance

---

4. Paragraph 303 of the Consent Decree states: "This Decree contemplates that the parties will reach agreement in the future about several issues. It further contemplates that Defendants' future activities will comport with the terms and intent of this Decree. If this proves to be incorrect, the parties may request relief from this Court. Absent emergency, no party may request relief from the Court without first providing the opposing party with one month's written notice."

with federal law. The Court rejected this argument, but the Court was overruled by the Fifth Circuit on appeal. *Frazar*, 300 F.3d at 530. The Fifth Circuit held that the Eleventh Amendment prevented enforcement of the Consent Decree, unless the violation of the Consent Decree was also a statutory violation of the Medicaid Act that imposed a clear and binding obligation on the State. *Id.* at 543. The Supreme Court, however, unanimously reversed the Fifth Circuit, holding that the Consent Decree is enforceable, in its entirety, under *Ex Parte Young*.[5] *Frew v. Hawkins*, 540 U.S. 431, 124 S.Ct. 899, 157 L.Ed.2d 855 (2004). The Supreme Court noted that, "[t]he decree states that it creates 'a mandatory, enforceable obligation,'" in the process of holding that "[o]nce entered, a consent decree may be enforced." *Id.* at 438, 440, 124 S.Ct. 899 (quoting Consent Decree ¶ 302). On remand, the Fifth Circuit held that, absent the jurisdictional issues related to the Eleventh Amendment, it lacked interlocutory jurisdiction over the appeal.[6] *Frazar v. Hawkins*, 376 F.3d 444 (5th Cir.2004).

The Supreme Court, while clarifying that the Consent Decree is valid and enforceable in its entirety, also explained that "the law's primary response to [the fear that enforcement of consent decrees can undermine the sovereign interests and accountability of state governments] has its source not in the Eleventh Amendment but in the court's equitable powers and the direction given by the Federal Rules of Civil Procedure." *Frew*, 540 U.S. at 441, 124 S.Ct. 899. It provided Defendants

with a potential avenue for relief, FED. R. CIV. P. 60(b)(5) (hereinafter "Rule 60(b)(5)"), and directed the Court and the parties to two cases as examples of the application of Rule 60(b)(5) to consent decrees in the context of institutional reform litigation. It also explained that a "federal court must exercise its equitable powers to ensure that when the objects of the decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials." *Id.* at 442, 124 S.Ct. 899. Defendants thus filed the instant Rule 60(b)(5) Motion for Relief from Judgment ("Defendants' Rule 60(b) Motion") on November 4, 2004. Docket No. 406.

### The Hearing and Memorandum Opinion

The Court held a hearing from June 6–15, 2005 (the "June Hearing"), on Defendants' Rule 60(b) Motion. Following the hearing, Plaintiffs and Defendants submitted briefs on the legal and factual issues involved in the instant motion. This memorandum opinion details the Court's findings of fact and conclusions of law based on the evidence presented at the June Hearing. Part One of the opinion discusses consent decrees and Rule 60(b)(5) motions generally, for the purpose of establishing the proper legal framework for the Court's analysis. Part Two details findings of fact and conclusions of law regarding Defendants' demand to dissolve the Consent Decree in its entirety. Part Three outlines findings of fact and conclusions of law regarding Defendants' alterna-

---

5. The Supreme Court also noted that "the state officials did not contend that the terms of the decree were impermissible under *Ex Parte Young*. Nor do they contend that the consent decree failed to comply with *Firefighters*. The officials challenge only the enforcement of the decree, not its entry." *Frew v. Hawkins*, 540 U.S. 431, 438, 124 S.Ct. 899, 157 L.Ed.2d 855 (2004).

6. Defendants, on remand, "continue[d] to press its remaining arguments that the district court improperly expanded the scope of the consent decree beyond the agreement of the parties," *Frazar*, 376 F.3d at 446, although the Fifth Circuit declined to reach the merits of the appeal at that time.

tive demand for relief. Part Four addresses whether Defendants' demanded relief satisfies the tailoring requirement set forth in *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992). Finally, Part Five contains the Court's analysis of whether Defendants have made reasonable efforts to comply with the Consent Decree, as required by *Cooper v. Noble*, 33 F.3d 540 (5th Cir.1994).[7]

## PART ONE: THE NATURE OF CONSENT DECREES AND RULE 60(b)(5)

### A. THE NATURE OF A CONSENT DECREE

■■■■ The Court begins its analysis by describing the general nature of a consent decree, to provide context for the Court's analysis as to whether the Consent Decree should be dissolved in its entirety, as De-

fendants primarily demand. The Supreme Court has described a consent decree as "an agreement between the parties to a case after careful negotiation has produced agreement on [its] precise terms." *Local Number 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 522, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986) (internal quotations omitted) (quoted in *Alberti v. Klevenhagen*, 46 F.3d 1347, 1364 (5th Cir. 1995)). Moreover, the Fifth Circuit has noted that "once the district court enters the settlement as a judicial consent decree ending the lawsuit, the settlement takes on the nature of a judgment." *Ho v. Martin Marietta Corp.*, 845 F.2d 545, 548 (5th Cir.1988). It is "an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees."[8]

---

7. These requirements of *Rufo* and *Cooper* are detailed in Part I(B)(2), *infra*.

8. Defendants argue that, based on general principles of contract law, the Consent Decree should be dissolved. *See* Defendants' Post–Hearing Brief at 4; Tr. Vol. VIII, p. 76 (closing argument of Defendants' counsel). If the Consent Decree is not a final judgment, Defendants argue, then they did not receive any consideration for undertaking the obligations set forth in it, and should thus be relieved of the obligations. Defendants' argument, however, rests upon their erroneous determination that the Court may declare that the Consent Decree is not a final judgment. Because "a consent decree is a final judgment that may be reopened only to the extent that equity requires," *Rufo*, 502 U.S. at 391, 112 S.Ct. 748, the Court rejects all of Defendants' arguments contingent upon the Court's determining that the Consent Decree is not a final judgment for the claims on which it is based. *See Williams v. Edwards*, 87 F.3d 126, 130 (5th Cir.1996); *Ho v. Martin Marietta Corp.*, 845 F.2d 545, 547 (5th Cir.1988). By definition, a consent decree is a final judgment for the claims it resolves, and its *sui generis* nature has seemingly caused confusion among Defendants. Additionally, Defendants received consideration for entering into the Consent Decree when they were allowed to

extensively negotiate its terms and avoid trial. As the Fifth Circuit has recognized, "[t]he very nature of a consent agreement is such that parties will agree to act in ways they do not believe the Constitution requires in order to save themselves the time, expense, and inevitable risk of litigation." *Cooper v. Noble*, 33 F.3d 540, 545 (5th Cir.1994) (quoting *United States v. Armour & Co.*, 402 U.S. 673, 681, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971)). Defendants apparently determined that it was more beneficial to avoid the time and expense of trial, negotiate the terms, and enter into a consent decree rather than proceed to a trial on the merits and potentially be allowed minimal input regarding relief Plaintiffs may have sought. Defendants' argument that it received no consideration thus lacks merit; indeed, the converse is more accurate. Plaintiffs chose to enter into the Consent Decree rather than pursuing a trial on the merits, undoubtedly with the expectation that Defendants would comply with their obligations under the Consent Decree. Defendants now seek to have the Consent Decree dissolved in its entirety, despite their failure to even attempt compliance with certain provisions and recent failure to comply with others. *See Frew v. Gilbert*, 109 F.Supp.2d 579 (E.D.Tex. 2000); *see also* discussion *infra* Part V (detail-

*Rufo,* 502 U.S. at 378, 112 S.Ct. 748. A consent decree is not court-imposed; rather, it is a voluntary agreement between the parties involved in litigation that is then evaluated for fairness, and potentially accepted by the Court and entered as a judgment. In the instant case, as with all consent decrees, the Court was not a party to the Consent Decree negotiations and did not have a hand in crafting the obligations contained therein.

In *Frew v. Hawkins,* 540 U.S. 431, 124 S.Ct. 899, 157 L.Ed.2d 855 (2004), the Supreme Court found, *in the instant action,* that although the Consent Decree implements the Medicaid statute "in a highly detailed way, requiring the state officials to take some steps that the statute does not specifically require ... [t]he same could be said ... of any effort to implement the general EPSDT statute in a particular way." *Id.* at 439, 124 S.Ct. 899. Defendants thus voluntarily chose the result of its negotiations with Plaintiffs, the Consent Decree, to be its judicially enforceable method of implementing the general federal EPSDT statute.

## B. Rule 60(b)(5)

### 1. Rule 60(b)(5) Generally

Rule 60(b)(5) provides, in relevant part, On motion and upon such terms as are just, the court may relieve a party ... from a final judgment, order, or proceeding for the following reasons ... (5) the judgment has been satisfied, released, or discharged ... or it is no longer equitable that the judgment should have prospective application.

As the Supreme Court wrote in the instant case, "[t]he Rule [60(b)(5)] encompasses the traditional power of a court of equity to modify its decree in light of

changed circumstances." *Frew,* 540 U.S. at 441, 124 S.Ct. 899. Under Rule 60(b)(5), the Court may relieve Defendants from the Consent Decree if the judgment has been satisfied, released, or discharged. Defendants do not argue that the Consent Decree has been satisfied, released, or discharged; instead, they argue that Defendants are in compliance with federal Medicaid law, thus rendering the Consent Decree unnecessary and its enforcement inequitable. In other words, Defendants argue that the ends of the Consent Decree have been met, not that the obligations within the Consent Decree have been satisfied, released, or discharged.[9] Defendants thus proceed with this motion under the second portion of Rule 60(b)(5), insisting that "it is no longer equitable that the judgment should have prospective application."

Rule 60(b)(5) is a form of equitable relief. *See Frew,* 540 U.S. at 441, 124 S.Ct. 899; *Waste Mgmt. of Ohio, Inc. v. City of Dayton,* 132 F.3d 1142, 1145 (6th Cir.1997) ("Equitable considerations are clearly factors a district court can address when they are related to a court's power and duty to modify, interpret, and oversee a consent decree."). "Equity" is defined as "[t]he recourse to principles of justice to correct or supplement the law as applied to particular circumstances," or more generally, "[t]he body of principles constituting what is fair and right." BLACK'S LAW DICTIONARY (8th ed.2004). Remedies grounded in equity, therefore, take into account all factors that contribute to a just, fair, and right outcome. In order to determine whether to order equitable relief, the Court examines the entire record-the facts and procedural history of the case, in addition to the

---

ing Defendants' attempts to comply with the Consent Decree).

**9.** *See* discussion *infra* Part I(B)(3) for a detailed explanation of the parties' arguments.

actions of the parties throughout the progression of the case.[10]

### 2. Legal Standard for Rule 60(b)(5) Relief

In *Frew*, 540 U.S. at 441, 124 S.Ct. 899, the Supreme Court cites two cases as examples of the application of Rule 60(b) to consent decrees in the context of institutional reform litigation: *Rufo*, 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 and *Philadelphia Welfare Rights Org. v. Shapp*, 602 F.2d 1114 (3rd Cir.1979). An overview of these two Rule 60(b) application cases provides a necessary introduction to the legal framework for the Court's analysis.

■ In *Rufo*, the Supreme Court adopted a flexible standard for determining whether to modify an institutional reform consent decrees and announced a two-part test regarding their modification. 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867. *Rufo* involved a consent decree entered as a result of litigation regarding alleged unconstitutional conditions at Suffolk County Jail. A change in factual circumstance-an upsurge in the population of pretrial detainees-led the petitioners to file a Rule 60(b) motion for modification of a decree provision prescribing single-bunking.[11] The district court denied petitioners' Rule 60(b) motion, which was affirmed by the United States Court of Appeals for the First Circuit, although the Supreme Court found that the district court applied the wrong consent decree modification standard in its analysis. *Id.* In announcing the flexible modification standard applicable in the instant case, the Supreme Court explained a two-part test: (1) the party seeking modification of the consent decree must establish that a significant change in facts or law warrants revision of the decree, and (2) the court should determine whether the proposed modification is suitably tailored to the changed circumstances. *See id.* at 392, 112 S.Ct. 748.

■ A flexible standard is desirable, the *Rufo* Court reasoned, because (1) the extended life of consent decrees increases the likelihood that significant changes will occur and (2) it serves the public's interest in the sound and efficient operations of its institutions.[12] *Id.* at 380–81, 112 S.Ct. 748. The *Rufo* Court also clarified that, within the "flexible standard" analysis,

[T]he moving party bears the burden of establishing that a significant change in circumstances warrants modification of a consent decree. No deference is involved in this threshold inquiry. However, once a court has determined that a modification is warranted, we think that principles of federalism and simple common sense require the court to give

---

10. For example: "Under the doctrine of unclean hands, he who commits inequity is not entitled to equitable relief." *Regional Properties, Inc. v. Real Estate Consulting Co.*, 752 F.2d 178, 183 (5th Cir.1985) (citations omitted).

11. The term "single-bunking" means assigning only one inmate to each cell. *See Rufo*, 502 U.S. at 374, 112 S.Ct. 748. The petitioners in *Rufo* also argued a change in law warranting modification, although Rule 60(b) analysis with respect to a change in law is inapposite to Defendants' Rule 60(b) Motion based on changed factual circumstances.

12. "[T]he public interest is a particularly significant reason for applying a flexible modification standard ... because such decrees 'reach beyond the parties involved directly in the suit and impact on the public's right to the sound and efficient operation of its institutions.'" *Rufo*, 502 U.S. at 381, 112 S.Ct. 748 (citing *Heath v. De Courcy*, 888 F.2d 1105, 1109 (6th Cir.1989)). Indeed, the public interest is undoubtedly a significant concern in the context of the implementation of Texas' EPSDT program.

significant weight to the views of the local government officials who must implement any modification. *Id.* at 392 n. 14, 112 S.Ct. 748.

*Rufo* provides a non-exhaustive list of three significant changes in factual conditions sufficient to support modification: (1) if the changed conditions "make compliance with the decree substantially more onerous;" (2) if the decree "proves to be unworkable because of unforeseen obstacles;" or (3) if "enforcement of the decree without the modification would be detrimental to the public interest." *Rufo*, 502 U.S. at 384, 112 S.Ct. 748; *see Thompson v. United States HUD*, 404 F.3d 821, 827 (4th Cir.2005).

If the Court determines that Defendants have met their "burden of establishing either a change in fact or in law warranting modification of a consent decree, the district court should determine whether the proposed modification is suitably tailored to the changed circumstance."[13] *Id.* at 391, 112 S.Ct. 748. The *Rufo* Court also warned that, although "a district court should exercise flexibility in considering requests for modification of an institutional reform consent decree, it does not follow that a modification will be warranted in all circumstances." 502 U.S. at 383, 112 S.Ct. 748.

In *Shapp*, 602 F.2d 1114, a pre-*Rufo* case, the district court ordered modification of an institutional reform consent decree in light of changed circumstances that were beyond the defendants' control and were not contemplated by the court or the parties when the decree was entered. The consent decree at issue in *Shapp* was entered as a result of litigation over Pennsylvania's EPSDT program, and the defendants were seeking to modify or vacate the decree based on (1) the exemplary performance of Pennsylvania's program, and (2) inability to comply, after a good faith effort, with certain terms of the decree. The district court modified the decree in three respects after finding that the defendants had made a good faith effort at compliance, but circumstances beyond the defendants' control and not contemplated by the court or parties "put achievement of the [provisions' requirements] beyond reach."[14] *Id.* at 1120–21. The court denied the defendants' motion to vacate the decree. *Id.*

Together, *Rufo* and *Shapp*: (1) instruct the Court to apply a flexible standard that contemplates federalism concerns with respect to modification of a consent decree based on changed circumstances under Rule 60(b)(5) and (2) illustrate that not *all* changed circumstances should be considered in the analysis. Instead, an example of a relevant significant change in circumstances is one that is unanticipated and beyond the defendants' control.[15]

13. *See* discussion in Part IV, *infra*, for explication and application of the *Rufo* tailoring requirement.

14. Specifically, the *Shapp* Court modified the consent decree in the following three ways: (1) the strict numerical quotas for annual EPSDT screens, applicable for the years 1976 and 1977, were eliminated; (2) the related provision for payment of 133% of the cost of such screens to eligible but unscreened persons was eliminated; and (3) the defendants' duty to provide treatment for discovered abnormalities within 60 days of the EPSDT ex-

amination in which they were discovered was qualified by permitting relief from the obligation where good reason for a greater length of time is documented in the recipient's case record. 602 F.2d at 1119.

15. The Court notes that the *Shapp* Court also did not rely on the Pennsylvania EPSDT program's alleged exemplary performance; instead, its conclusions were based on the inability, after a good faith effort, to comply with the terms of the consent decree at issue.

After the Supreme Court announced *Rufo*'s flexible standard, the Fifth Circuit clarified the Rule 60(b) standard for modification of a consent decree in the context of institutional reform litigation, based on changed factual circumstances, in *Cooper v. Noble.* 33 F.3d 540, 544 (5th Cir.1994). The *Cooper* Court upheld a United States Magistrate Judge's denial of the defendants' Rule 60(b) motion in a pre-Prison Litigation Reform Act case applying the *Rufo* Rule 60(b) standard.[16] The court explained:

> When significant changes in factual conditions make a consent judgment unworkable, make compliance substantially more onerous, or make enforcement detrimental to the public interest, a court has the discretion to modify the judgment. However, the Supreme Court [in *Rufo* ] never suggested that changed factual circumstances in and of themselves were sufficient grounds for relief from a judgment. In fact, the Court insisted that the petitioning party must "make a reasonable effort to comply with the decree." Thus, even if we take as true all the alleged changes in factual conditions, the county officials are far from meeting their burden under *Rufo*. The county officials must also: (1) show that those changes affect compliance with, or the workability or enforcement of, the final judgment, and (2) show that those changes occurred despite the county officials' reasonable efforts to comply with the judgment.

*Cooper,* 33 F.3d at 544 (quoting *Rufo,* 502 U.S. at 385, 112 S.Ct. 748) (citations omitted). A change in factual circumstances, without more, is thus insufficient to warrant modification of a consent decree in the Fifth Circuit; the moving party must additionally show how the change in factual circumstances warrants modification of the consent decree by "show[ing] that those changes affect compliance with, or the workability or enforcement of, the final judgment." [17] *Cooper,* 33 F.3d at 544; *cf. Rufo,* 502 U.S. at 384, 112 S.Ct. 748. Stated more simply, the Fifth Circuit clarified that consent decree modification under Rule 60(b) requires satisfaction of the *Rufo* test, in addition to a showing that the moving party made reasonable efforts to comply with the judgment, similar to *Shapp.*

### 3. The Parties Misunderstand the Applicable Rule 60(b)(5) Standard

The Court now addresses the parties' arguments with respect to the Rule 60(b)(5) legal standard that the Court should employ. The Court finds that both parties are mistaken as to the applicable standard; instead of applying the standards the parties proffer, the Court will apply the flexible standard as set forth in *Rufo,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867, *Shapp,* 602 F.2d 1114, *Cooper,* 33 F.3d 540, and their progeny, as detailed in Parts I(B)(2) and I(B)(4).

**16.** Though *Cooper* involved prison litigation, a class of cases whose remedies are now governed by the standards set forth in 18 U.S.C. § 3626, it illustrates the Fifth Circuit's standard for modification of consent decrees based on changed factual circumstances, under Rule 60(b), in the context of institutional reform litigation.

**17.** Indeed, the moving party must "satisfy a heavy burden to convince a court that it agreed to the decree in good faith [and] made a reasonable effort to comply with the decree" in order to be granted equitable relief under Rule 60(b)(5). *Rufo,* 502 U.S. at 383, 112 S.Ct. 748; *see Sierra Club v. Meiburg,* 296 F.3d 1021, 1034 (11th Cir.2002) ("A party seeking to modify a consent decree has a high hurdle to clear and the wind in its face."). These good faith and reasonable effort requirements follow logically for a form of relief grounded in equity.

## Defendants' Arguments

The crux of Defendants' argument in support of their Rule 60(b) motion is that they are currently in compliance with federal Medicaid law,[18] which they assert is sufficient to warrant dissolution of the Consent Decree either in its entirety, or for the areas of Texas under managed care, under Rule 60(b)(5). Tr. Vol. VIII, pp. 77, 84–85, 111 (closing argument of Defendants' counsel); Defendant's Post–Hearing Brief at 3. Because they are currently in compliance with federal law, Defendants argue, the objects of the Consent Decree have been attained, and "it is no longer equitable that the judgment should have prospective application." *Id.* at 2, 5 (citing Rule 60(b)(5)). Defendants argue that "[w]hen it was entered, and throughout the ten years and more of its application, the Consent Decree could have only one legitimate object-to ensure that Texas complied with federal law regarding the administration of its EPSDT program."

*Id.* Alternatively, Defendants argue that they have established compliance with federal law in all "Urban Areas"[19] of the State; thus, the objects of the Consent Decree have been attained, and it should have no prospective application, with respect to these areas. In sum, as articulately summarized at the June Hearing and outlined in Defendants' Post–Hearing Brief, Defendants demand only two alternative forms of relief, each based solely on compliance with federal law: (1) dissolution of the Consent Decree in its entirety, or (2) dissolution of the Consent Decree in its entirety for all Urban Areas of Texas. Defendants' Post–Hearing Brief at 1–4, 75–79; Tr. Vol. VIII, p. 88 (closing argument of Defendants' counsel).[20]

Notably, neither in their original Rule 60(b) Motion, at the June Hearing, nor in their Post–Hearing Brief do Defendants cite an applicable Rule 60(b) standard for modification or dissolution of consent de-

18. Specifically, Defendants argue that Texas Health Steps currently "provide[s] for ... informing" all eligible class members and "provide[s] for ... the provision of" all EPSDT services "where they are requested," pursuant to 42 U.S.C. § 1396a(a)(43). *See* Defendants' Rule 60(b) Motion at 10–15.

19. The term "Urban Areas," as Defendants define it, refers to the counties served by the Medicaid managed care organizations ("MCOs") that have entered into the standardized Contract for Services with the Texas Health and Human Services Commission (the "STAR Contract"). *See* D. Ex. 49; D Ex. 51 (listing the following as STAR MCOs: Amerigroup (Dallas, Harris, Tarrant and Travis service areas); Community First (Bexar service area); Community Health Choice (Harris service area); El Paso First (El Paso service area); First Care (Lubbock service area); Parkland (Dallas service area); Superior (all service areas); Texas Children's (Harris service area)); P.Ex. MAN–2. The STAR Program is the name of the Texas Medicaid managed care program enacted by the State legislature. P.Ex. MAN–2 at 8–3.

20. In Defendants' Rule 60(b) motion, they also argue that the Court should account for the State's compliance with the terms of the decree in modifying it and remove provisions with no prospective application. Defendants' Rule 60(b) Motion at 7–21. Defendants' Post–Hearing Brief, however, specifically clarifies that Defendants seek only two alternative forms of relief. *See* Defendants' Post–Hearing Brief at 1–4. Defendants' closing argument at the June Hearing also omitted any mention of modification in part, other than complete dissolution with respect to the Urban Areas of the State. *See* Tr. Vol. VIII, pp. 76–88 (closing argument of Defendants' counsel). The Court thus interprets Defendants' failure to urge the arguments mentioned in their original Rule 60(b) motion as an abandonment of them. Alternatively, to the extent Defendants believe they have not abandoned these additional arguments, the Court finds that Defendants have failed to meet their burden to prove significant changed factual circumstances warranting modification of the Consent Decree. *See* discussion *supra* Part I(B)(2).

crees. Instead, they simply recite the plain language of Rule 60(b)(5); they do not discuss either of the two cases cited by the Supreme Court in its discussion of Rule 60(b)(5) in *Frew,* 540 U.S. 431, 124 S.Ct. 899, 157 L.Ed.2d 855, nor do they discuss any other cases applying Rule 60(b)(5) or addressing the burden placed on a party moving for modification or dissolution of a consent decree under Rule 60(b)(5).

Additionally, Defendants do not argue that they are in substantial compliance with the Consent Decree; rather, they argue that they are in compliance with federal law and that such compliance, regardless of compliance with the Consent Decree, is sufficient to warrant dissolution under Rule 60(b)(5). *See* Defendants' Post–Hearing Brief at 78–79; Tr. Vol. VIII, pp. 76–88 (closing argument of Defendants' counsel).

### Plaintiffs' Arguments

Plaintiffs contend that Defendants are not entitled to Rule 60(b)(5) relief, because: (1) compliance with federal law is insufficient, by itself, to warrant dissolution of the Consent Decree; (2) Defendants are not in compliance with federal law; (3) Defendants have never attempted to comply, in good faith, with certain provisions of the Consent Decree; and (4) the objects of the Consent Decree have not been attained. *See* Plaintiffs' Post–Hearing Brief at 3–10; Tr. Vol. VIII, pp. 89–90, 99 (closing argument of Plaintiffs' counsel).

In support of their response to Defendants' request for dissolution of the Consent Decree in its entirety, Plaintiffs cite a legal standard set forth in *Missouri v. Jenkins,* 515 U.S. 70, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995).[21] Plaintiffs argue that Defendants cannot satisfy their burden for dissolution under Rule 60(b), in that they

have not shown a good faith commitment to the whole of the Consent Decree's provisions, as they intentionally violated or ignored, *inter alia,* ¶¶ 17, 35, 37, 171 and 223 thereof. Plaintiffs' Post–Hearing Brief at 5; Plaintiffs' Motion for Sanctions (Docket No. 429).

In support of their response to Defendants' request for modification of the Consent Decree to exclude the Urban Areas of the State, Plaintiffs argue that Defendants have not met *Rufo*'s requirements for modification under Rule 60(b)(5). *Id.* at 6–7. Plaintiffs thus distinguish between the Rule 60(b)(5) standard for modification of institutional reform consent decrees and the standard for dissolution. Defendants' managed care companies, argue Plaintiffs, remain in disarray, their outreach efforts have no effect or even make things worse, and their overall outcomes are poor. *Id.*

### a. The *Rufo* Flexible Standard Applies to Both Modification and Dissolution of Consent Decrees

█ While Defendants do not cite a legal standard for Rule 60(b) beyond the text of the rule itself, Plaintiffs distinguish between the standard for consent decree modification and the standard for consent decree dissolution. *See* Plaintiffs' Post–Hearing Brief at 3–7. The applicable legal standard in the Fifth Circuit for *both* types of relief, however, is that announced in *Rufo* and applied in *Cooper.*

First, the Supreme Court does not draw a distinction between the two types of relief in *Rufo* or in *Frew,* nor does the Fifth Circuit draw a distinction in *Cooper.* Indeed, the defendants in *Rufo* moved to vacate the decree as well as to modify it and, on remand, the district court applied a single flexible standard for determining whether either type of relief was warranted under Rule 60(b). *See Rufo,* 502 U.S.

**21.** For a discussion of the *Missouri v. Jenkins* standard, *see* discussion *infra* Part I(B)(3)(a).

367, 112 S.Ct. 748, 116 L.Ed.2d 867; *Inmates of Suffolk County Jail v. Rufo,* 148 F.R.D. 14 (D.Mass.1993). The defendants in *Cooper* also demanded relief from the whole of the consent judgment via a Rule 60(b) motion, and the Magistrate Judge applied *Rufo*'s flexible standard in the process of denying their motion. *Cooper,* 33 F.3d at 540.

Second, multiple courts have addressed and dismissed similar arguments with respect to a differing standard for consent decree modification versus that for consent decree dissolution under Rule 60(b)(5). For example, the defendants in *Alexander v. Britt,* 89 F.3d 194 (4th Cir.1996), argued that the standard set forth in *Board of Education of Oklahoma City Public Schools v. Dowell,* 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991), applies to Rule 60(b) motions for dissolution, as opposed to modification, of a consent decree. *Rufo,* the defendants argued, applies only to Rule 60(b) motions to modify a consent decree. The *Alexander* Court harmonized the *Rufo* and *Dowell* standards, by explaining that the two formulations of the Rule 60(b) standard, announced by the Supreme Court in two consecutive terms, simply illustrate the flexibility of the standard and the need to tailor the inquiry to the specific context of the case. 89 F.3d at 197. The *Alexander* Court thus found that a court should employ a single, flexible standard for either modification or dissolution of a consent decree under Rule 60(b). *Id.; see Rufo,* 502 U.S. at 380, 112 S.Ct. 748 ("The same theme [the need for flexibility in administering consent decrees] was repeated in our decision last Term in [*Dowell* ]."); *see also Nat'l Labor Relations Board v. Harris Teeter Supermarkets,* 215 F.3d 32, 36 (D.C.Cir.2000) ("*Dowell and Rufo* must be read together . . . .").

Finally, employing a unified flexible standard for consent decree modification and dissolution under Rule 60(b) is simply logical. Because both types of relief are forms of equitable relief, and both may be demanded under Rule 60(b), a single standard that takes into account equitable considerations pertaining to the unique circumstances of each case (as the *Rufo* standard does) is the most efficient standard under which to determine whether significant changed factual circumstances exist that warrant any change in, or relief from, obligations contained within a consent decree.

Furthermore, the *Missouri v. Jenkins* standard is inapplicable to the instant case. 515 U.S. 70, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995). In *Jenkins,* Missouri demanded that it be relieved of the district court order that required the State to fund remedial quality education programs in the context of school desegregation litigation. In its analysis, the *Jenkins* Court discussed "the showing that must be made by a school district operating under a desegregation order for complete or partial relief from that order," a test it had previously articulated in *Freeman v. Pitts,* 503 U.S. 467, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992). *Id.* at 88–89, 115 S.Ct. 2038. However, *Jenkins* did not involve modification or dissolution of a consent decree, nor was the defendants' motion for relief from the judgment's obligations made under Rule 60(b). The Court thus declines to apply the *Jenkins* standard, as urged by Plaintiffs, as it does not apply to either the Rule 60(b)(5) motion before the Court or to the type of judgment from which Defendants demand relief.

### b. Defendants Misstate the Objects of the Consent Decree

Defendants' main argument in support of their demand for dissolution of the Consent Decree in its entirety is that the

objects of the Consent Decree have been attained. As the Supreme Court admonished, "when the objects of the decree have been attained, the responsibility for discharging the State's obligations [must be] returned promptly to the State and its officials." *Frew*, 540 U.S. at 442, 124 S.Ct. 899. Defendants thus argue that the only legitimate object of the Consent Decree, to ensure that Texas complied with federal law regarding the administration of its EPSDT program, has been attained, and it is thus "no longer equitable that the judgment should have prospective application." *Frew*, 540 U.S. at 442, 124 S.Ct. 899; Defendants' Post–Hearing Brief at 3; Rule 60(b)(5). Defendants' argument, therefore, can be interpreted as two discrete assertions: (1) the sole object of the Consent Decree is to ensure compliance with federal law, and (2) Defendants are currently in compliance with federal law. Because the Court finds that compliance with federal law is not the sole object of the Consent Decree, the second assertion need not be addressed.[22]

■ Plaintiffs respond to Defendants' argument by citing *Rufo*'s admonishment that a court should not rewrite the decree to reduce it to the constitutional minima. *Rufo*, 502 U.S. at 391, 112 S.Ct. 748. In *Rufo*, the Supreme Court stated:

A proposed modification should not strive to rewrite a consent decree so that it conforms to the constitutional floor. Once a court has determined that changed circumstances warrant a modification in a consent decree, the focus should be on whether the proposed modification is tailored to resolve the problems created by the change in circumstances. A court should do no more, for a consent decree is a final judgment that

may be reopened only to the extent that equity requires. The court should not "turn aside to inquire whether some of [the provisions of the decree] upon separate as distinguished from joint action could have been opposed with success if the defendants had offered opposition."

*Id.* at 391–92, 112 S.Ct. 748 (quoting *United States v. Swift & Co.*, 286 U.S. 106, 116–17, 52 S.Ct. 460, 76 L.Ed. 999 (1932)). Plaintiffs thus argue that Defendants' assertion that the sole object of the Consent Decree is to ensure compliance with federal law implicitly requires the Court to rewrite the Consent Decree to conform to the constitutional floor, in clear violation of *Rufo*. The Court finds Plaintiffs' argument to be meritorious.

In rejecting Defendants' argument, it is sufficient to find that compliance with federal law is not the sole object of the Consent Decree. First, ¶ 6 of the Consent Decree states:

To address the parties' concerns, to enhance recipients' access to health care, and to foster the improved use of health care services by Texas EPSDT recipients, the parties agree and the Court orders Defendants to implement the following changes and procedure for the Texas EPSDT program.

The Consent Decree itself does not refer to mere compliance with federal law as its object; rather, it speaks to the broader goals of enhancing recipients' access to health care and improving the use of health care services by Texas EPSDT recipients. The Consent Decree's stated purpose is, moreover, not limited by importing any reference to federal Medicaid law in ¶ 6. Finally, the Consent Decree implements the Medicaid statute "in a

---

**22.** Defendants' argument can also be interpreted as asserting that compliance with federal law, by itself, is sufficient to warrant

relief under Rule 60(b)(5). This alternative interpretation is addressed in Part I(B)(3)(c), *infra*.

highly detailed way, requiring the state officials to take some steps that the statute does not specifically require." *Frew,* at 540 U.S. at 439, 124 S.Ct. 899. To interpret the sole object of the Consent Decree to ensure compliance with something less than that which is stated in the Consent Decree itself would be akin to rewriting the Consent Decree to conform to the constitutional floor. Such action is clearly prohibited by the Supreme Court's holding in *Rufo. See* 502 U.S. at 391–92, 112 S.Ct. 748.

Second, as the Fifth Circuit has noted, "[t]he very nature of a consent agreement is such that parties will agree to act in ways they do not believe the Constitution requires in order to save themselves the time, expense, and inevitable risk of litigation." *Cooper,* 33 F.3d at 545. If the sole object of the Consent Decree is compliance with the minimum requirements of federal law, as Defendants argue, and Defendants were thus entitled to dissolution of the Consent Decree under Rule 60(b)(5), without reference to the naturally enhanced obligations of the Consent Decree, Plaintiffs would not receive the benefits for which they bargained; and Defendants would never be required to comply with the obligations which they undertook in exchange for saving the time, expense, and inevitable risk of litigation.

Taking into account the Consent Decree's statement as to its purpose, *Cooper*'s explication of the nature of a consent decree, and *Rufo*'s admonishment to avoid rewriting a consent decree to merely conform to the constitutional floor, the Court disallows Defendants' argument that the sole object of the Consent Decree is to ensure that Texas complies with federal law regarding the administration of its EPSDT program. Because it is unnecessary to delineate the objects of the Decree beyond discarding Defendants' arguments, the Court abstains from doing so.

### c. Compliance With Federal Law, Alone, is Insufficient to Warrant Rule 60(b)(5) Relief

Given the Court's rejection of Defendants' argument that compliance with federal law is the sole object of the Consent Decree, the alternative interpretation of Defendants' argument will be addressed, *i.e.,* that compliance with federal law, by itself, is sufficient to warrant relief under Rule 60(b)(5). For this assertion to be accurate, compliance with federal law must be sufficient, by itself, to prove significant changed circumstances warranting dissolution of the Consent Decree, and dissolution of the Consent Decree must be suitably tailored to this changed circumstance. *See Rufo,* 502 U.S. at 384–91, 112 S.Ct. 748. The Court finds that this is not the case.

While compliance with federal law may be one factor in assessing changed factual circumstances, it is neither the focus of the Court's inquiry nor dispositive of the merits of Defendants' Rule 60(b) Motion. Defendants cite no authority for the assertion that compliance with federal law is sufficient, alone, to warrant relief under Rule 60(b), nor has the Court discovered *any* inquiry into compliance with federal law in the context of a Rule 60(b) motion for relief from a consent decree. Instead, courts addressing modification or dissolution of a consent decree since 1992 are bound by *Rufo*'s flexible standard and its requirements to prove both that significant changed factual circumstances warrant modification of the consent decree and that the demanded relief is suitably tailored to the changed circumstances. *Rufo,* 502 U.S. at 384–91, 112 S.Ct. 748; *see Frew,* 540 U.S. at 441, 124 S.Ct. 899. Defendants' contention that compliance with federal law, without more, is sufficient to war-

rant relief under Rule 60(b) improperly circumvents both prongs of the *Rufo* test.

Furthermore, the Supreme Court noted Defendants' argument that "[a] State in full compliance with federal law could remain subject to federal court oversight through a course of judicial proceedings brought to enforce the consent decree." *Frew*, 540 U.S. at 438, 124 S.Ct. 899. The Supreme Court, cognizant of Defendants' concern that it could be bound by the Consent Decree despite compliance with federal law, unanimously held that the Consent Decree is enforceable in its entirety unless and until a federal court grants a Rule 60(b)(5) motion. *Frew*, 540 U.S. at 431, 124 S.Ct. 899. It did *not* mention federal law compliance as a factor in the Rule 60(b)(5) analysis; rather, it directed the Court to *Rufo* and *Shapp* as examples of the proper application of Rule 60(b)(5) to modification of institutional reform consent decrees, neither of which discusses the merits of the claims on which a consent decree is based.

■ Dissolution based on mere compliance with the minimum requirements of federal law is, additionally, inequitable, because it would permit perpetual re-litigation of the merits of Plaintiffs' claims. In choosing to voluntarily enter into the Consent Decree, Defendants waived the opportunity to litigate the merits of the claims in Plaintiffs' Third Amended Complaint in exchange for negotiating the terms of the Consent Decree and avoiding the time, expense, and inevitable risk of litigation. *See Cooper*, 33 F.3d at 545. Through their argument that compliance with federal law necessarily warrants relief under Rule 60(b)(5), however, Defendants are seemingly attempting to re-litigate the claims underlying the Consent Decree. If the basis for a meritorious Rule 60(b) motion is that the claims underlying the consent decree are not meritorious, then parties to consent decrees would be permitted to file periodic Rule 60(b) motions asserting compliance with federal law and, in effect, continually re-litigate the underlying claims until a court determines the defendants are in compliance with federal law and the decree is dissolved. The party filing the Rule 60(b) motion would potentially be able to eliminate consent decree obligations, even if there is no attempted compliance with its legally enforceable terms, no showing that conformity to federal law makes compliance with the consent decree substantially more onerous or unworkable, and no showing that the requested relief is sufficiently tailored to the changed factual circumstances. *See Rufo*, 502 U.S. at 384–91, 112 S.Ct. 748; *Cooper*, 33 F.3d at 545. It follows that the parties opposing dissolution would not enjoy the benefits for which they bargained or the judicially enforceable obligations upon which they relied in entering into the consent decree; and the parties seeking dissolution would paradoxically be entitled to equitable relief despite their inequitable behavior. A Rule 60(b) motion is not a vehicle by which Defendants may disregard the voluntary obligations contained in the Consent Decree, allow time to pass, and then litigate the underlying claims in hopes of never actually complying with the its terms.

Based on the absence of authority for Defendants' argument, contradiction with the *Rufo* Rule 60(b) consent decree modification standard and the inequities involved in simply ruling on the merits of the claims which were the basis for negotiation and entry of the Consent Decree, the Court rejects Defendants' argument that compliance with federal law, by itself, is sufficient to warrant Rule 60(b)(5) relief. Because Defendants' asserted Rule 60(b) standard is found to be wanting, the Court abstains from determining whether Defendants are

currently in compliance with federal Medicaid law.

Additionally, it is noted that Plaintiffs adamantly object to the assertion that Defendants are currently in compliance with federal Medicaid law. *See* Plaintiffs' Post–Hearing Brief at 162–181; Tr. Vol. VIII, pp. 89–90, 99 (closing argument of Plaintiffs' counsel). Specifically, Plaintiffs argue, *inter alia,* that: (1) Defendants' protocols are not designed to effectively inform class members about EPSDT, in violation of 42 U.S.C. § 1396a(a)(43)(A) and 42 C.F.R. § 441.56(a)(1); (2) Medical checkups are incomplete, in violation of 42 U.S.C. § 1396a(a)(43)(B); (3) "requests" for medical checkups go unmet; and (4) Defendants do not "arrange" follow-up treatment that class members need, in violation of 42 U.S.C. § 1396a(a)(43)(C). *Id.*

As the parties have either failed to cite the proper standard for Rule 60(b) relief, or have cited to a standard inapplicable to the instant case, the Court will hereafter interpret the parties' arguments to comply with the appropriate standard as set forth in *Frew, Rufo, Shapp* and *Cooper.* By following relevant precedent, taking general equitable considerations into account and "ensur[ing] that when the objects of the decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials," *Frew,* 540 U.S. at 442, 124 S.Ct. 899, the Court will determine whether, and to what extent, Rule 60(b)(5) relief is warranted in the instant case.

### 4. Overview of Cases Applying Rule 60(b) to Consent Decrees

In this section, the Court analyzes cases determining whether significant changes in circumstances warranting revision of a consent decree under Rule 60(b) exist, in order to inform the Court's determination of whether Defendants have met their burden in the instant case. Cases applying *Rufo*'s tailoring requirement are discussed in Part IV, *infra.*

### a. Cases Finding A Significant Change in Factual Circumstances

Generally, in the analysis of whether to modify a consent decree, courts first consider whether there is a relevant significant change in factual circumstances that fits within one of *Rufo*'s three categories: (1) if the changed conditions "make compliance with the decree substantially more onerous;" (2) if the decree "proves to be unworkable because of unforeseen obstacles;" or (3) if "enforcement of the decree without the modification would be detrimental to the public interest." *Rufo,* 502 U.S. at 384, 112 S.Ct. 748. Indeed, this is the Fifth Circuit's approach. *Cooper,* 33 F.3d at 544. While *Rufo* does not necessarily preclude the possibility that other changed factual circumstances may warrant modification of a consent decree, post-*Rufo* courts typically analyze changed factual circumstances within *Rufo*'s three-category structure.

After the Supreme Court's *Rufo* decision, 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867, the case was remanded to the United States District Court for the District of Massachusetts for reconsideration under the appropriate, flexible standard. On remand, the district court denied the defendants' motion to vacate the consent decree and two motions to modify the consent decree;[23] the First Circuit then affirmed the denials. *Inmates of Suffolk County Jail v. Rufo,* 148 F.R.D. 14 (D.Mass.1993); *Inmates of the Suffolk*

---

**23.** In addition to moving to vacate the decree, the defendants moved to modify the consent decree to permit double-bunking and to re-

move female detainees from the Nashua Street Jail.

*County Jail v. Rufo,* 12 F.3d 286 (1st Cir.1993). The district court found a significant changed circumstance-an upsurge in pretrial detainee population-but then found that the defendants' proposed modifications "fail the test that this court 'should consider whether the proposed modification is suitably tailored to the changed circumstance[s].'" *Rufo,* 148 F.R.D. at 16–17 (quoting *Rufo,* 502 U.S. at 383, 112 S.Ct. 748). The district court found that the upsurge in pretrial detainee population was "higher than actually anticipated or reasonably foreseeable" and thus satisfied *Rufo*'s requirement that a significant change in factual circumstances existed that made compliance with the decree substantially more onerous.[24] *Rufo,* 148 F.R.D. at 20; *Rufo,* 502 U.S. at 384, 112 S.Ct. 748.

*Reynolds v. McInnes,* 338 F.3d 1221 (11th Cir.2003), involved a consent decree resulting from an action alleging racial discrimination in employment practices by Alabama state agencies. The district court found that the defendants had made reasonable, good faith efforts at complying with the consent decree, although the efforts had been unsuccessful with respect to one article contained in the consent decree. Reiterating that the standard for modification of consent decrees is a flexible one, the *Reynolds* Court found that "the fact that a provision of a consent decree has proven to be unworkable is itself a significant change in circumstances." 338 F.3d at 1228–29. Thus, the court rejected the plaintiffs' argument that, without evidence of the specific circumstances that gave rise to the provision, there can be no determination that those circumstances have changed. The plain fact that the defen-

dants, after good faith efforts, were unable to comply with a consent decree provision was sufficient to satisfy the *Rufo* flexible standard. The court, in response to this significant changed circumstance, modified 1 of the 21 articles contained in the consent decree.

In the same vein, *Shapp,* a pre-*Rufo* case, involved a consent agreement under which the defendants were responsible for 180,000 screenings per year. In support of their Rule 60(b) motion, the defendants presented evidence that the total population eligible for EPSDT screening was between 230,000 and 250,000 persons, "a figure which, due to declining welfare rolls, was significantly lower than had been expected at the time of the consent decree." *Shapp,* 602 F.2d at 1118. Given the relatively low number of eligibles, they argued, in addition to a 35–45% screening no-show rate, achievement of the screening goals was virtually impossible. Additionally, the defendants argued that it was impossible to comply with the consent decree provision requiring them to provide treatment for discovered abnormalities within 60 days of the EPSDT examination in which they were discovered. The district court found that, despite good faith efforts, both the screening goals and 60-day treatment rule were impossible to perform. *Id.* at 1120. Accordingly, the district court eliminated the screening goals and qualified the 60–day treatment provision, and both modifications were affirmed by the Third Circuit. *Id.* Though *Shapp* was decided approximately 13 years before *Rufo,* the Supreme Court cited it as an example of Rule 60(b) application to a consent decree relating to a State's EPSDT

---

**24.** *See Parton v. White,* 203 F.3d 552, 556 (8th Cir.2000) (applying *Rufo,* the court found that changed factual circumstances, in the form of an unanticipated increase in the prison's inmate population, "caused a significant hous- ing shortage resulting in the use of makeshift or out-of-state housing, thus making compliance with the decree substantially more onerous and detrimental to the public interest.").

program, and it is instructive with respect to illustrating an example of changed factual circumstances warranting revision of a consent decree under Rule 60(b).

In *Thompson v. United States HUD*, 404 F.3d 821 (4th Cir.2005), the Fourth Circuit, applying *Rufo*, found that the magnitude of a party's failure to comply with the terms of the consent decree was a significant change in circumstances warranting modification of the decree. *Cf. Pigford v. Veneman*, 292 F.3d 918 (D.C.Cir.2002) (finding that class counsel's inability and/or unwillingness to meet consent decree deadlines constituted a significant changed circumstance under *Rufo* ). The *Thompson* Court found that the defendants were "woefully behind schedule with regard to many provisions of the Consent Decree," 404 F.3d at 825, but focused on one failure as support for the modification of the decree. The consent decree at issue in *Thompson* required the defendants to make available 911 hard units of housing (as opposed to rent vouchers) by a specified date; on that specified date, the defendants had supplied only 8 of the required units. The court thus decided to extend jurisdiction over the defendants, modifying the consent decree's provision that the district court would exercise jurisdiction for only a limited period of time that was near expiration. The *Thompson* Court found that the plaintiffs had not anticipated the exceptional magnitude of non-compliance and that the modification

ensured that the decree could be efficiently enforced.

**b. Cases Finding No Significant Change in Factual Circumstances Warranting Revision of a Consent Decree**

In *Cooper*, 33 F.3d 540, inmates brought a class action against county officials for alleged unconstitutional conditions at a jail. Ten years after the consent judgment was entered, the county officials filed a Rule 60(b) motion requesting complete relief from the judgment, asserting, *inter alia*, significant changes in factual circumstances. The county officials argued that dramatic and unforeseen changes had occurred in the prison system since the final judgment was entered. They contended that jail conditions and procedures had been radically altered by the construction of a new jail, and the resulting conditions and procedures were either in conformity with, or improvements upon, the stipulations contained in the final judgment. The district court found, and the Fifth Circuit affirmed, that the county officials neither (1) adequately explained how the factual changes affected the workability of the final judgment, compliance with the judgment, or enforcement of the judgment, nor (2) showed that those changes occurred despite their reasonable efforts to comply with the judgment. On these bases, the court denied the defendants' Rule 60(b) request for dissolution of the consent judgment.[25]

---

**25.** *See also National Labor Relations Board v. Harris Teeter Supermarkets*, 215 F.3d 32 (D.C.Cir.2000) (denying the defendants' Rule 60(b) motion to vacate the consent decree). In *Harris Teeter*, a supermarket chain and the National Labor Relations Board ("NLRB") originally entered into a consent decree in response to allegations of labor law violations. The court found that the defendant failed to show how any alleged change (*e.g.*, personnel changes, internal reorganization, and increase in facility size) made its compliance with the decree substantially more onerous,

as required by the first of *Rufo* 's three scenarios. In the course of finding that the defendant also failed to establish that the changed circumstances satisfied either of *Rufo* 's other two scenarios, the court explained that "self-imposed hurdles and hurdles inherent in a consent decree's entry do not count as 'obstacles.' " *Harris*, 215 F.3d at 36 (citing *Rufo*, 502 U.S. at 380–81, 112 S.Ct. 748). With respect to compliance, the court concluded: "While we agree that good faith compliance certainly matters, extended com-

*Alexander*, 89 F.3d 194, involved a class action against state officials responsible for the administration of North Carolina's Aid to Families with Dependent Children and Medical Assistance (Medicaid) programs. The parties entered into a consent decree under which the administrators agreed to meet the deadlines that federal regulations mandate for processing applications; the consent decree also provided that the court would retain jurisdiction over its subject matter for six years. The defendants moved, pursuant to Rule 60(b), to dissolve the consent decree after less than two years, arguing that they had complied with the decree for a reasonable period of time sufficient to establish that the decree had served its purpose. In denying the defendants' motion for dissolution, the court found that "[w]ithout proof of a reasonable period of compliance, regardless of a party's subjective good faith or good intentions, equitable considerations weigh strongly against terminating a consent order." *Id.* at 202. The court found that the defendants had not complied with the decree for a reasonable period of time; indeed, the defendants had never complied *fully* with the consent decree. The court noted that "[o]nly compliance for substantially longer periods has been regarded as significant evidence of good faith compliance."[26] *Id.* at 201. The *Alexander* Court thus found that the defendants' two-year period of alleged compliance was insufficient to constitute significant changed fac-

tual circumstances warranting revision of the consent decree under *Rufo* and Rule 60(b).

## PART TWO: DISSOLUTION OF THE CONSENT DECREE IN ITS ENTIRETY

In determining whether to award to Defendants their primary demanded relief, dissolution of the Consent Decree in its entirety, the Court considers evidence of all aspects of the Texas Health Steps program. Accordingly, the findings of fact in both Part II (Dissolution of the Consent Decree in its Entirety) and Part III (Dissolution as to all Urban Areas of Texas) are taken into account in the Court's reaching its conclusions of law with respect to dissolution of the Consent Decree in its entirety. Evidence relating to the Texas Health Steps program's overall performance, exclusive of evidence relating to Defendants' STAR MCOs,[27] includes: (1) statistics and anecdotal evidence relating to class members' receiving medical checkups and dental services; (2) outreach and informing efforts; and (3) case management services.

## A. MEDICAL CHECKUPS AND PROVISION OF DENTAL SERVICES

■ The Court, first, addresses Defendants' provision of medical checkups and dental services, as both parties emphasized

---

pliance alone does not compel the modification of a consent decree .... *Dowell* and *Rufo* must be read together and the precedent leads us to conclude that compliance over an extended period of time is not in and of itself sufficient to warrant relief." *Harris*, 215 F.3d at 36 (citing *Dowell*, 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715, and *Rufo*, 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867). Although *Harris Teeter* does not involve institutional reform litigation, it is instructive with respect to this overview of how various courts determine whether significant changes in fac-

tual circumstances warranting revision of a consent decree exist.

**26.** The cases the *Alexander* Court cites for examples of reasonable periods of compliance found good faith compliance only after periods of compliance in excess of 10 years. 89 F.3d at 201.

**27.** *See* discussion *infra* Part III for an analysis of the performance of Defendants' STAR MCOs.

these EPSDT services in the presentation of their evidence regarding the overall performance of Texas Health Steps. The Court finds, as the parties argue, that the number of class members receiving medical checkups and the number of class members receiving dental services are the most reliable indicia of the overall performance of Texas Health Steps and, as such, constitute the primary bases for the Court's conclusions of law with respect to the Texas Health Steps program as a whole. This evaluation metric is consistent with the Consent Decree, as ¶ 2 states that "Check Ups are the cornerstone" of Texas Health Steps. In the analysis that follows, the Court finds that Defendants have failed to prove that significant changed factual circumstances exist that warrant modification of the Consent Decree with respect to either class members' receipt of medical checkups or Defendants' provision of dental services. Accordingly, the Court finds that Defendants have failed to meet their burden under *Rufo* to prove significant changed factual circumstances with respect to medical checkups and provision of dental services warranting dissolution of the Consent Decree. *See* 502 U.S. at 392, 112 S.Ct. 748.

### 1. The CMS–416 as a Measure of the Overall Performance of Texas Health Steps

As a general indicator of the overall performance of Texas Health Steps, both parties presented evidence relating to medical checkups and dental service utilization, as reported to the federal government on the "CMS–416." Defendants report, *inter alia*, medical checkup and

dental service statistics annually to the Centers for Medicare and Medicaid Services ("CMS"), the federal agency responsible for oversight of the Medicaid program, in a "CMS–416" report.[28] The Court thus, initially, considers medical checkup and dental service statistics, as reported on the CMS–416, to determine whether significant changed factual circumstances exist that warrant dissolution of the Consent Decree. While the Court finds that medical checkups and dental service provision are the most comprehensive statistics evidencing the overall performance of Texas Health Steps, it does not necessarily follow that these statistics, *as reported on the CMS–416*, accurately reflect the overall performance of Texas Health Steps.

Federal law mandates specific reporting requirements for EPSDT services. Specifically, 42 U.S.C. § 1396a(a)(43)(D) requires that a state Medicaid plan provide for:

> reporting to the Secretary [ ]in a uniform form and manner established by the Secretary, by age group and by basis of eligibility for medical assistance ... information relating to early and periodic screening, diagnostic, and treatment services provided under the plan during each fiscal year ... *(i) the number of children provided child health screening services*, (ii) the number of children referred for corrective treatment ... (iii) *the number of children receiving dental services*, and (iv) the State's results in attaining the participation goals set for the State under section 1905(r).

---

**28.** The CMS–416 was previously known as the "HCFA–416" (with reporting requirements established by the Health Care Financing Administration ("HCFA"), the predecessor of the Centers for Medicare and Medicaid Services ("CMS")). Beginning in 2002, the HCFA–416 was renamed the CMS–416. D. Ex. 94. The Court's references to the CMS–416 thus refer to either the HCFA–416 or the CMS–416, depending on the year for which the statistics are cited.

(emphasis added). The CMS–416 is the federal form that States are required to submit pursuant to 42 U.S.C. 1396a(a)(43)(D), which includes, *inter alia,* a "participation ratio"[29] and a "screening ratio"[30] regarding medical checkups, as well as a figure reporting the total *number* of eligibles receiving dental services. Tr. Vol. III, p. 161 (testimony of Dr. Bultman[31]); D. Ex. 94.

Defendants maintain that, although the CMS–416 participation ratio potentially *understates* the performance of the Texas Health Steps program, "[t]he participation rate and the screening rate [as reported on the CMS–416] are the best-and the only fair-measures of the Texas Health Steps program's performance." Defendants' Post–Hearing Brief at 21; Tr. Vol. IV, p. 16 (testimony of Dr. Bultman). Plaintiffs, however, maintain that the CMS–416 participation ratio *overstates* the number of eligible children who actually receive medical checkups and is thus not a reliable indicator of the Texas Health Steps program's overall performance. Plaintiffs' Post–Hearing Brief at 44; Tr. Vol. VIII, p. 91 (closing argument of Plaintiffs' counsel). Furthermore, Plaintiffs argue, any increase in the CMS–416 participation ratio is insufficient to warrant relief under Rule 60(b). *See* Tr. Vol. VIII, pp. 89–90, 99 (closing argument of Plaintiffs' counsel). With respect to dental services, Defendants argue that Texas' dental program is exemplary when compared to other States' and that Texas' dental participation ratio has significantly increased since entry of the Consent Decree.[32] Plaintiffs respond

**29.** The Participation Ratio is the number of eligible children who receive a checkup as a percentage of the eligible children who should receive at least one initial or periodic checkup. D. Ex. 97 at 3. The Court takes judicial notice that a "rate" is the relationship between two measurements defined by different units, whereas a "ratio" is the relationship between two measurements usually defined by the same units. D. Ex. 97 at 24. The Court will employ the term "participation rate" to refer to the *actual* participation rate among class members, while "participation ratio" will refer to the statistic as reported on the CMS–416.

**30.** The Screening Ratio calculates the number of recommended screens administered as a percentage of the expected number of screens. D. Ex. 97 at 12.

**31.** As the Director of the Research and Public Health Assessment Office of the Department of State Health Services, Linda Bultman, Ph. D., is in charge of the statistical reporting group responsible for the calculations that appear on the CMS–416. Tr. Vol. III, pp. 156–57 (testimony of Dr. Bultman). Dr. Bultman is also in charge of research and surveillance (epidemiology) for the health service programs that deal with women, infants, and children; is responsible for the reporting for those same public health service programs;

and is chair of the department's institutional review board for the protection of human subjects research. Tr. Vol. III, pp. 156–57 (testimony of Dr. Bultman). She holds a doctorate in exercise science from the University of Massachusetts and has taught statistics at both the undergraduate and graduate level at Kent State University. *Id.* at 158–59. The Court qualified Dr. Bultman as an expert in applied statistical analysis in the field of health care. *Id.* at 161.

**32.** Defendants, through Dr. Lachman, assert: "Notwithstanding your encouragement, there will always be some patients who, for whatever reason, will not get immunizations." Tr. Vol. IV, p. 157 (testimony of Dr. Lachman). Indeed, the Fifth Circuit also commented that "some children are unable or, for whatever reason, fail to take full advantage of the services." *Frazar,* 300 F.3d at 533. What Plaintiffs argue, with which Defendants disagree, is the sheer magnitude of underutilization of the services provided through Texas's EPSDT program. Neither the plaintiffs nor the Court assert that Defendants are responsible for providing services to those who do not want them; however, the facts found herein reveal that Defendants are failing to provide services to a substantial portion of the plaintiff class-a portion that Defendants have failed to prove *choose* not to take advantage of the services.

that the number of class members receiving no preventive dental care is rapidly increasing, thus Defendants' dental program's performance has not significantly improved.

## 2. Medical Checkups

### a. How the CMS–416 Participation Ratio is Calculated

The CMS–416 participation ratio is the fraction resulting from the number of class members who receive at least one initial or periodic screening over the number of class members "who should receive at least one periodic screening." D. Ex. 141 at 2 (testimony of Cynthia Ruff[33]); D. Ex. 97 at 3. The number of class members who should have received a checkup during the year, the denominator in the equation, is not the total number of class members; instead, it is adjusted to account for both the average period of Medicaid eligibility during the year and the number of recommended screens per age group. D. Ex. 97 at 3. For example, the average period of eligibility in 2003 and 2004 was .74 years, or slightly less than nine months, so the

total number of class members is multiplied by .74 in the process of determining the denominator for the ratio. D. Ex. 94; D. Ex. 96 at 1. The exact formula that Defendants use in this calculation has recently changed twice—in 1999 and 2001—the implications of which are discussed in Part II(A)(2)(c)(ii), *infra*.

### b. The Participation Ratio, as Reported in the CMS–416, is Inflated

It is initially noted that the Court has already visited the merits of the participation ratio as reported in the HCFA/ CMS form 416. *See Frew*, 109 F.Supp.2d at 602–613. In 2000, the Court found that "the reported participation ratios are inflated indicators of the actual participation rates among the plaintiff class."[34] *Id.* at 602. The Court reasoned that, because the participation ratio is adjusted for the average length of time that class members receive Medicaid during the reporting period, the reported participation ratios did not accurately reflect actual participation rates.[35] *Id.* For the reasons discussed in

---

**33.** Cynthia Ruff, who testified by deposition, is an employee of the Centers for Medicare & Medicaid Services ("CMS"), U.S. Department of Health and Human Services. She is the federal official responsible for the review of the CMS–416. D. Ex. 141 at 1.

**34.** Plaintiffs' argument, and the Court's reasoning, now and in 2000, is based on simple division: keeping the numerator constant in a ratio, while reducing the denominator, increases the ratio. For example, a numerator of one over a denominator of two equals a ratio of one-half, or 50%; decreasing the denominator to one results in a fraction of one over one, resulting in a ratio of one, or 100%. Thus, Plaintiffs argue, accounting for average periods of eligibility by decreasing the denominator artificially inflates the reported participation ratio.

**35.** "For example, according to a hypothetical presented by plaintiffs, if ten four-year-olds receive Medicaid for only six months (half a year), the participation ratio method mandat-

ed by HCFA would reduce the number of ten class members by one-half, to five. Thus, if the ten class members received five medical checkups, the participation ratio would be 1.0, or 100%, despite the fact that only one-half of the ten children eligible for the checkup had received the service. Defendants base their methodology on the assumption that not all of the ten children would be 'due' for a checkup during their period of eligibility, as a four-year-old who had recently received a checkup just before being placed on the Medicaid program would not be 'due.' Plaintiffs acknowledge this possibility, but argue that the vast majority of newly-eligible class members have not recently seen a doctor; hence, they argue, a more acceptable empirical assumption would be that all ten, or at least some high fraction of the ten, are in fact 'due' upon enrollment. It is noted that only a well-supported estimate of the likelihood of a newly-enrolled participant's having recently received a checkup just prior to enrollment will enable the parties to resolve their current

the 2000 opinion, in addition to the reasons detailed below, the Court maintains that the CMS–416 participation ratio is an inflated indicator of actual participation rates among the plaintiff class and does not accurately reflect the Texas Health Steps program's overall performance. Because Defendants re-urge the argument that CMS–416 participation ratios accurately reflect actual participation rates among the class, which the Court rejected in 2000, the Court will again discuss the shortcomings of the participation ratio as reported on the CMS–416.

Defendants' argument in support of using the CMS–416 participation ratio as the primary evaluation metric for Texas Health Steps is three-fold: (1) Defendants should not be held accountable for class members with short periods of Medicaid enrollment;[36] (2) participation rate calculations beyond the requirements of the CMS–416, such as those required by Consent Decree ¶ 284, misrepresent the Texas Health Steps program's performance; and (3) even though CMS–416 participation ratios potentially understate Texas Health Steps' performance, because of its exclusion of class members with some form of medical insurance in addition to Medicaid, they still evidence significant improvement in the program. Defendants' Post–Hearing Brief at 18–20; Tr. Vol. VIII, pp. 79–82

(closing argument of Defendants' counsel); Tr. Vol. VI, p. 24 (testimony of Dr. Shenkman). Plaintiffs present two objections to evaluating the Texas Health Steps program based on the CMS–416 participation ratio: (1) the CMS–416 participation ratio is adjusted for the average length of time that class members receive Medicaid during the reporting period, thus inflating the reported statistic, and (2) the ratio includes data about children whose "checkups" are incomplete, further inflating the reported statistic. The Court addresses the parties' arguments in turn.

### The Effect of Considering The Average Period of Eligibility

In order to evaluate the parties' respective arguments relating to discounting the denominator in the CMS–416 participation ratio to account for average periods of eligibility, the Court must first determine why the federal formula prescribes such a methodology. *See* D. Ex. 97 at 3. According to Dr. Bultman, "[t]he federal calculations for the CMS–416 mandate the use of these formulas to assure states [sic] requirements are standardized, but also to assure meaningful and reasonable reporting requirements." D. Ex. 97 at 3. The Court accepts Dr. Bultman's opinion, to the extent that accounting for average periods of eligibility permits a general, stan-

---

disputes concerning the accuracy of the participation ratio as an indicator of actual receipt of services." *Frew*, 109 F.Supp.2d at 602, n. 34. The Court notes that Defendants presented no credible evidence at the June hearing regarding a well-supported estimate of the likelihood of a newly-enrolled participant's having recently received a checkup just prior to enrollment; the Court thus declines to find that Defendants' assumption is superior to Plaintiffs.

**36.** *See* Defendants' Post–Hearing Brief at 19 ("It is unfair to hold Defendants or a managed-care organization accountable for rendering services to a person if the person is not

a beneficiary, and turnover in Medicaid programs nationally tends to be very high. When people are not part of the Medicaid program, the State or the managed-care organization should not be accountable for providing services to them." Tr. Vol. VI, p. 24 (testimony of Dr. Shenkman).). The Court notes that by compiling statistics which include class members excluded by CMS–416 calculations, Defendants are not being held accountable for non-Medicaid recipients; instead, statistics required by Consent Decree ¶ 284 relate only to those *actually enrolled* in Texas Health Steps.

dardized State–to–State assessment.[37] As each State prescribes its own Medicaid eligibility requirements, the average period of eligibility may be drastically different from State to State. Disparate average periods of eligibility correspondingly affect the ability of various States to provide the services within their respective average periods of eligibility and, if not considered in the calculation of participation ratios, will skew State–to–State comparisons.[38] However, the Court finds that taking into account the average period of eligibility is unnecessary when assessing one State's participation ratio in isolation. Although removing this factor from the denominator will lower the calculated participation ratio, the entire Medicaid population is taken into account, rather than only a fraction, and the calculated participation ratio will provide additional information about the actual participation rate among the entire class. Neither method of participation ratio calculation, however, is an accurate reflection of the actual participation rate among the plaintiff class: the CMS–416 is under-inclusive and inflates the ratio, whereas inclusion of every Texas Health Steps member is over-inclusive, as the ratio would factor in class members who are either not due for a checkup or not enrolled in Texas Health Steps long enough to come due.[39]

### Defendants' 8.5% Estimate Overstates the Potential Effect of "Other" Insurance on CMS–416 Statistics

Defendants argue, finally, that CMS–416 statistics regarding medical checkups and dental service utilization potentially understate the actual figures by as much as 8.5%. According to Piper Purcell's [40] calcu-

---

**37.** The Court acknowledges that the precise formula for calculating CMS–416 participation ratios is federally mandated and serves as a useful indicator of relative performance of States' EPSDT programs. The Court's rejection of participation ratios as the sole indicator of the overall performance is thus not a criticism of the figure itself; however, the CMS–416 participation ratio is only one piece of information that may be used to evaluate the Texas Health Steps program's performance rather than the *sole* indicator.

**38.** *See, e.g.,* D. Ex. 97 at 5 ("Georgia reported only 2.64 months of eligibility in the year, and eligibles age 1–2 reported just over two weeks eligibility for the year (0.03)."); *cf.* D. Ex. 94 (describing Texas' average periods of eligibility). Stated simply, a State with a shorter average period of eligibility, to report the same participation ratio as a State with a longer average period of eligibility, would be required to provide EPSDT services to the same percentage of Medicaid recipients in a shorter amount of time; State–to–State comparisons will thus be skewed in favor of States with a longer average period of eligibility without the CMS–416's method of State–to–State standardization.

**39.** Accounting for average periods of eligibility "recognizes that some children may have had other screenings during the year that were provided when the child was not eligible for medical assistance or that may have been provided by a third-party payer. It also recognizes that some children may not have been eligible for medical assistance at the point in time during the year that they would have been scheduled to be screened ...." D. Ex. 141 at 3 (testimony of Cynthia Ruff). Plaintiffs again argue, however, that the most reasonable assumption is that "the vast majority of newly-eligible class members have not recently seen a doctor, hence ... a more acceptable empirical assumption would be that all ... or at least some high fraction ... are in fact 'due' [for a medical checkup] upon enrollment." *Frew*, 109 F.Supp.2d at 602, n. 34. Defendants, at the June Hearing, however, did not provide "a well-supported estimate of the likelihood of a newly-enrolled participant's having recently received a checkup just prior to enrollment." *Id.* The Court thus finds that Defendants have failed to meet their burden to prove that the CMS–416 is an accurate, reliable reflection of actual participation rates among class members.

**40.** Piper Purcell is an employee of the Texas Medicaid Health care Partnership, which is a contractor of the Texas Health and Human Services Commission and is responsible for

lations, in fiscal year 2004, 8.5% of all class members under the age of 21 reported having some other form of medical insurance in addition to Medicaid. Tr. Vol. II, p. 212 (testimony of Piper Purcell). Defendants argue that this 8.5% of class members cause Texas' CMS–416 participation ratios to understate the number of class members receiving medical and dental services, because Medicaid is, by law, the payer of last resort. Put more simply, if a child is enrolled in Medicaid, and also has private insurance, the private insurer is billed and no record of the checkup is recorded for Medicaid purposes. Thus, argue Defendants, such a child may be enrolled in Medicaid and get a checkup, yet the checkup will not be reflected in the CMS–416 calculations. The result, Defendants contend, is that the 8.5% of class members who allegedly have other forms of insurance are not included in the participation ratio reported on the CMS–416. However, this 8.5% figure overstates the effect of "other" insurance, for at least three reasons: (1) it does not discount the figure based on average period of eligibility,[41] (2) it assumes that *all* children with private insurance in addition to Medicaid received the required checkups;[42] and (3) it does not clarify which portion of the

8.5% have other dental insurance, as opposed to other medical insurance.[43]

Defendants' assertion, then, that "the [CMS–416] participation rate potentially understates the number of children receiving checkups in the Texas Medicaid program by almost nine percent," Defendants' Post–Hearing Brief at 22, is grossly inaccurate. Based on the evidence presented, it is impossible to know what portion of the 8.5% of children with private insurance in addition to Medicaid, if any, actually received a medical checkup or dental service which was paid by private insurance and thus not included in the State's CMS–416 calculations. Furthermore, the 8.5% estimate must be discounted by the average period of eligibility, just as the total number of class members who should have received a checkup during the year is discounted. *See* discussion *supra* Part II(A)(2)(a). In conclusion, the Court declines to accept Defendants' flawed estimate of the alleged CMS–416 understatement due to class members' having "other" insurance.

### CMS–416 Participation Ratios Include Incomplete Checkups

As a further criticism of using CMS–416 participation ratios as a measure of the

---

doing the billing and payment that is related to Medicaid. Tr. Vol. II, pp. 208–09 (testimony of Piper Purcell). Her calculations are reflected in D. Ex. 98.

41. As discussed, although the Court finds that discounting the denominator in the ratio based on average period of eligibility overstates the actual participation rate, the Court is simply pointing out the inconsistency in Defendants' calculations: if they rely on the reported participation ratio, which accounts for average period of eligibility in support of the Texas Health Steps program's performance, they must also discount the 8.5% figure to account for the same.

42. Defendants presented no evidence related to this assumption; similar to Defendants'

argument with respect to accounting for average periods of eligibility, assuming that all children with "other" insurance receive their required checkups does not appear to be an acceptable empirical assumption. *Cf. infra* n. 39.

43. This distinction is crucial because the participation ratio reflects medical checkup utilization, whereas the utilization of dental services is reflected in a separate statistic on the CMS–416. As Defendants urge this 8.5% "other" insurance argument with respect to both medical and dental statistics, it is necessary to determine the breakdown between the types of "other" insurance class members allegedly have in order to determine the effect on the discrete statistics.

Texas Health Steps program's overall performance, Plaintiffs clarify that a "check-up" for CMS–416 purposes is not necessarily a complete Texas Health Steps checkup. *See* Plaintiffs' Post–Hearing Brief at 44; *cf.* discussion *infra* Part III(C)(1).

Class members receive checkups that are counted as checkups for CMS–416 purposes, and are thus factored into the CMS–416 participation ratio, although they may lack one or more requirements of a Texas Health Steps checkup, such as blood tests for lead poisoning or immunizations. *See* D. Ex. 141, Cross Question 3 (Deposition on written questions of Cynthia Ruff). Plaintiffs thus argue that CMS–416 participation ratios erroneously include checkups that should not be considered in an evaluation of the performance of Texas Health Steps. Defendants do not refute Plaintiffs' allegation that CMS–416 participation ratios include incomplete Texas Health Steps checkups. The Court thus finds that inclusion of incomplete Texas Health Steps checkups further inflates CMS–416 participation ratios; however, neither party presented evidence relating to the magnitude of the inclusions' effect. Because the burden of proof is on Defendants for purposes of their Rule 60(b) Motion, the Court considers the CMS–416 participation ratio's erroneous inclusion of incomplete checkups in its conclusions of law.

### c. Conclusions of Law: Medical Checkups

Based on the findings of fact relating to the CMS–416, the Court arrives at the following conclusions of law with respect to medical checkups: (1) HCFA/CMS–416 participation ratios are not a reliable indicator of Texas Health Steps' overall performance, and (2) neither the increased participation ratios nor increased screening ratios, as reported on Texas' CMS–416s, constitute changed factual circumstances warranting dissolution of the Consent Decree, as demanded by Defendants. The Court's reasoning is detailed below.

**(i) CMS–416 Participation Ratios Are Not a Reliable Indicator of Texas Health Steps' Overall Performance**

First, as discussed at length in Part II(A)(2)(a) and (b), the CMS–416 participation ratio is not a reliable indicator of the Texas Health Steps program's overall success. It is unreliable as a sole indicator of Texas Health Steps' overall performance, since it inflates actual participation rates among the plaintiff class by considering average periods of eligibility and including incomplete checkups. *See* discussion *supra* Part II(A)(2)(b). Furthermore, though actual participation rates are among the most reliable indicators of the overall performance of Texas Health Steps, CMS–416 participation ratios are but one small indicator of the health of the program. Because the CMS–416 participation ratio formula excludes many class members who are due for a checkup, yet do not receive one, it does not paint a complete picture of Texas Health Steps' overall performance. These findings of fact, alone, substantiate the Court's conclusion that any increase in CMS–416 participation ratios, by itself, does not constitute significant changed circumstances warranting dissolution of the Consent Decree; however, to bolster this finding, the Court considers the statistics, as reported on the CMS–416, since entry of the Consent Decree.

**(ii) The Increase in CMS–416 Participation Ratios Does Not Constitute a Significant Changed Factual Circumstance**

Even assuming, *arguendo*, that CMS–416 participation ratios are a reliable indicator of the overall success of the Texas Health Steps program, the increase in

participation ratios since the entry of the Consent Decree does not constitute a significant changed factual circumstance warranting revision of the Consent Decree. *See Rufo*, 502 U.S. at 392, 112 S.Ct. 748. Defendants argue that Texas' CMS–416 participation rates have substantially increased since 1993, thus constituting significant changed circumstances warranting revision of the Consent Decree. Furthermore, argue Defendants, Texas' current CMS–416 participation rates rank in the top one-third of all reporting jurisdictions. D. Ex. 97 at 9. Plaintiffs, however, argue that the number of class members failing to receive medical checkups to which they are entitled has increased since entry of the Consent Decree; that Texas' participation rates, as reported on the CMS–416, have declined since 1998; and that Texas' CMS–416 participation ratio relative to other States' is an unreliable indicator of the Texas Health Steps program's performance. Chart A contains Texas' participation ratios, as reported on the CMS–416, from 1994 through 2004: [44]

| Chart A: CMS–416 Participation Ratios (1994–2004) | |
|---|---|
| Year | Participation Ratio |
| 1994 | .42 |
| 1995 | .43 |
| 1996 | .51 |
| 1997 | .55 |
| 1998 | .66 |
| 1999 | .62 |
| 2000 | .63 |
| 2001 | .52 |
| 2002 | .55 |
| 2003 | .60 |
| 2004 | .62 |

### The Number of Class Members Receiving No Medical Checkups Has Consistently Increased Since Entry of the Consent Decree

First, the Court declines to look at CMS–416 participation ratios in isolation. To evaluate the current state of Texas Health Steps and class members' utilization of EPSDT services, the Court must additionally consider actual numbers of class members receiving Texas Health Steps services. Percentages, alone, are only a small quadrant of the complete picture; the size of the plaintiff class has grown substantially and, regretfully, the number of class members receiving no checkups has correspondingly increased. While a comparison of Texas' CMS–416 for 1994 and that for 2004 [45] reveals an increase in participation ratios from 42% to 62%, respectively, the number of class members who received no medical checkups also increased from 1994 to 2004– from at least 623,650 in 1994 to at least 764,233 in 2004. [46] D. Ex. 94; D Ex. 96.

---

**44.** D. Ex. 94; D. Ex. 96.

**45.** As the Consent Decree was submitted to the Court for approval in 1995, the Court compares, to the extent possible, statistics for 1994 to those for 2004. Statistics for 2005 are not yet available, and statistics for 1994 best describe the state of Texas Health Steps at the time the parties submitted the Consent Decree to the Court in 1995.

**46.** Defendants object to Plaintiffs' initial calculation, which did not consider average period of eligibility. Plaintiffs argue that, to determine how many class members have not received medical checkups, the Court should subtract the total number of eligibles receiving at least one initial or periodic screen from the total number of individuals eligible for EPSDT. Defendants, however, argue that the Court should subtract the total number of eligibles receiving at least one initial or periodic screen from the total number of eligibles who "should" receive at least one initial or periodic screen, similar to the method prescribed by the CMS–416 formula. While the Court finds that the total number of class members not receiving at least one initial or periodic screen has increased from 631,451 in

Despite the increase in reported participation ratios since entry of the Consent Decree, on which Defendants rely to prove significant changed factual circumstances for the better, the number of class members who should have received services, but received none, has actually *increased* since entry of the Consent Decree.[47] The Court finds that Defendants' reliance on increased participation ratios to prove significant changed factual circumstances warranting dissolution of the Consent Decree is, therefore, misplaced.

### Participation Ratios Do Not Evidence Significant Improvement in the Overall Performance of Texas Health Steps

The State's CMS–416 reported participation ratio increased from .42 in 1994 to .62 in 2004. D. Ex. 94; D. Ex. 96. In isolation, these snapshots appear to evidence significant changed factual circumstances; however, these two figures are only the first step in an analysis of significant changed circumstances based on CMS–416 participation ratios. Looking solely at the CMS–416, Defendants' participation rate has *declined* from .66 in 1998 to .62 in 2004. *Id.* The decline from 66% to 62% between 1998 and 2004 is particu-

larly disturbing, since Defendants, through their Rule 60(b) Motion, are asserting that Texas Health Steps has taken giant strides forward in the years since the Consent Decree's entry, thus rendering the Consent Decree unnecessary in light of the program's success.[48] Any recent decline in CMS–416 participation ratio thus contradicts Defendants' perception of Texas Health Steps' overall performance and does not support a finding of significant changed factual circumstances. To determine what conclusions, if any, may be drawn from these data, including both the overall increase in Defendants' CMS–416 participation ratio since 1994 and the decrease in CMS–416 participation ratio since 1998, the Court must closely scrutinize the parties' arguments relating to the comparability of the HCFA/CMS–416 participation ratios for the years under examination.

Paradoxically, Defendants assert that the formula underlying the calculation of participation rates for purposes of the CMS–416 has changed twice–in 1999 and 2001–thus rendering pre— and post-formula change calculations "apples and oranges," respectively. *See* Defendants' Post–Hearing Brief at 23–24;[49] D. Ex. 97

1994 to 1,453,277 in 2004, it acknowledges that this number is an inflated estimate of the number of class members not receiving screening services to which they are entitled and due, because it does not exclude those either not due or who have received services from a source other than Texas Health Steps. D. Ex. 94; D. Ex. 96. By either calculation, the number of class members receiving no medical checkups is increasing at an alarming rate, despite the increase in reported participation ratio.

47. It should be noted that the parties have always anticipated a continued increase in the number of recipients of EPSDT benefits. *See* Consent Decree ¶¶ 1,4. Thus, the nearly 100% increase in class size since the instant lawsuit was filed does not constitute a signifi-

cant changed circumstance warranting modification of the Consent Decree. Furthermore, *each* child is entitled to medical checkups according to a regular schedule; neither federal law nor the Consent Decree ties Defendants' obligations to a percentage of those eligible for EPSDT services.

48. Though this is essentially Defendants' argument, the Court notes that program success, alone, does not necessarily warrant relief under Rule 60(b). *See Rufo,* 502 U.S. at 392, 112 S.Ct. 748; *Shapp,* 602 F.2d at 1120; *Cooper,* 33 F.3d. at 544.

49. "Plaintiffs' simplistic approach, however, compares apples to oranges, in that it ignores changes in the formula for calculating the participation ratio that occurred in 1999 and

at 12–13. Defendants argue that, as a result, the only meaningful comparisons of CMS–416 participation ratios are from 2001 forward, taking into account the fact that the formula has remained constant since that time. *See* Defendants' Post–Hearing Brief at 24; D. Ex. 97. The Court is astonished by Defendants' audacious argument in this respect, because they are urging the Court to compare 1993 CMS–416 participation ratios to 2004 CMS–416 participation ratios as proof of the program's success, while simultaneously arguing that pre–2001 CMS–416 participation ratios cannot be meaningfully compared to post–2001 CMS–416 participation ratios.

Taking Defendants' first argument, that the Court should look only to post–2001 CMS–416 participation ratios, the Court notes that Texas' reported participation rate increased from .52 in 2001 to .62 in 2004. D. Ex. 94; D. Ex. 96. The Court finds that a 10% increase in inflated participation rates between 2001 and 2004 is insufficient to prove significant changed circumstances warranting dissolution of the Consent Decree in its entirety. Furthermore, the number of class members failing to receive a checkup, using Defendants' preferred calculation, increased from 633,130 in 2001 to 764,233 in 2004. D. Ex. 94; D. Ex. 96. While the increase in CMS–416 participation ratio evidences increased Texas Health Steps success over the past four years, the Court finds that it does not constitute a significant changed factual circumstance.

Next, Defendants, through Dr. Bultman, seemingly assert that the increase in participation ratios from .42 in 1994 to .62 in 2004 understates the actual increase in CMS–416 participation ratios, by reason of formula changes in 1999 and 2001. Defendants' argument thus implies that the in-

crease in CMS–416 participation ratios since the entry of the Consent Decree is actually in excess of 20%. As Dr. Bultman explained: "Both changes influenced the CMS Annualized State Periodicity Schedule (average number of screens that should be received each year for a specific age group) calculation . . . and, therefore, influenced the expected number of screenings and participants." D. Ex. 97 at 12. In further explication, Dr. Bultman testified that the 1999 and 2001 changes "cause[d] both the Screening Ratio and Participation Ratio to decrease because the denominator used in the calculation increase[d]." *Id.* at 14. Although Dr. Bultman's analysis implies that Texas' reported post–2001 participation ratios would have been higher without the formula changes, since the denominator in the equation would be lower absent the formula changes, neither she nor Defendants provided an estimate of the magnitude of the changes' impact on reported participation rates. While the Court finds Dr. Bultman's assessment of the changes' impact on participation rates credible and accurate, the magnitude of the effect remains unaddressed. As Defendants have failed to offer definitive proof in this respect, the Court finds that CMS–416 participation ratios from 1994 through 2004 are roughly comparable. As already discussed, though a 20% increase in CMS–416 participation ratio evidences a substantial increase in Texas Health Steps' performance, the number of class members failing to receive checkups for which they were due has increased over the same period of time. Thus, the Court finds that the increase in CMS–416 participation ratio does not constitute a significant changed factual circumstance warranting modification of the Consent Decree. *See Rufo*, 502 U.S. at 392, 112 S.Ct. 748.

again in 2001." Defendants' Post–Hearing Brief at 23.

Finally, Defendants argue that Texas' reported medical screening participation ratio for 2004 placed the State in the top one-third of all reporting jurisdictions, thus evidencing the success of the Texas Health Steps program. D. Ex. 97. Furthermore, argue Defendants, the State's rigid adherence to the CMS–416 reporting rules and the higher standards that Texas has set for itself (*e.g.*, the periodicity schedule requiring 26 screens for children aged 0–21 years) render Texas' ranking even more impressive. The Court declines to accept Texas' CMS–416 performance relative to other States' as proof of the success of the program. First, as previously discussed, CMS–416 participation ratios are not a reliable indicator of the success of the Texas Health Steps program. Second, as Dr. Bültman explained in her expert report, there are numerous ways a State can manipulate the ratios required by the CMS–416.[50] As the Court finds that Texas' CMS–416 ratios, alone, are not reliable indicia of the success of the Texas Health Steps program, it similarly finds that comparing this unreliable ratio to ratios of other States, which may easily manipulate their ratios, is similarly inappropriate.

Furthermore, the Court finds that the increase in inflated, manipulable reported screening ratios from 48% in 1994 to 75% in 2004 does not constitute significant changed factual circumstances warranting dissolution of the Consent Decree. *See* D. Ex. 94, 96, 97. While the increased screening ratio evidences improvement in utilization of medical screening services, it

is insufficient to satisfy *Rufo*'s requirement for modification of a consent decree.

After careful consideration of the parties' arguments in this regard, the Court finds that the CMS–416 participation and screening ratios have improved substantially since, and perhaps *because of,* the entry of the Consent Decree. *See Shapp,* 602 F.2d at 1120 ("[T]he decree continues in force most of the provisions … which have produced one of the most successful EPSDT programs in the country."). While Defendants' CMS–416 participation ratio has increased by approximately 20% since entry of the Consent Decree, it has declined since 1998 (from .66 to .62). D. Ex. 94; D. Ex. 96. Defendants' reliance on these statistics to prove significant changed factual circumstances warranting revision of the Consent Decree, is misplaced and is, accordingly, rejected. Defendants have also failed to present evidence that these alleged changes in factual circumstances "affect[s] compliance with, or the workability or enforcement of, the final judgment [or] show that those changes occurred despite [Defendants'] reasonable efforts to comply with the [Consent Decree]," thus further failing to satisfy the *Rufo/Cooper* Rule 60(b) standard for consent decree modification. 502 U.S. at 384, 112 S.Ct. 748, 33 F.3d at 544.

**3. Defendants Have Failed to Meet Their Burden With Respect to Consent Decree ¶¶ 171 and 284**

Dr. Bultman, Defendants' expert witness, testified that it is not possible to provide the information required by Consent Decree ¶¶ 171[51] and 284[52] in any

---

50. *See* D. Ex. 97 at 8–9 (describing the ways a state may manipulate the CMS–416 ratios, including a State's policy regarding the number of recommending medical screens and whether a State's data policy permits reporting in such a way as to exceed 100% participation).

51. Paragraph 171 provides: "Defendants do not maintain records of the number of recipients who receive 1 or 2 dental check ups each year. The parties agree that by September 30, 1996, Defendants will prepare a report of the number and percent of recipients who receive 1 dental check up/year and 2 dental

meaningful fashion other than what presently appears on the State's annual CMS–416.[53] Tr. Vol. III, pp. 203–06 (testimony of Dr. Bultman). As she explained, if Defendants count all of the medical and dental checkups but are not permitted to use the calculations mandated by the CMS–416–which take into account the average period of eligibility for each age group-any resulting numbers will "grossly misrepresent" Defendants' efforts in providing Plaintiffs access to services. *Id.*; Tr. Vol. IV, pp. 20–22 (testimony of Dr. Bultman). As briefly discussed in Part II(A)(2)(b), the Court rejects this argument, as non–CMS–416 statistics do not misrepresent participation ratios any more so than CMS–416 participation ratios. Additionally, Dr. Bultman asserts that, because children are not uniformly Medicaid eligible for the entire year, each individual child will likely have a unique schedule of EPSDT examinations, and compilation of the data would be time consuming and costly. D. Ex. 99.

█ The Court next addresses the merits of Defendants' arguments, in order to determine whether Defendants have satisfied *Rufo*'s and *Cooper*'s requirements for modification of consent decree provisions. First, Defendants' arguments fail to recognize the purpose of the statistics required by Consent Decree ¶¶ 171 and 284. Plaintiffs do not contend, and the Court is not under the impression, that the statistics required by paragraphs 171 and 284 would serve to replace those reflected in the CMS–416 or serve as an indicator of the overall success of the State's program. Instead, they would merely supplement the CMS–416 participation ratio and provide additional, different information about the program's efficacy and provide Plaintiffs with some idea of the utilization level of *all* of those enrolled in Medicaid.[54] Instead of providing mis-

---

check ups/year. They will prepare similar reports every year."

**52.** Paragraph 284 provides: "Every year from 1996 through 1999, Defendants will also report to Plaintiffs the number and percent of recipients who receive all of their scheduled medical check ups. They will further report the number and percent of recipients who receive all of their scheduled dental check ups. Defendants will provide these reports to Plaintiffs no later than December 31 of each year."

**53.** Indeed, Dr. Bultman, Cynthia Ruff, and Dr. Shenkman all testified that it is not appropriate to evaluate the provision of services to the Medicaid population, as required by Consent Decree ¶¶ 171 and 284 without determining what portion of a year the individuals are actually eligible for Medicaid. Tr. Vol. III, pp. 203–05 (testimony of Dr. Bultman); D. Ex. 141 at 1–2 (testimony of Cynthia Ruff); Tr. Vol. VI, pp. 24–25 (testimony of Dr. Shenkman). Though each of these defense witnesses deems the calculations "inappropriate," none testified that they would be impossible to compile, nor do they testify that the degree of difficulty in their calculation has increased since the entry of the Consent Decree. *See Rufo*, 502 U.S. at 392, 112 S.Ct. 748. Defendants also note that "Plaintiffs introduced no testimony by anyone . . . supporting the continued enforcement of Consent Decree paragraphs 171 and 284 . . . ." Defendants' Post–Hearing Brief at 32. However, the Court notes that Defendants have the burden of proof under Rule 60(b), *Rufo*, 502 U.S. at 383, 112 S.Ct. 748, which they have not met with respect to the requirements of Consent Decree ¶¶ 171 and 284.

**54.** *See Frew*, 109 F.Supp.2d at 612 (finding that "[w]hen read in conjunction with paragraph 283, which mentions defendants' pre-existing duty to report participation ratios to HCFA, paragraph 284 requires defendants to provide plaintiffs with more information; namely, 'the number and percent of recipients who receive all of their scheduled dental checkups.' Defendants' argument that HCFA Form 416 data fulfills their obligations under paragraph 284 is therefore rejected. Paragraph 284 makes clear that plaintiffs bargained for a very specific type of data in addition to the 'calculations' or 'approximations' already required by the HCFA." (quoting Consent Decree ¶ 284).).

leading data, it would provide the *only* data with respect to the class members excluded by the CMS–416 calculations. The additional statistics would thus be "meaningful" indicators of Texas Health Steps' performance and would not "grossly misrepresent" participation rates.[55] The lens through which such statistics should be viewed will take any shortcomings into account in their interpretation.

Consent Decree ¶¶ 171 and 284 were drafted with the federal CMS–416 requirements in mind. *See* 42 U.S.C. § 1396a(a)(43)(D). As a result, all parties knew that the mandatory, enforceable obligations enumerated in Paragraphs 171 and 284 go beyond the minimum requirements of federal law. Defendants' argument with respect to the statistics required by paragraphs 171 and 284 of the Consent Decree is thus not related to any changed circumstances, as required by Rule 60(b)(5); rather, it relates to whether Defendants, unilaterally, find their requirements useful or cost effective. However, Defendants cannot simply choose which Consent Decree provisions they deem cost effective and useful nearly ten years after the Consent Decree was entered.

Dr. Bultman also opined that providing the information in the form described in Consent Decree ¶¶ 171 and 284 would not be fiscally responsible, nor would it be a good expenditure of public funds, to spend the time required to generate the reports for these two Consent Decree paragraphs.[56] Tr. Vol. III, pp. 204, 206 (testimony of Dr. Bultman). However, Defendants provided no cost estimates on which the Court could base a determination that such provisions are fiscally irresponsible or that the provisions would require Defendants to divert a substantial amount of resources from other parts of the Texas Health Steps program. Defendants presented no evidence regarding *changed circumstances* with respect to compiling the data required by Consent Decree ¶¶ 171 and 284; the Court finds that Defendants have proved neither significant changed circumstances, nor that the alleged difficulties of compiling this data, and Defendants' sentiments regarding its necessity, did not exist when the Consent Decree was entered. The Court thus finds that Defendants' current views with respect to these Consent Decree provisions do not make compliance with the Consent Decree substantially more onerous than when it was entered, make the provisions unworkable because of unforeseen obstacles, or cause enforcement of the Consent Decree to be detrimental to the public interest. *See Rufo*, 502 U.S. at 384, 112 S.Ct. 748.

Furthermore, Defendants show their unilateral disregard for Consent Decree

---

**55.** The Court reiterates that "the complexities associated with collecting utilization data require the parties' continued collaboration in the design and implementation of this system. Plaintiffs must therefore collaborate with defendants in their pursuit of the required number and percent." *Frew*, 109 F.Supp.2d at 612 (quotations omitted).

**56.** Dr. Bultman also testified that CMS–416 statistics are the "best measures" of the program's performance, Tr. Vol. IV, p. 20–22 (testimony of Dr. Bultman); however, this does not help prove that non–CMS–416 statistics either misrepresent actual participation rates or are more difficult to compile than

when the Consent Decree was entered. Given that Defendants have failed to compile statistics relating to the class members excluded from the CMS–416 calculations, it is not difficult to believe that CMS–416 statistics are currently the "best measures." Additionally, questions regarding the utility of various statistics need not be phrased in an "either-or" manner; even if the CMS–416 ratios are the "best measures" of the program's overall performance, Plaintiffs' assertion that *additional* statistics would be informative and paint a more accurate picture of the program's overall performance is not foreclosed.

provisions by asserting that gathering and collecting data other than that which is federally required is a "needless expense." *See* Defendants' Post–Hearing Brief at 22; *see also* Tr. Vol. VIII, p. 87 (closing argument of Defendants' counsel) ("[T]hey will be meaningless numbers."). Defendants, however, fail to recognize that *not gathering and reporting* the data required by the Consent Decree is potentially an even greater expense, as it exposes the State to equitable sanctions for willful violation of Consent Decree provisions.[57] Unless and until the Court grants a Rule 60(b) motion to modify or dissolve the decree, the obligations contained in the Consent Decree are binding and enforceable, and Defendants may not choose to disregard them after unilaterally determining that a provision is unnecessary or undesirable. Furthermore, Defendants' desire, or lack thereof, to compile the data is not relevant in the Court's *Rufo* analysis; instead, Defendants must prove that *changed* factual circumstances-since they voluntarily agreed to compile the data-make compliance with the Consent Decree substantially more onerous, render certain provisions unworkable or cause enforcement to be detrimental to the public interest. *See Rufo*, 502 U.S. at 384, 112 S.Ct. 748; *Cooper*, 33 F.3d at 544. Defendants have not satisfied this burden.

### 4. Dental Services

Defendants argue that a significant increase in dental participation ratios, in addition to Texas' exemplary provision of dental services relative to other States', proves significant changed factual circumstances warranting modification of the Consent Decree. As in 2000, and similar to their CMS–416 participation ratio argument, Plaintiffs argue that relative comparisons to other States are irrelevant in determining whether Defendants are in compliance with the Consent Decree. *See Frew*, 109 F.Supp.2d at 603. Furthermore, Plaintiffs' argument is misplaced with respect to Defendants' Rule 60(b) motion. Because Defendants are not arguing that they are in compliance with the Consent Decree, but rather that the program is so successful as to render the Consent Decree unnecessary, compliance with the Consent Decree is not in issue with respect to changed factual circumstances.[58] Plaintiffs further argue that class members' access to dentists is hampered by Defendants' failure to enroll sufficient numbers of dentists in Texas Health Steps.

### a. Defendants Manipulate Texas' Relative Ranking

■ Defendants' primary argument with respect to provision of dental services is that Texas' dental participation rate, which in 1993 was as low as 14%, improved to 45% for 2004, making Texas' dental participation rate the second best in the nation. D. Ex. 97 at 10. However, both Defendants' temporal comparison and relative rankings are fatally flawed and lack merit; therefore, they are rejected.[59]

---

57. *See Hutto v. Finney*, 437 U.S. 678, 685, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (cited in *Frew*, 540 U.S. at 439–40, 124 S.Ct. 899) ("When the officials [in *Hutto*] refused to comply in good faith with the order, the District Court awarded attorney's fees to the prisoners' lawyers to be paid from the state treasury."); *see also Alberti v. Klevenhagen*, 46 F.3d 1347, 1357–58 (5th Cir.1995).

58. Compliance with the Consent Decree is relevant, however, when determining whether Defendants have made "reasonable efforts to comply with the judgment." *See Cooper*, 33 F.3d at 544. *See also* discussion *infra* Part V (discussing Defendants' reasonable efforts to comply with the Consent Decree).

59. Relative comparisons to other States are not necessarily unreliable for provision of dental services, in contrast to CMS–416 participation ratios. As discussed in Part II(A)(2)(c)(ii), CMS–416 participation ratios are unreliable because the calculation itself is

First, Table 3, contained in D. Ex. 97, prepared by Dr. Shenkman, calculates dental participation ratios "for all states as if they followed the Texas eligibility, in which children become eligible for checkup services at age one." D. Ex. 97 at 7. "It should be noted that state Medicaid policy sets the age at which dental services begin, and some states begin dental eligibility at age three (3). Actual dental Participation Ratios for those states would be understated in Table 3, which uses age 1(one)." *Id.* Table 3 thus ranks all States based on Texas' Medicaid policy and provides no meaningful comparison among States.[60] In other words, instead of determining Texas' relative rank with respect to provision of dental services based on each State's dental eligibility requirements, Defendants calculate dental participation ratios based on Texas' eligibility requirements. As a result, other States' dental participation ratios, in the chart prepared by Dr. Bultman, are understated if eligibility for dental services begins after age one. D. Ex. 97 at 7. Defendants do not explain which States begin eligibility at

age three or by how much those States' participation ratios are understated as a result of Dr. Shenkman's manipulations. The Court declines to find that Texas ranks in the top two States with respect to provision of dental services and finds that Dr. Shenkman's Table 3 is misleading and inaccurate. Defendants offered no other meaningful relative comparisons; thus, Defendants' argument that Texas' provision of dental services is exemplary compared to other States' is without support and, accordingly, is rejected.

**b. Dental Participation Ratio**

The Court now turns to Defendants' argument that the dental participation ratio, which in 1993 was as low as 14%, improved to 45% for 2004.[61] First, as the parties proposed the Consent Decree to the Court in 1995, data from 1994 most accurately reflects the state of Texas Health Steps at the time of the Consent Decree's entry.[62] *See supra* n. 45. In 1994, the class size was 1,390,857, and 344,535 class members received dental assessments; thus, roughly

---

unreliable with respect to Texas Health Steps, and a relative comparison to other States is unreliable because States may manipulate their participation ratios. However, provision of dental services is submitted as a raw number on the CMS–416, as opposed to a ratio, and the average period of eligibility is thus not considered in the statistics reported. Furthermore, States' ability to manipulate the statistic, as explained by Dr. Bultman, does not apply to dental services statistics because they are reported in raw number format. D. Ex. 97. States must provide the total number of eligibles receiving various types of dental services, a figure unaffected by individual States' periodicity schedules or average periods of eligibility. But, because the Court finds that Defendants' only relative comparison is substantially manipulated, and thus unreliable, it declines to determine whether accurate State–to–State comparisons of CMS–416 dental statistics evidence Texas Health Steps' dental program's superior relative performance.

60. The Court emphasizes that Table 3 is not prepared directly from States' CMS–416s; the CMS–416 requires only the following dental statistics: "Total Eligibles Receiving Any Dental Services," "Total Eligibles Receiving Preventive Dental Treatment Services," and "Total Eligibles Receiving Dental Treatment Services." D. Ex. 96. Dr. Shenkman, Defendants' expert witness, manipulated the data and calculated a "dental participation ratio" modeled on the CMS–416 medical participation ratio formula, based on Texas' EPSDT eligibility requirements. D. Ex. 97; D. Ex. 99.

61. Defendants' Post–Hearing Brief at 30; *see* D. Ex. 94; D. Ex. 96; D. Ex. 97 at 10.

62. The Court again notes that "dental participation ratio" is not submitted on the CMS–416; instead, it is calculated by dividing "total individuals eligible for EPSDT" by one of the dental service statistics. *See* D. Ex. 94; D. Ex. 96.

25% of class members received dental assessments.[63] D. Ex. 94. In 2004, the class size had increased to 2,706,903, and "total eligibles receiving preventive dental treatment services" was 999,387; thus, roughly 37% of class members received preventive dental care. D. Ex. 96. Also in 2004, however, 1,142,966 class members received "any dental services." D. Ex. 96. While the number of class members receiving "any dental services" in 2004 constitutes 42.2% of the number of class members eligible for EPSDT services (presumably the statistic Defendants used in their calculation resulting in a professed 45% dental participation rate), it is misleading to compare this number to the exclusively preventive dental statistic reported in 1994. In other words, the most accurate comparison between1994 and 2004 shows that provision of preventive dental services increased from 25% to 37%. Defendants' argument, then, that dental participation rate increased from 14% to 45%, is flawed in two respects: (1) it compares 1993 [64] to 2004, rather than 1994 to 2004, and (2) it compares statistics measuring different types of dental services, thus comparing "apples to oranges." The Court finds the increase in CMS–416 dental figures from 25% to 37% (comparing relevant years and statistics measuring provision of similar services) insufficient to prove significant changed factual circumstances with re-spect to provision of dental services warranting dissolution of the Consent Decree. *See Rufo,* 502 U.S. at 392, 112 S.Ct. 748.

**c. Defendants' Provision of Dental Services Has Not Otherwise Significantly Improved**

In addition to failing to prove significant changed circumstances warranting revision of the Consent Decree via dental participation ratios or Texas' dental program performance relative to other States', Defendants have failed to prove any other significant factual changes warranting revision of the Consent Decree with respect to Texas Health Steps' dental program. Plaintiffs presented substantial reliable evidence of other shortcomings in Defendants' dental program, the most significant of which is detailed below.

In 2000, the Court expressed concern about the severe, statewide shortage of dentists available to see class members; the number of active dentists who saw at least one class member was less than 1,600. *See Frew,* 109 F.Supp.2d at 604. As of the first quarter of 2005, only 1,539 active dentists were enrolled with Texas Health Steps. P.Ex. DEN–11. According to Dr. Seale, "we're going backwards; we're losing providers and increasing numbers of patients." Tr. Vol. VI, p. 92 (testimony of Dr. Seale). This stagnation in numbers of active dentists is exacerbated when viewed in conjunction with the in-

---

**63.** In 1993, the only line on the HCFA–416 relating to dental services was labeled "Number of eligibles receiving preventive dental services." D. Ex. 94. In 1994 and 1995, the dental line was labeled "Number Receiving Dental Assessments." *Id.* However, in 1996 it was again labeled "Preventive Dental Services," before returning to "Dental Assessments" in 1997 and 1998. *Id.* Beginning 1999, and continuing through 2004, the HCFA/CMS–416 included three dental service lines: "Total Eligibles Receiving Any Dental Services," "Total Eligibles Receiving Preventive Dental Treatment Services," and "Total Eligibles Receiving Dental Treatment Ser-vices." *Id.* The Court will thus interpret the 1994 figure entitled "Number Receiving Dental Assessments" as the equivalent of "Number of eligibles receiving preventive dental services," a category also included in the 2004 CMS–416. D. Ex. 96.

**64.** The number of eligibles receiving preventive dental services in 1993 was 160,284; the number of individuals eligible for EPSDT in 1993 was 1,330,465. D. Ex. 94. The "dental participation ratio" for 1993 was thus approximately 12%.

creasing number of class members. In the last quarter of 2004, 1,517 active dentists were enrolled in Texas Health Steps. P.Ex. DEN–11. During that time, there were also 2,458,671 class members over the age of 12 months. D. Ex. 96. For each class member to receive dental care, then, *every* active dentists would have had to take care of 1,621 children with Medicaid. However, in 2004, only 223 of the 1,517 active dentists took care of more than 1,500 class members. P.Ex. I–1; Tr. Vol. VII, p. 154 (testimony of Dietmar Kennel).

Defendants have enrolled less than 20% of Texas' roughly 8,000 dentists to care for class members. Tr. Vol. VII, p. 154 (testimony of Dietmar Kennel). Dr. Seale testified that the most important change needed to increase class members' utilization of dental care is "more providers, because I don't care how much we teach [families] about what they need to have done, if there's no one who will see them ... [children are] ... not going to get the care." Tr. Vol. VI, pp. 90–91 (testimony of Dr. Seale). Plaintiffs offer several explanations for low provider participation in Defendants' dental program, including low payment rates and the administrative burdens of being reimbursed by Texas Health Steps. *See* Kennedy Deposition at ¶ 32. Defendants respond that there is an insufficient number of pediatric dentists in Texas to provide the majority of dental care to children, regardless of what kind of insurance the children have. Tr. Vol. VI, p. 79 (testimony of Dr. Seale).

Defendants also respond that, despite the increase in the number of active dentists, the active dentists' capacity to care for class members has increased. If this argument is meritorious, the relatively constant total number of dentists enrolled in the program is seemingly irrelevant; so long as capacity has increased, the number

of children able to be served by Texas Health Steps dentists has increased. Plaintiffs argue that the actual increase in the number of "high volume dentists" is only 69, from 1,105 in 2000 to 1,174 in 2004. P.Ex. DEN–11. Defendants argue that, from 2000 to 2004, Defendants "gained a capacity to serve about 240,000 patients because of the increase in high volume providers." Tr. Vol. VI, p. 115 (testimony of Nancy Seale). However, the size of the class eligible for dental services increased by roughly 810,000 during the same time period, so even assuming, *arguendo*, that Defendants' calculations are correct, the state of Texas Health Steps dental services is more dismal than the Court found in 2000, as class growth has exceeded the growth of Defendants' capacity to serve class members. *Id.; see* D. Ex. 94; D. Ex. 96; *Frew,* 109 F.Supp.2d at 603–04.

Based on an insignificant increase in dental participation ratios, the Court's rejection of Defendants' manipulated relative State-to-State dental participation ratios and a lack of convincing evidence that Defendants have cured the shortage of dentists found in 2000, the Court finds that no significant changed factual circumstances warranting dissolution of the Consent Decree exist with respect to Defendants' dental program. *See Rufo,* 502 U.S. at 392, 112 S.Ct. 748.

## B. OUTREACH

As additional proof of the Texas Health Steps program's overall success, Defendants presented substantial evidence regarding Maximus, the company with which Defendants contracts to provide outreach and informing services. While Defendants do not purport to argue that Maximus' outreach and informing efforts, alone, justify dissolution of the Consent

Decree in its entirety,[65] they proffer evidence of Maximus' efforts to show that Defendants, through Maximus, have made significant progress with respect to their outreach and informing efforts. Substantial progress has seemingly been made, although the results of this progress have yet to be fully realized. The Court begins by briefly summarizing its 2000 findings with respect to Defendants' outreach and informing efforts, then analyzes the evidence presented at the June Hearing in the process of determining that Defendants have presented insufficient evidence to prove significant changed factual circumstances warranting dissolution of the Consent Decree. Defendants failed to offer evidence of their past outreach and informing efforts; instead, their presentation consisted chiefly of a Maximus representative describing its policies and exhibiting its outreach materials. Furthermore, Defendants have failed to show how any alleged changed circumstances "make [the Consent Decree] unworkable, make compliance substantially more onerous or make enforcement detrimental to the public interest." *Cooper*, 33 F.3d at 544; *see Rufo*, 502 U.S. at 384, 112 S.Ct. 748. Instead, it appears that Defendants, through their contract with Maximus, have successfully incorporated Consent Decree requirements into their outreach and informing plan, which have certainly aided its performance in recent years.

### 2000 Findings

It is, initially, noted that the Court found Defendants to be in violation of Consent Decree ¶¶ 32 and 52, relating to outreach, in its 2000 opinion. *Frew*, 109 F.Supp.2d at 599. The Court found that the degree to which class members lacked knowledge regarding the Texas Health Steps program, in addition to low participation rates, minimal receipt of services after oral outreach, and insufficient staffing, prevented Defendants' outreach and informing efforts from being effective, as required by the Consent Decree. *Id.*; Consent Decree ¶¶ 32, 52. In contrast to the Court's 2000 inquiry, however, the Court is not currently determining whether Defendants are in compliance with the Consent Decree or whether Defendants' current outreach and informing efforts are effective;[66] rather, the Court must determine whether any progress in Defendants' outreach and informing efforts constitutes significant changed factual circumstances warranting modification of the Consent Decree. *Cf. Frew*, 109 F.Supp.2d at 594 ("[I]t is by no means clear that defendants' progress is at issue, as the decree does not require progress in these areas."); *see Rufo*, 502 U.S. at 391, 112 S.Ct. 748. The Court, below, details the current state of Defendants' outreach and informing efforts.

### 1. Maximus Outreach and Informing

Since the 2000 Opinion, Defendants, through Maximus, have drastically revamped their outreach and informing efforts. Defendants first contracted with Maximus for outreach and informing in the fall of 1999.[67] Tr. Vol. I, p. 95 (testimony

---

**65.** The Consent Decree paragraphs relating to outreach and informing include ¶¶ 10–74.

**66.** However, with respect to *Cooper*'s requirement that Defendants must "show that those changed occurred despite the county officials' reasonable efforts to comply with the judgment," 33 F.3d at 544, the Court must determine whether Defendants have reasonably attempted to provide "effective" outreach, as required by the Consent Decree. *See* discussion *infra* Part IV, for a discussion of Defendants' efforts to comply with the Consent Decree.

**67.** Because Defendants entered into a contract with Maximus in 1999, 2000 is the first year for which the parties presented evidence

of Melinda Metteauer). During the 2000 Hearing, however, the Court noted that it was still too soon to evaluate Maximus' performance. *Frew,* 109 F.Supp.2d at 594, n. 19. The parties presented ample evidence at the June Hearing to evaluate the results of Maximus' outreach and informing efforts since 1999.

Maximus is a government consulting and contracting organization that currently contracts with the State of Texas to conduct Texas Health Steps-related outreach and informing, in addition to enrollment brokering services. *See* D. Ex. 20. Maximus provides outreach and informing services to Medicaid families with children younger than age 21, to inform them about Texas Health Steps and to assist them in accessing Texas Health Steps services. *See* Tr. Vol. I, p. 16 (testimony of Melinda Metteauer); D. Ex. 19; D. Ex. 20. Maximus receives $16 million annually from the State of Texas for its outreach and inform-

ing efforts. Tr. Vol. I, p. 29 (testimony of Melinda Metteauer). It employs 197 outreach workers statewide, a far cry from about 10 total Texas Health Steps employees and contract workers in 1993. Tr. Vol. III, p. 18 (testimony of Melinda Metteauer); *see Frazar,* 300 F.3d at 533. In its capacity as enrollment broker, on the other hand, Maximus serves as an independent third party that provides information to those who are eligible for Medicaid managed care regarding the picking of a plan and enrolling in managed care in Texas.[68] Tr. Vol. I, p. 21 (testimony of Melinda Metteauer). Maximus performs outreach and informing services throughout all of Texas, while it performs enrollment brokering services for only those regions under managed care.

Maximus' project design for outreach and informing focuses on telephone contact, mail-outs, and in-home visits.[69] Maximus receives lists of EPSDT-eligible indi-

regarding Maximus' outreach and informing efforts; but Defendants did not present evidence of their pre–2000 outreach and informing efforts. In order to determine whether factual circumstances have significantly changed since the entry of the Consent Decree, then, the Court refers to findings of fact contained in the 2000 opinion.

**68.** Maximus' role as enrollment broker is discussed in Part III(B), *infra.*

**69.** Defendants' Post–Hearing Brief at 8. Defendants also presented substantial evidence of other types of outreach activities, including, *inter alia,* organizing and attending health fairs and community events, attending family or parent meetings at Head Start programs, meeting with parent groups or children groups through school districts, scheduling medical and dental appointments and visiting class members at Women, Infants and Children Nutrition Program ("WIC") offices. D. Ex. 145 at 3–4; Tr. Vol. I, pp. 59–60 (testimony of Melinda Metteauer). Defendants, however, have failed to present sufficient evidence to prove the necessary amount of such outreach and whether or how it affects class members' education about, or uti-

lization of, Texas Health Steps services. From the evidence presented, the Court has been given to understand that these types of outreach activities are a relatively minor part of Maximus' outreach program design. While the Court considers these efforts in determining whether Defendants have satisfied *Rufo* 's requirements, the Court's determination is chiefly based on the three most significant pieces of Maximus' project design: telephone contact, mail-outs, and in-home visits. However, it is noted that the number of community events attended has increased significantly, from 1,470 in 2000 to 16,652 in 2004. D. Ex. 23. With no evidence relating to how much of these activities are necessary to provide Texas Health Steps services to a class of more than 2.7 million, the Court does not find that these increases in outreach and informing activities constitute significant changed factual circumstances warranting revision of any specific provision of the Consent Decree. Similarly, the number of medical or dental appointments scheduled has significantly increased from 8,886 in 2000 to 59,284 in 2004. D. Ex. 23.

viduals from Defendants on a weekly basis and, pursuant to its contract with Defendants, Maximus has 60 days to make contact with each of the individuals on these lists. Tr. Vol. I, pp. 32–35, 56 (testimony of Melinda Metteauer). The first stage in Maximus' outreach and informing effort entails efforts by call center staff to reach the listed EPSDT-eligible individuals by telephone. *See* D. Ex. 145 at 3 (testimony of Lyn Garcia). Maximus has a call center located in Austin and nine regional service areas, staffed by field outreach workers, to perform this outreach function.[70] Tr. Vol. I, pp. 133 (testimony of Melinda Metteauer); D. Ex. 19. By the end of the first week of this telephone effort, eligibles who either have no telephone or for whom the listed telephone numbers are incorrect or non-working are identified, and this information is provided to Maximus regional staff. The regional staff members then begin efforts to identify phone numbers and/or addresses for these individuals. Tr. Vol. I, p. 35 (testimony of Melinda Metteauer); D. Ex. 19. The eligibles who have still not been reached by phone or mail by day 45 are then designated for home visits by Maximus regional outreach staff members. Tr. Vol. I, p. 40 (testimony of Melinda Metteauer). Maximus also sends out various forms of letters and information to class members after the initial outreach contact. *See* D. Ex. 22. These mailings inform class members of program services and include periodic newsletters, letters to nonparticipants, letters to pregnant women, and letters to foster children. Tr. Vol. I, pp. 74–75 (testimony of Melinda Metteauer).

Plaintiffs' and Defendants' disagreements with respect to evidence relating to outreach and informing involve each of the three areas of Maximus' outreach and informing project design: telephone contact, mail-outs, and in-home visits. Plaintiffs do not dispute Defendants' description of Maximus' outreach and informing plan; rather, they argue that the process has not produced significantly better results than past outreach and informing efforts. In addition to looking at the process Defendants choose to employ and determining whether their methods have significantly changed since the Decree was entered, the Court looks to the outcome of that process to determine whether significant changed factual circumstances warranting modification of the Consent Decree exist-*e.g.*, the number of successful outreach contacts and whether information has been conveyed successfully.

Maximus compiles monthly data relating to its outreach efforts, including statistics for its call center and statistics for various forms of EPSDT client outreach. *See* D. Ex. 23. Plaintiffs argue that neither Maximus' efforts via telephone, mail-out, nor in-home visits constitute significant changed factual circumstances warranting modification of the Consent Decree. Defendants argue that the rise in annual contacts in each of these categories evidences significant changed factual circumstances.

### Telephone Contacts

While the number of total outbound calls and number of total completed calls decreased from 2003–04, as Plaintiffs argue, the general trend since entry of the Consent Decree indicates increasing numbers

70. Plaintiffs argue that Defendants' operation of only one call center, located in Austin, violates Consent Decree ¶ 26, which states: "An outreach unit is the entity responsible for oral outreach in a geographic area of Texas. An outreach unit can be either (a) an agency that contracts with TDH to provide oral outreach services or (b) TDH staff." The Court will refrain from determining whether operation of only one call center violates Consent Decree ¶ 26.

in each category. *See* D. Ex. 23. But, the rate of increase in numbers of calls placed and numbers of calls completed since 2000 is similar to the rate of increase in class size. Total outgoing calls increased from 396,358 in 2000 to 573,972 in 2004, while total calls completed increased from 272,367 in 2000 to 452,779 in 2004. D. Ex. 23 at 2. Total number of class members increased from 1,738,991 in 2000 to 2,706,903 in 2004. D. Ex. 94; D. Ex. 96. In other words, Maximus completed calls to approximately 16% of the class in 2000, while it completed calls to approximately 17% of the class in 2004. The increase in completed calls thus grew proportionately with the class and does not constitute a significant changed factual circumstance.

Maximus makes roughly 50,000 outbound phone calls per month for purposes of conducting outreach to program recipients and informing them of program services, combining both predictive-dialer technology [71] and manual dialing methods. Tr. Vol. I, pp. 49–50 (testimony of Melinda Metteauer); D. Ex. 23. However, this raw number of predictive-dialer technology

calls is misleading, as extremely small percentages of predictive-dialer calls are actually completed.[72] *See* D. Ex. 24. Plaintiffs argue that this low predictive-dialer completion rate is at least partly explained by Maximus' employing insufficient staff to both handle its inbound calls and maximize the efficiency of the predictive dialer technology.[73] Tr. Vol. I, p. 146 (testimony of Melinda Metteauer). While the Court agrees that predictive-dialer efficiency is compromised by Maximus' staffing decisions, it does not necessarily follow that existing staff numbers are insufficient. Nor does it follow that numbers of outgoing calls are reliable indicators of the success of Defendants' outreach and informing efforts; instead, the Court relies on numbers of completed calls to aid its determination of whether significant changed factual circumstances exist.

Total calls received has also slowly increased, from 294,241 in 2000 to 495,500 in 2004.[74] D. Ex. 23. These data are relevant to the instant Rule 60(b) Motion because, for example, an increase in calls

---

**71.** Predictive-dialer technology automatically places calls to class members' phone numbers. Tr. Vol. 1, pp. 53–55 (testimony of Melinda Metteauer). "[I]t conserves the time of the call center counselor so that their time is spent only talking to clients, not waiting for a phone to ring." *Id.* at 54.

**72.** For example, from September 2003 through August 2004, the highest monthly percentage of contacts was 17.2 percent of numbers dialed. D. Ex. 24 at 2. Out of a total of 21,453 total number of case names, only 3,682 were actually contacted in August 2004 using Defendants' predictive dialer technology. *Id.* While the Court commends Defendants, and Maximus for employing new technologies to accomplish outreach and informing, sheer numbers of outbound calls are not the mark of success; instead, these calls must actually be answered, and the class member contacted must be provided with the information Defendants, through Maximus, aspire to provide.

**73.** In other words, Plaintiffs argue that the predictive-dialer places the calls, although no staff is available to talk to any class members who then answer the calls.

**74.** In Defendants' Post–Hearing Brief, they recount the sum of the total inbound calls received and the sum of calls they answered between 2000 and 2005, apparently as an indication of the success of their call center. The Court notes, though, that a raw sum of five years of calls is entirely irrelevant to prove the requirements of Defendants' Rule 60(b) motion. It does not take into account the size of the class, does not provide any standard by which to measure whether the numbers they cite are sufficient to prove Defendants' provision of outreach and informing services, nor does it prove changed circumstances.

received may evidence increased provision of information about who to call with questions about Texas Health Steps. Nevertheless, the corresponding increase in class size by more than 1,000,000 children between 2000 and 2004 renders this increase in class members' incoming calls insufficient to constitute significant changed factual circumstances warranting dissolution of the Consent Decree. Also with respect to incoming calls, the Court finds that Maximus' toll-free number's "abandonment rate" and "average wait in queue" have not been significantly reduced since 2000.[75]

Defendants' outreach calls, on the other hand, increased from 442,037 in 2000 to 2,053,400 in 2004. D. Ex. 23. In percentage terms, Maximus' outreach calls totaled 25% of the total number of class members in 2000, whereas they totaled 76% of class members in 2004. The Court finds that this aspect of Maximus' outreach and informing effort experienced significant changed factual circumstances. Nonetheless, Defendants do not direct the Court to, and the Court does not *sua sponte* find, any specific Consent Decree provision wanting modification as a result of this change. Furthermore, Defendants have failed to show how this changed circumstance affect compliance with, or the workability or enforcement of, the final judgment, or that those changes occurred despite the county officials' reasonable efforts to comply with the judgment. *See Cooper*, 33 F.3d at 544; *Rufo*, 502 U.S. at 392, 112 S.Ct. 748.

### Mail–Outs and Materials Distribution

In 2000, Maximus mailed 358,301 letters; in 2004, it mailed 465,637 letters. D. Ex. 23. Again, with an increase in class size of approximately 1,000,000 between these years, an increase of approximately 100,000 letters is insufficient to prove significant changed factual circumstances. In 2000, Maximus mailed letters to approximately 20% of the class, whereas in 2004, Maximus mailed letters to approximately 17%. D. Ex. 23: D. Ex. 94; D. Ex. 96.

The number of materials distributed in connection with Maximus' EPSDT community outreach has declined since Maximus began tracking this statistic. In 2001, the first year for which Maximus compiled data for "Number of Materials Distributed," it distributed 6,032,034 materials; in 2004, it distributed 4,630,380. D. Ex. 23. This decrease fails to support Defendants' assertion that Maximus' efforts have met with substantial success since 1999.

### In–Home Visits

Finally, Defendants dispute Plaintiffs' assertion that decreasing numbers of in-home visits reflect the declining quality of Defendants' outreach efforts. Defendants insist that in-home visits are ineffective and that resources are more wisely allocated to other forms of outreach. The Court notes that neither federal law nor the Consent Decree mandate a specific number of in-home visits that Defendants must perform.[76]

---

**75.** "Abandonment rate" and "wait in queue" are two important criteria in evaluating a toll-free number's performance. *See Frew*, 109 F.Supp.2d at 644. "Abandonment rate" is the percentage of callers who hang up before speaking to a live person, while "wait in queue" is how long the caller must wait to talk to a person once the call is initially answered. Maximus' Texas Health Steps toll-free line had an average abandonment rate of 8.58% for 2004, up from 7.26% in 2000. D.

Ex. 23. The Court notes that Maximus has not exceeded a 10% abandonment rate for any month in the years 2000–04. Tr. Vol. I, p. 49 (testimony of Melinda Metteauer); D. Ex. 23; *see Frew*, 109 F.Supp.2d at 644. The average wait in queue for the Texas Health Steps hotline in 2000 was 26.13 seconds; but, it increased to 66 seconds by 2004. D. Ex. 24 at 1.

**76.** While the Court agrees that in-home visits are an effective means of outreach, it does not

Defendants argue that "[u]nsolicited in-home visits are not an effective way to conduct outreach and informing activities. Experience has shown that these visits are not always productive." Defendants' Post–Hearing Brief at 17. To accept Defendants' logic with respect to the efficacy of in-home visits based on a few complaints, though, would be akin to accepting the testimony of a handful of parents with children in the plaintiff class as dispositive of the overall quality of Texas Health Steps. While the isolated experiences of some workers illuminate some of the obstacles and dangers inherent within in-home visits, they are not convincing proof that in-home visits should be eliminated. Indeed, if the fact that in-home visits "are not always productive" is sufficient to warrant eliminating them from the State's outreach plan, all facets of Defendants' outreach plan are vulnerable to elimination.

Frank Moore, Ph.D., disagrees with Defendants' assessment of the effectiveness of in-home visits.[77] Dr. Moore testified that current research indicates that "a more active engagement with families to assist them in problem solving to strengthen that family's capacity is ... important, it is effective, and, indeed ... for many families ... that is an essential requirement for them to be able to participate" in Texas Health Steps. Tr. Vol. IV, p. 35 (testimony of Dr. Moore). He testified that face-to-face visits

> afford the opportunity to all parties to explore the barriers in some detail and, more importantly, to begin to assist the family in understanding what resources are available to them to deal with those barriers .... It is entirely likely that each family will present a unique set of constraints, barriers, and in order to individualize the help necessary for that family, it's really most effectively done face-to-face.

Tr. Vol. IV, p. 56 (testimony of Dr. Moore). The Court continues to agree with Dr. Moore that in-home visits are effective and, indeed, essential for some class members. *See Frew*, 109 F.Supp.2d at 593 ("Although the decree does not mandate that a certain proportion of defendants' outreach contacts be home visits, it is found that defendants are not adequately availing themselves of the opportunity to use one of the most effective means of outreach.").

find that in-home visits should constitute any specific portion of Defendants' efforts. Instead, it analyzes any change in numbers of in-home visits purely to determine whether significant changed factual circumstances warranting revision of the Consent Decree exist. Plaintiffs and Defendants disagree on the proper mix of outreach methods; thus, the Court declines to pass judgment on this issue, as it is beyond both the scope of this motion and beyond the four corners of the Consent Decree. *See United States v. Armour & Co.*, 402 U.S. 673, 682, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971); Rule 60(b)(5).

77. During the December 1995 hearing, the Court ruled that Dr. Moore was an expert in the field of public health as it applies to the issues in this lawsuit. Without objection, the Court again ruled at the June hearing that he continues in that capacity. Tr. Vol. IV, p. 34 (testimony of Dr. Moore). Dr. Moore is a Professor at the University of Texas School of Public Health and has been on the faculty there since 1977. *Id.* at 40. He was staff to the United States Senate Committee that drafted the original Medicaid Act and has also been actively involved in the training and assessment of outreach workers. *Id.* at 53, 111. In addition to his own extensive experience in the field, Dr. Moore relied on a 2005 Cohrane Collaboration review of the effectiveness of face-to-face outreach by community-based workers in arriving at his conclusions about in-home visits. *Id.* at 65. The Collaboration concluded that community-based outreach workers are effective in improving utilization of preventive health care. Tr. Vol. IV, pp. 65–66 (testimony of Dr. Moore).

Despite arguing that they are an ineffective means of conducting outreach, however, Defendants take pride in the alleged formidability of Maximus' numerous in-home visits. Defendants argue that Maximus has made at least 1,011,878 home visits since 2000, for purposes of conducting outreach and informing activities. D. Ex. 23 at 2. Defendants extoll a five-year sum of in-home visits, which is irrelevant to prove changed circumstances. The Court is unimpressed with numbers reaching into the millions; with over 2.7 million class members in 2004, all of Defendants' services should be provided to millions of class members. Significant changed circumstances with respect to Defendants' outreach and informing efforts is, instead, the relevant inquiry. Despite an increase of 967,912 class members between 2000 and 2004, the number of in-home visits increased by only 28,930 during the same years. D. Ex. 23 at 2; D. Ex. 94; D. Ex. 96. Thus, the percentage of class members receiving in-home visits decreased from 6.2% in 2000 to 5% in 2004. While the Court does not find this to be a significant changed factual circumstance for the worse, it certainly does not aid Defendants' argument that Maximus' outreach and informing efforts have resulted in significant changed factual circumstances for the better.

### 2. STAR MCO Outreach and Informing

A separate and distinct part of Defendants' outreach and informing effort consists of that provided by Defendants' STAR MCOs. Defendants argue that Maximus' outreach and informing efforts, combined with Defendants' STAR MCOs' efforts, adequately inform and encourage class members to utilize Texas Health Steps services, thus constituting a significant change in factual circumstances warranting dissolution of the Consent Decree. While Dr. Moore testified that STAR MCOs' redundancy does not improve outreach effectiveness, because it suffers from the same defects as Maximus' efforts,[78] Defendants argue the supplementation, nonetheless, enhances the outreach and informing services that Plaintiffs receive, as the number of telephone calls, mail-outs, and in-home visits increase in managed care areas.

While the Court accepts Defendants' argument that STAR MCOs' outreach and informing efforts supplement Maximus' efforts to some extent, Defendants have failed to present evidence regarding how many STAR MCO calls, mail-outs, or in-home visits reach class members not also reached by Maximus; Defendants have also failed to present evidence establishing that STAR MCOs have access to any information not also accessible by Maximus. Because the STAR MCOs and Maximus are likely working from similar lists, containing identical contact information, the most reasonable assumption is that class members easily contacted via telephone or mail-outs will be contacted by both Maximus and Defendants' STAR MCOs. In other words, Defendants have failed to establish the amount of duplicated outreach efforts or otherwise prove that Maximus' and STAR MCOs' efforts reach different members. Accordingly, the Court bases its conclusions of law with respect to outreach and informing efforts primarily on its findings of fact respecting Maximus' outreach and informing efforts.

**78.** For example, Dr. Moore testified that Maximus' and STAR MCOs' outreach and informing plans rely too heavily on telephone contact and emphasize process over results. *See* Tr. Vol. IV, p. 51 (testimony of Dr. Moore).

### 3. Confusion Regarding Texas Health Steps Services

In addition to rebutting Defendants' statistical evidence regarding the degree of success of Defendants' outreach and informing efforts, Plaintiffs presented extensive credible anecdotal evidence detailing mass confusion among class members about the services offered by, and utilization process for, Texas Health Steps. While this anecdotal evidence, alone, is not dispositive of the state of Defendants' outreach and informing efforts, the Court finds that it illuminates the confusion among class members with respect to Texas Health Steps services and supports the Court's conclusion that outreach and informing efforts have not significantly improved. Despite Maximus' and STAR MCOs' outreach and informing efforts, Plaintiffs argue, class members and their families continue to be confused about basic aspects of Texas Health Steps, such as Medicaid benefits and medical and dental checkups. *See Frew*, 109 F.Supp.2d at 590–94 (detailing, as of 2000, class members' confusion with respect to the Texas Health Steps program).

Some class members have never heard of Texas Health Steps, even after registering their children for Medicaid. *See* Lloyd Deposition at 9. As a result of this confusion regarding the programs, many class members are unaware of the basic services they could receive or how to obtain those services. Evidence from health care providers supports the conclusion that class members and their families are ill-informed regarding Texas Health Steps and available services. Because many patients do not have even a basic knowledge of the program, one health care provider said she must explain the program to families "as if they've never heard it before." Lloyd Deposition at 9. This confusion results in a lack of understanding among parents regarding the benefits of early and essential care such as checkups or immunizations. *Id.* For example, in Harris County, "parents do not know what their children are entitled to through the Medicaid program. They don't know as a rule when ... checkups are due .... This is typically true even if the child has had Medicaid for a long time. Parents typically do not know anything about the benefits of preventative care ... even if the child has been on Medicaid for years." Misek Deposition at 2; *see also* Fette Deposition at 5 (Denton area); James Deposition at 4 (Dallas area).

Plaintiffs further offered credible evidence that mass confusion exists among class members with respect to dental services available through Texas Health Steps and procedure to access those services. Class members, Plaintiffs argue, do not understand the concept of preventive dental care or even that dental care is covered by Texas Health Steps. Tr. Vol. VII, p. 150 (testimony of Dietmar Kennel). Many parents are simply "not aware that dental care is a covered benefit for their children." Prachyl Deposition at 16. Approximately 60% of families are not aware that Medicaid covers dental care. Tr. Vol. VII, p. 184 (testimony of Karen Clemmer). Lacking awareness of this basic dental coverage, many children on Medicaid never visit a dentist. Prachyl Deposition at 16. The Court finds that the plaintiff class remains largely confused about basic aspects of Texas Health Steps, such as Medicaid benefits and medical and dental checkups, in addition to how to access Texas Health Steps services.

### 4. Conclusions of Law: Outreach

While Maximus' outreach and informing plan and Defendants' $16 million annual expenditure are impressive and certainly contribute to Defendants' progress with respect to outreach and informing, they do

not prove widespread success or effectiveness of Maximus' outreach and informing efforts.[79] Similarly, though Maximus' outreach materials are seemingly well-crafted, easy to understand and contain useful information, their existence does not prove significant changed factual circumstances. To be effective, these materials must actually reach class members, and/or Maximus employees must actually speak voice-to-voice or face-to-face with class members. The Court finds that Maximus has a noteworthy outreach and informing plan in place, although the recency of its establishment has seemingly prevented realization of its effects as of the June Hearing.

As discussed in Part II(A), the Court finds the CMS–416 participation ratio and dental participation ratios presented at the June Hearing evidence neither class members' improved utilization of Texas Health Steps services nor significant success of Defendants' outreach and informing efforts. The Court finds that much of the evidence of Defendants' improved outreach and informing efforts is undermined by this lack of improvement in actual provision of medical checkups and dental services, as detailed in Part II(A). *Cf. Frew*, 109 F.Supp.2d at 593–94 ("Much of the evidence of improvement is severely undermined by the low levels of success that have characterized defendants' outreach program."). Thus, independent of the statistics discussed in Part II(B)(1) and (2), the findings of fact with respect to medical checkups and dental services demonstrate a lack of significant changed circumstances with respect to Defendants' outreach and informing efforts.

The Court further finds that Maximus' telephone efforts have increased since it began conducting outreach and informing services for Defendants, although in rough proportion to the increase in class size and not in a manner indicating significant changed circumstances satisfying *Rufo's* requirements. *See Rufo*, 502 U.S. at 384, 112 S.Ct. 748. The slight increase in Maximus' mailing campaign and numbers of in-home visits similarly do not constitute significant changed factual circumstances, as both have also increased only in rough proportion to, or slower than, the increase in class size. Class members' continued confusion about basic aspects of Texas Health Steps also supports the Court's conclusion that significant changed factual circumstances do not exist with respect to Defendants' outreach and informing efforts.

In sum, the Court finds that neither the individual outreach and informing efforts of Maximus, that of Defendants' STAR MCOs, nor their combination constitute significant changed factual circumstances warranting modification of the Consent Decree. *See Rufo*, 502 U.S. at 384, 112 S.Ct. 748.

## C. CASE MANAGEMENT

In opposition to Defendants' Rule 60(b) Motion, Plaintiffs also argue that Defendants' case management program has not significantly improved. The Court agrees. The Court, in 2000, succinctly described case management:

> "Case management" refers to the service provided by "case managers," or employees of the state who help families to navigate the often confusing health care system. Case management helps indigent families to develop coherent plans to take care of their children's

---

**79.** While the Fifth Circuit noted the magnitude of Texas' outreach and informing expenditures, *Frazar*, 300 F.3d at 533, it did not imply that expenditure alone is a sufficient measure of Texas' outreach and informing performance. Indeed, expenditure, alone, is always a poor proxy for success.

health care and related needs. Case managers also work to help empower families to request health care services on their own. Their support can often be crucial for class members and their families, who are largely uneducated and unfamiliar with the state's health care system in general, and with Texas Health Steps in particular. Thus, case management plays a vital role in facilitating recipients' access to needed medical, social, and educational services.

*Frew,* 109 F.Supp.2d at 646. The Department of State Health Services ("DSHS") administers the Case Management for Children and Pregnant Women ("CPW") program, "which is available for a child or pregnant woman having a health risk or a health condition above and beyond their peers' and who is having trouble accessing services." Tr. Vol. III, p. 22 (testimony of Margaret Bruch). Defendants also offer other case management services, including Early Childhood Intervention (children under three years of age), Texas Commission for the Blind, Mental Health and Mental Retardation ("MHMR"), and Children with Special Health care Needs ("CSHCN"). P.Ex. CM–1. Plaintiffs argue that Defendants' case management programs have recently been seriously curtailed, thus revealing yet another lack of significant changed circumstances warranting modification of the Consent Decree.

 Based on the evidence presented, the Court finds that Defendants' case management program has not experienced significant changed factual circumstances warranting modification of the Consent Decree and supports the Court's conclusion that Texas Health Steps, as a whole, has not experienced significant changed circumstances warranting dissolution of the Consent Decree. First, the cumulative number of class members served by Defendants' case management programs in 2004 was about 79,000 class members; in

the first two years of the program, fewer than 33,000 class members received case management services. Tr. Vol. III, pp. 129–30 (testimony of Margaret Bruch). In other words, roughly 3% of the class received case management services in 2004, up from roughly 1% in 1998. *Id.;* D. Ex. 94; D. Ex. 96. In 2000, the Defendants estimated that about 5–7% of the plaintiff class required case management assistance, while Plaintiffs estimated that about 10% of the class requires the service. *See Frew,* 109 F.Supp.2d at 647–48. While Defendants have since reduced their estimate of the number of class members requiring case management assistance to a figure less than their 2000 estimate, *see* Tr. Vol. III, p. 138–42 (testimony of Margaret Bruch), the Court finds that neither the current 3% utilization of case management services nor Defendants' reduced estimate of class members' need indicates significant changed factual circumstances warranting modification of the Consent Decree.

Furthermore, insufficient evidence was presented to determine whether Defendants have cured the problems found in 2000 relating to recruitment, class members' knowledge regarding case management services, and accessibility in rural areas of the State. *See Frew,* 109 F.Supp.2d at 646–54. It is of note that in 2000, Defendants had enrolled 162 case managers, and 41 were inactive. *Frew,* 109 F.Supp.2d at 650. In 2004, only 178 providers were enrolled, and only 73 were active in the entire state. P.Ex. CM–3. Thus, the number of active case managers has decreased from 121 (2000) to 73 (2004), while the size of the class has grown by about one million. P.Ex. CM–3; D. Ex. 94, D. Ex. 96.

## PART THREE: DISSOLUTION AS TO ALL URBAN AREAS OF TEXAS

Apart from demanding dissolution of the Consent Decree in its entirety, Defendants

demand, in the alternative, that the Consent Decree be dissolved as to all Urban Areas of Texas. In support of this demand, Defendants assert that they are in compliance with federal law in all Urban Areas of the State, exclusive of the areas of the State not under managed care. As discussed in Part I(B)(3)(c), compliance with federal law, alone, is insufficient to necessarily warrant relief under Rule 60(b). Nevertheless, the Court will make findings of fact with respect to Defendants' STAR MCOs, to determine whether Defendants have established significant changed factual circumstances warranting the modification they seek. *See Rufo,* 502 U.S. at 392, 112 S.Ct. 748.

Because the Court finds that Texas Health Steps' overall performance is insufficient to warrant modification of the Consent Decree in its entirety, the Court's inquiries in this section of the opinion are whether Defendants have proved any of the following: (1) STAR MCOs' performance is significantly superior to the performance of non-managed care Medicaid in Texas; (2) STAR MCOs' performance is significantly superior to the overall per-

formance of Texas Health Steps; or (3) Defendants have established other significant changed factual circumstances demonstrating that dissolution of the Consent Decree is warranted with respect to the Urban Areas of Texas. In this analysis, the Court does not consider STAR MCOs' performance relative to the performance of MCOs in other States;[80] indeed, State-to-State MCO comparisons prove neither STAR MCOs' superior performance as compared to Texas Health Steps as a whole nor distinguish Defendants' STAR MCOs from non-managed care areas of Texas.[81]

It is also noted that the Court visited managed care issues in its 2000 Opinion. *See Frew,* 109 F.Supp.2d at 618–37. Similar to the 2000 Hearing, much of the evidence introduced at the June Hearing concerned Defendants' managed care programs throughout the State. *Id.* at 618. The Court, in 2000, analyzed the performance of Defendants' managed care programs at that time and found them inadequate; accordingly, the Court found Defendants to be in violation of Consent Decree ¶¶ 190 and 192.[82] *Id.* at 618–37.

**80.** Rule 60(b) does not permit Defendants to simply prove that the MCOs are comparable to the national average for MCOs; assert that such a finding necessitates a finding of compliance with federal law, and thus be entitled Rule 60(b) relief; as discussed in Part I(B)(3)(c), Rule 60(b) is not simply a second chance for Defendants to litigate Plaintiffs' claims on the merits. Because Defendants' only asserted basis for warranting relief under Rule 60(b) is compliance with federal law, which the Court rejects, the Court will attempt to analyze Defendants' evidence under the appropriate Rule 60(b) standard, in such a way as to preserve their argument and arrive at an equitable result.

**81.** Defendants also make multiple arguments comparing STAR MCO performance to commercial managed care. The Court makes no findings of fact with respect to these arguments because relative performance between

Medicaid managed care and commercial managed care is not in issue; Defendants, through their alternative demand that the Consent Decree be dissolved as to only Urban Areas under managed care, seek to draw a distinction either between Medicaid managed care and non-managed care Medicaid, or between Medicaid managed care and the Texas Health Steps program as a whole. As the Court has found that significant changed factual circumstances warranting modification of the Consent Decree do not exist with respect to Texas Health Steps as a whole, Defendants must distinguish their managed care program in order to warrant relief. Consequently, comparisons between STAR MCOs and either other States' MCOs or commercial managed care are irrelevant.

**82.** More specifically, the Court found that Defendants were in violation of Consent Decree ¶ 190, for the failure to provide the "timely

The managed care programs operating in Texas today, however, have been more fully implemented and are much more prevalent than those operating in 2000.[83]

Plaintiffs and Defendants also again presented evidence depicting the advantages and disadvantages of managed care generally.[84] As the Court noted in 2000:

> The breadth and difficulty of the public policy questions they have raised is apparent. While it forms the subject of much debate and discussion in the realm of public policy, the viability of managed care is not, and should not be, on trial in this proceeding. Whether or not to continue the rapid expansion of managed care is an issue for the legislature alone.

*Frew*, 109 F.Supp.2d at 620. Similarly, the Court's focus, for purposes of the instant Rule 60(b) motion, is not on these questions of public policy. Instead of determining whether managed care is the best method of delivering EPSDT services, the Court, in making its determination, looks only to the results of whichever EPSDT service delivery mechanism Defendants, "with front-line responsibility for administering the program," choose to utilize. *Frew*, 540 U.S. at 442, 124 S.Ct. 899. The Court begins its analysis with an overview of managed care in Texas and MCOs under the STAR contract. Next, it analyzes data compiled by the Texas External Quality Review Organization for Medicaid Managed Care and CHIP. Finally, it details other STAR MCO inadequacies about which Plaintiffs presented evidence.

## A. MEDICAID MANAGED CARE IN TEXAS

Defendants, through the STAR MCOs with which they have contracted, currently employ two managed care models: primary care case management ("PCCM") and health maintenance organizations ("HMOs"). *See* P.Ex. MAN–2 at 8–4. All of the plans in the STAR program, with the exception of Texas Health Network, are HMOs. P.Ex. MAN–2 at 8–4. Approximately 77% of class members enrolled in managed care are members of Defendants' STAR MCOs; thus, only 23% of class member are enrolled in PCCM managed care. D. Ex. 96 (total class members enrolled in managed care); D. Ex. 82 at 4 (total class members enrolled in STAR MCOs). In most populated areas of the

---

receipt of the full range of EPSDT services, including but not limited to medical and dental checkups," and in violation of Consent Decree ¶ 192 for failing to "assure medical and dental checkups in a timely manner to all [managed care] recipients." *Frew*, 109 F.Supp.2d at 631, n. 105.

**83.** "In 1999, the Texas legislature declared a moratorium on the further expansion of managed care for class members and other Texas Medicaid recipients. However, a future continuation of the 'rollout' of managed care is considered likely by all parties." *Frew*, 109 F.Supp.2d at 618, n. 73 (citations omitted). The parties' prophecy has been realized; managed care organizations currently operate in nine Texas regions, and Defendants plan to expand managed care throughout Texas in the fall of 2005. P.Ex. MAN–2; P.Ex. MAN–3; P.Ex. MAN–4.

**84.** For example, Defendants argue that managed care-whether commercial or not-always creates administrative burdens. Tr. Vol. VII, pp. 14–15 (testimony of Dr. Hellerstedt). These burdens include establishing a particular network of providers, the requirement for prior authorization for specialist care, elective admissions and expensive diagnostic tests, and preferred drug formularies. *Id.* MCOs also limit provider choice by requiring patients to make selections from its network of providers. *Id.* at 15. However, Defendants argue, managed care provides benefits that compensate for its administrative burdens; the main benefit is the ability to provide a medical home. *Id.* at 16. For example, in theory, the existence of a medical home allows the primary care provider to know about the other medical services that the patient is receiving and thus provide more effective health care. *Id.*

State, including Dallas, Houston, San Antonio, El Paso, Fort Worth, and Lubbock, persons who are eligible for Texas Health Steps automatically participate in Medicaid managed care. Tr. Vol. I, pp. 22–23 (testimony of Melinda Metteauer).

PCCM and HMO models share several characteristics, two of which are particularly relevant to the Court's analysis for purposes of the Rule 60(b) motion.[85] First, in either model, each class member chooses or is assigned a primary care provider ("PCP"). The primary function of the PCP is to provide each class member with a "medical home," including comprehensive preventive and primary care. PCPs are also typically charged with approving other forms of care that class members may need, such as most forms of specialty care.[86] *See* Tr. Vol. VII, pp. 14–15 (testimony of Dr. Hellerstedt); Tr. Vol. II, p. 30 (testimony of Martin Jimenez) (Community First). In other words, PCPs' assist class members and coordinate their basic health care needs, while they also function as gatekeepers who may limit the care that class members receive. *See* P.Ex. MAN–2 at 8–4. Second, both models involve specific networks of providers and, therefore, limit clients' choice of providers to those under contract with the specific MCO of which they are a member.

Compensation schemes, however, vary with respect to different managed care models. Typically, the compensation arrangement determines who is responsible for managing the health care of an MCO's members and, additionally, who bears the

risk of providing services that are medically necessary.

> In capitated fee models, [MCOs] are paid flat fees by Medicaid to provide services for their patients. The MCO assumes the risk of providing services that are medically necessary. The model is based on the theory that when organizations are paid a flat fee to serve their patients, they will provide cost-effective preventive care in an effort to avoid the costs of expensive treatment of acute conditions.

*Frew*, 109 F.Supp.2d at 618. In other words, the MCO receives a flat fee per member per month in exchange for managing its members' health care, which it then uses to compensate its providers for providing health care to its members. Texas HMOs typically employ the capitated fee model.[87]

In primary care case management, however, individual health care providers are paid a small monthly fee to arrange referrals and other needed services for patients, and providers are also paid a fee for the services they provide. *See Frew*, 109 F.Supp.2d at 618. In other words, primary care case managers receive the capitated fee for managing the patients' health care, instead of the HMO, in addition to receiving fees for the services they provide. In primary care case management, Defendants continue to assume the risk of providing services that are medically necessary rather than shifting the liability to an MCO.

The parties have presented arguments relating to incentives the various compen-

---

**85.** *See Frew*, 109 F.Supp.2d at 618–19 (describing more extensive managed care program characteristics generally).

**86.** The Court notes that not all STAR MCOs require PCP approval, known as a referral, to visit a specialist. *See* Tr. Vol. V, p. 22 (testimony of Kim Nettleton) (Community Health);

Tr. Vol. II, pp. 121–22 (testimony of Paige Alvarado) (First Care).

**87.** *See, e.g.,* Tr. Vol. II, p. 102 (testimony of Paige Alvarado) (First Care) (stating the that capitated fee model is preferable); Tr. Vol. II, p. 197 (testimony of Aron Head) (Amerigroup).

sation arrangements create. For example, Defendants argue that reimbursing doctors on a fee-for-service basis, rather than a capitated basis, provides them with an incentive to offer more preventive care. Tr. Vol. II, p. 103 (testimony of Paige Alvarado). Similarly, compensating an MCO on a capitated basis encourages the MCO to increase preventive services in order to prevent large expenditures on emergency service, thus saving the MCO money in the long run. Tr. Vol. II, p. 103 (testimony of Paige Alvarado). As a result, argue Defendants, the compensation system is optimally designed to maximize financial incentives for the provision of preventive and wellness care. Tr. Vol. II, p. 103 (testimony of Paige Alvarado). Plaintiffs, on the other hand, argue that compensating MCOs on a capitated basis creates an incentive to minimize utilization of services, to ensure that the capitated payment covers the services that are medically necessary. While the incentive structure of Defendants' managed care program is indeed an important issue, it is beyond the scope of Defendants' Rule 60(b) motion and, like managed care implementation generally, an issue for the legislature alone. The Court, as previously mentioned, will not pass judgment on Defendants' method of operating the EPSDT program outside the context of the Consent Decree, federal law, and changed factual circumstances.

## B. MCOS OPERATING IN TEXAS' URBAN AREAS

Maximus, in its capacity as enrollment broker, is the first step in enabling class members' participation in Defendants' managed care program. Once a household in an area served by a managed care organization is determined to be eligible for Medicaid, Maximus, as enrollment broker, receives a notice of its eligibility in electronic form from the State.[88] Maximus then sends out an enrollment kit explaining the basic information about the enrollment process and, likewise, information about the various managed care plans that serve the class members' geographic area. The enrollment kit is so designed as to include a provider list for each health plan serving that geographic area, an enrollment form, and a toll-free number that recipients can call for assistance in enrolling. If the recipient neither calls nor enrolls, Maximus begins proactive enrollment outreach. Proactive outreach includes phone calls and in-home visits for certain populations, and its purpose is to assist recipients in choosing an appropriate managed care plan and selecting a provider to serve as their PCP. Tr. Vol. I, pp. 25–27 (testimony of Melinda Metteauer).

As an initial matter, Defendants' presentation did not focus on changed circumstances. Instead, the majority of Defendants' evidence consisted of representatives from Parkland Community Health (Dallas), Community Health Choice (Houston), Community First (San Antonio), First Care (Lubbock) and Amerigroup (Austin), describing their MCOs' policies.[89] The Court notes that much of Defendants' evidence in this regard is inconsequential for purposes of the instant

---

88. Defendants did not present evidence regarding how they initially determine eligibility. Maximus works with a list created by the State, but the Court has not been made aware of the process by which the State creates the list. This is particularly troubling, since compiling an accurate and complete list of Medic-

aid-eligible class members is one of the most crucial steps in EPSDT outreach.

89. Additionally, Defendants presented a report entitled "Parents' Satisfaction with their Children's Health Care in the STAR MCO Program," D. Ex. 88, and also one entitled "STAR Statewide Enrollee Satisfaction Re-

motion because it evidences neither changed factual circumstances nor the alleged widespread success of the STAR MCOs as compared to traditional fee-for-service Medicaid. As stated previously, evidence relating to Defendants' and STAR MCOs' service *plan* is not dispositive of the provision of the services; the Court relies chiefly on statistics presented by Defendants, taking into account the methodologies employed, so as to evaluate the current state of Texas' managed care EPSDT program.[90] The Court presents a brief overview of each STAR MCO about which evidence was presented.

Parkland Community Health ("Parkland") is an MCO serving recipients in the Dallas Service Area. It has approximately 125,000 members, and the vast majority of its members are on Medicaid. Tr. Vol. IV, p. 122 (testimony of Dr. Lachman[91]). When a new recipient enrolls in Parkland, he or she, according to the plan, is to receive a welcome phone call and a welcome packet explaining how to use the plan. Tr. Vol. IV, p. 124, 130 (testimony of Dr. Lachman). Parkland also conducts outreach and informing separate from the outreach that is conducted by Maximus on behalf of the State. Tr. Vol. IV, p. 151 (testimony of Dr. Lachman). Furthermore, Parkland operates a toll-free number whose aim is to provide information to its members, including information regarding Texas Health Steps. Tr. Vol. IV, p. 139 (testimony of Dr. Lachman). Per its policy, Parkland offers case management services, facilitates making appointments, and arranges needed transportation for its members to medical appointments. Tr. Vol. IV, pp. 125, 127 (testimony of Dr. Lachman). Parkland's case management program includes 18 case managers, and it contracts with over 500 primary care providers in the seven counties it serves. Tr. Vol. IV, p. 125–26, 131 (testimony of Dr. Lachman). If a member needs access to a specialist that is not participating in Parkland's plan, Parkland's case management staff aspires to arrange for an out-of-network referral.[92] Tr. Vol. IV, p. 147 (testimony of Dr. Lachman).

port," D. Ex. 89. While the Court commends Defendants for having such reports prepared in an effort to improve the STAR MCO program, they are beyond the limited scope of the current question before the Court. The Court, in the exercise of judicial restraint, need only determine whether STAR MCO performance is so successful compared to that of non-managed care Medicaid as to warrant relief under Rule 60(b). Findings of fact relating to parents' satisfaction with STAR MCOs is, therefore, beyond the scope of Defendants' alternatively demanded relief under Rule 60(b), for the reason that Defendants did not present any evidence relating to the satisfaction of parents of children enrolled in traditional fee-for-service Medicaid. *See* P.Ex. 7, 8 (explaining traditional, fee-for-service Medicaid and Medicaid managed care).

**90.** Accordingly, many of the details regarding what STAR MCOs do *in theory* will be disregarded in favor of an analysis of the results those theories have attained. While the poli-cies of the various managed care organizations are germane in the sense that it shows they desire to provide certain services, the policies themselves do not necessarily prove the efficacy of the policies or reflect an outcome constituting changed circumstances or otherwise warranting relief under Rule 60(b). Instead, the Court's analysis is outcome-based, looking to evidence which may show Plaintiffs' superior access to, and the enhanced effectiveness of, STAR MCO services.

**91.** Barry Lachman, M.D., is the medical director for Parkland. Dr. Lachman is a pediatric physician who has performed approximately 3,000 Texas Health Steps checkups. He is an expert in the areas of pediatric medicine, public health, and Medicaid managed care organizations. Tr. Vol. IV, pp. 118–20 (testimony of Dr. Lachman).

**92.** Defendants, through Dr. Lachman, described a situation in which an out-of-network referral was accomplished: a member needed

Community Health Choice ("Community Health") is an MCO that serves clients in the Houston area, including Harris, Montgomery, Waller, Brazoria, Fort Bend, and Galveston counties. It serves only Medicaid clients, and the plan has about 50,000 members. Tr. Vol. IV, p. 181 (testimony of Kim Nettleton[93]). The welcome packet, which Community Health attempts to provide to all newly enrolled members, includes an explanation of how to read the Medicaid identification card provided by the State, contains relevant toll-free numbers that members may call for assistance, and is written at the sixth-grade level in both English and Spanish. Tr. Vol. IV, p. 188 (testimony of Kim Nettleton). Community Health has five field staff members who conduct outreach to recipients; further, the plan has a full-time staff member who assists members in completing the Medicaid re-certification process. Community Health also operates a toll-free line for the assistance of its members that is separate from the help line operated by Maximus. Tr. Vol. IV, p. 190 (testimony of Kim Nettleton). Community Health allows access to in-network specialists without the need for a referral, maintains a specialist-scheduling office to help set members' appointments with specialists, and attempts to provide transportation reimbursement and taxi vouchers to help members get to appointments. Tr. Vol. V, p. 23–24 (testimony of Kim Nettleton).

Community First Health Plans ("Community First") is an MCO based in San Antonio that serves the Bexar County Service Area (including the eight contiguous counties). Tr. Vol. II, pp. 4–5 (testimony of Martin Jimenez[94]). Community First participates in the Texas Medicaid managed care program, in addition to offering commercial managed care. Tr. Vol. II, p. 5 (testimony of Martin Jimenez). Community First attempts to send a welcome packet and conduct a welcome telephone call to its newly enrolled members. Tr. Vol. II, pp. 6, 21 (testimony of Martin Jimenez); *see also* D. Ex. 40. New members of Community First also receive a survey card designed to discover whether the member's immunizations are past due. Tr. Vol. II, pp. 11–12 (testimony of Martin Jimenez). Community First operates an information hotline for all members to call with questions about program services separate from the information line that is operated by the State through its contract with Maximus. Tr. Vol. II, p. 22 (testimony of Martin Jimenez). All Community First providers receive a STAR provider manual that describes the necessary components of the Texas Health Steps checkup in detail, and each must agree to provide a Texas Health Steps checkup on all newly enrolled members within 90 days of their enrollment, in accordance with Consent Decree ¶ 192. Tr. Vol. II, pp. 24–25 (testimony of Martin Jimenez). Community First has physicians that practice all 27 identified medical specialties. Tr. Vol. II, pp. 29–30 (testimony of Martin Jimenez). A referral is required from the member's PCP if a Community First member who is on Medicaid needs to see a specialist. Tr. Vol. II, p. 30 (testimony of Martin Jimenez).

an intestinal transplant, but at that time, no physicians in the State of Texas were performing intestinal transplants. Parkland arranged for the member to travel to Miami and receive the transplant. Tr. Vol. IV, p. 147 (testimony of Dr. Lachman). The Court commends Parkland and Defendants for succeeding in this referral.

93. Kim Nettleton is the Vice–President of Operations for Community Health Choice. Tr. Vol. IV, p. 180 (testimony of Kim Nettleton).

94. Martin Jimenez is the Director of Network Management for Community First.

First Care is an HMO that serves Lubbock County and the eight surrounding counties. Tr. Vol. II, pp. 94–95 (testimony of Paige Alvarado[95]). When a new member enrolls in First Care, he or she receives a new member packet and a welcome phone call. Tr. Vol. II, p. 106 (testimony of Paige Alvarado). The new member packet contains all of the important phone numbers that a recipient might need to call in order to receive assistance, including the phone number for the assistance line that is operated by Maximus. Tr. Vol. II, p. 108 (testimony of Paige Alvarado). First Care also conducts outreach, which is separate from the outreach that is conducted by the State through Maximus. Tr. Vol. II, p. 105 (testimony of Paige Alvarado). First Care operates a phone line that is separate from the Texas Health Steps information line that is operated by the State through Maximus, and the phone line receives an average of 3,000 calls per month from members. Tr. Vol. II, p. 122 (testimony of Paige Alvarado). Members of First Care do not need referrals to seek care from a specialist. In the network operated by First Care, there are approximately 250 participating primary care physicians, approximately 450 specialists, and 12 hospitals.[96] Tr. Vol. II, p. 98 (testimony of Paige Alvarado). First Care sends "overdue" letters to Medicaid members who are deemed by the State to be due or overdue for a Texas Health Steps examination, and those letters have received a 92 percent response rate. Tr. Vol. II, p. 123 (testimony of

Paige Alvarado). Currently, there are over 3,000 First Care Texas Health Steps recipients in case management. Tr. Vol. II, p. 113 (testimony of Paige Alvarado).

Amerigroup is an MCO that serves the Dallas, Houston, Fort Worth, and Austin delivery areas. Tr. Vol. II, p. 201 (testimony of Aron Head[97]). Amerigroup has Texas Health Steps recipients among its members, and it is the largest of Defendants' STAR MCOs. Tr. Vol. II, p. 153 (testimony of Aron Head); D. Ex. 82 at 4. When a new member of the plaintiff class enrolls with Maximus and selects Amerigroup as his or her managed care organization, the new member receives a welcome phone call and a welcome packet that includes a new member handbook explaining all of the benefits to which he or she is entitled and relevant telephone numbers. Tr. Vol. II, p. 154 (testimony of Aron Head). Amerigroup aspires to have its doctors perform a Texas Health Steps screening for newly-enrolled class members, regardless of Amerigroup's determination that the class member is past due. Tr. Vol. II, p. 161 (testimony of Aron Head). Amerigroup also conducts outreach to its members that is separate from the outreach that is conducted by the State through Maximus. Tr. Vol. II, p. 154 (testimony of Aron Head). Amerigroup sends out periodic fliers, called "Ameritips," to members and providers, which serve to inform members of the importance of obtaining Texas Health Steps checkups, and they include a simplified periodicity sched-

**95.** Paige Alvarado is the Manager of Regional Government program at First Care. Tr. Vol. II, p. 94 (testimony of Paige Alvarado).

**96.** On occasion, a pediatrician or primary care physician may close his practice to all new patients, including Medicaid patients, but in these situations the provider must give 30-day written notice to First Care, which then follows a procedure of reporting the informa-

tion to Maximus on a monthly basis. Tr. Vol. II, p. 100 (testimony of Paige Alvarado). When they close their panel, they are continuing to see their current members; they are just not accepting new members. *Id.*

**97.** Aron Head is the Provider Service Director for Amerigroup in the Dallas/Fort Worth area. Tr. Vol. II, p. 151 (testimony of Aron Head).

ule. Tr. Vol. II, p. 160 (testimony of Aron Head). Amerigroup sends out a card to each member on his or her birthday specifying which immunizations and checkups are needed. Tr. Vol. II, p. 171 (testimony of Aron Head); *see also* D. Ex. 63. Amerigroup also operates a medical transportation program, separate from that operated by the Texas Department of Transportation, that aims to transport members to appointments. Tr. Vol. II, p. 164 (testimony of Aron Head).

### C. MANAGED CARE STATISTICS

As discussed above, the process by which STAR MCOs' representatives operate is only tangentially relevant to the Court's inquiry as to whether significant changed factual circumstances exist warranting revision of the Consent Decree. The Court thus turns to statistics purporting to compare STAR MCOs' performance and Defendants' EPSDT program in place in non-Urban Areas of Texas.

#### *HEDIS Measures*

The Health Plan Employer Data and Information Set ("HEDIS") is a standard set of performance measures used to compare managed care organizations nationwide. Tr. Vol. II, p. 42 (testimony of Carol Huber). HEDIS is developed and maintained by the National Committee for Quality Assurance ("NCQA"), a nonprofit organization in Washington, D.C.[98] Tr. Vol.

II, p. 45 (testimony of Carol Huber). HEDIS data is collected as part of the attempt by the federal government to establish a standardized system of data collection that permits State-to-State comparisons among various aspects of managed care plans. Tr. Vol. IV, p. 76 (testimony of Dr. Moore); *see also* Tr. Vol. VI, pp. 42–43 (testimony of Dr. Shenkman). HEDIS data, similar to CMS–416 data, accounts for the length of class members' enrollment in calculating the statistics. Defendants' Post-Hearing Brief at 19. Rather than accounting for the average period of eligibility, as the CMS–416 does, however, HEDIS statistics generally include only those class members who have been enrolled in Medicaid, and in the same Medicaid HMO, for at least 12 months with at most one brief interruption. Tr. Vol. VI, pp. 23–24 (testimony of Dr. Shenkman). This standard automatically excludes a majority of the plaintiff class, as most class members do not satisfy this HEDIS requirement.[99]

#### *The EQRO*

The Institute for Child Health Policy at the University of Florida serves as Texas' External Quality Review Organization (the "EQRO"). The EQRO prepares multiple reports for Defendants, including a chart book containing STAR Managed Care Organization Quality of Care Measures

---

98. The NCQA is a commission that "gathers data from Medicaid managed care plans nationally and compiles them." D. Ex. 82 at 3. The NCQA also establishes HEDIS technical specifications. *Id.*

99. Because the average period of Medicaid eligibility in 2003 and 2004 was .74 years (just under nine months), most class members do not qualify for Medicaid for 12 consecutive months. D. Ex. 94; D. Ex. 96. Again, while the Court understands the need for standardization of statistics to permit the most accurate State–to–State comparisons, such a standardization measure is unnecessary to assess

the relative success of intra-state EPSDT plans. Furthermore, the Court has acute reservations relating to acceptance of statistics that exclude a majority of class members from their computation as being representative of STAR MCOs' overall performance. However, because HEDIS statistics are the only evidence that was presented that in any way permits relative comparisons between managed care and non-managed care Medicaid, the Court proceeds with its analysis based on the HEDIS statistics proffered by Defendants.

("Chart Book") and a report analyzing the quality of the data on which the statistics in the Chart Book are based (entitled "Validating Encounter Data").[100] D. Ex. 82, 84. Defendants' EQRO uses HEDIS measures to assess STAR MCO Program Quality of Care while also analyzing STAR MCO Program Access to Care in an effort to provide an independent assessment of the performance of Texas' STAR MCO Program. *See id.* The statistical analysis that follows is based on the reports prepared by the EQRO, as the parties did not offer any other credible statistics on which to base an analysis of STAR MCO program performance relative to Texas Health Steps' non-managed care programs.

### 1. Data Quality and Accuracy

The parties' disagreements with respect to the reliability of HEDIS data analyzed by the EQRO can be distilled into two categories: (1) data parameters and (2) data collection. First, Plaintiffs argue that, because HEDIS medical checkup specifications include both Texas Health Steps checkups and "well child" checkups, the reported statistics regarding checkups are inflated and misrepresent the STAR Program Quality of Care. In other words, argue Plaintiffs, the HEDIS/EQRO data parameters are inconsistent with Texas Health Steps requirements and, such being the case, they exceed the data parameters that the parties and the Court should employ to accurately assess the success of STAR MCOs. Second, Plaintiffs argue that the data Defendants provide to the EQRO is incomplete and inaccurate. Defendants assert that the data is reliable and that the

Court should assess STAR MCO performance using HEDIS data specifications. The Court now addresses these arguments relating to data quality and collection for purposes of Defendants' Rule 60(b) Motion.

### Data Parameters

Because HEDIS is used to assess commercial managed care as well as publicly financed managed care, its measures do not always coincide with Texas Health Steps standards. For example, the EQRO includes "well child" visits in its HEDIS analysis. In 2000, the Court found that Defendants' data is inflated because it includes "well child" visits that are not as comprehensive as Texas Health Steps medical checkups; the so-called "well child" visit is considerably less comprehensive than the Texas Health Steps checkup and "do[es] not substitute for the full checkup[ ] required by federal law, by decree paragraphs 190 and 192, and by defendants' own policies." *Frew,* 109 F.Supp.2d at 620–21, 623. Similarly, the statistics that Defendants present in support of their Rule 60(b) Motion include "well child" visits in addition to Texas Health Steps medical checkups, thus inflating the reported number of class members receiving the comprehensive checkups to which they are entitled. *See* Tr. Vol. VI, p. 46–47 (testimony of Dr. Shenkman). The Court finds that the HEDIS/EQRO statistics regarding "well child" checkups are inflated with respect to the number of comprehensive checkups class members receive, and the EQRO's conclusions are unreliable to assess provision of Texas Health Steps checkups.[101] However, the

---

**100.** The EQRO's most recent Chart Book, D. Ex. 82, compiles data from December 1, 2003, to November 30, 2004.

**101.** The Court is particularly disturbed that the last time Defendants requested the EQRO

to study the issue of checkup completeness, for SFY 2001, the EQRO did not find a single complete medical checkup among all of the managed care medical records that it reviewed. P.Ex. MAN–E–10, App. D. The EQRO has not repeated the prior EQRO's

statistics are somewhat useful to compare *relative* numbers of "well child" checkups between STAR MCOs and non-managed care Medicaid within Texas. The Court will thus analyze the HEDIS/EQRO statistics in an attempt to assess relative performance of the two health care delivery models for purposes of Defendants' Rule 60(b) Motion.

### Data Collection

The EQRO's report analyzing the quality of the data on which the statistics in the EQRO's Chart Book are based compares the information contained in HMOs' administrative data to that contained in medical records. D. Ex. 84. "The primary purpose of this study was to validate the data contained in the encounter data detail against the care and services documented in the enrollees' medical records." *Id.* at 1. While the EQRO commended all of the STAR MCOs for increased provider response to record requests from 2002(65%) to 2003 (84.1%), the EQRO received a response from only approximately 60% of the enrollees who were requested to respond. *Id.* at 1, 12. Plaintiffs argue that the study is thus inherently flawed because the EQRO could not review approximately 40% of the medical charts they requested from STAR MCOs

Elizabeth Shenkman, Ph.D., director of the EQRO, posits that Defendants' managed care data are accurate. D. Ex. 87. Because the EQRO commended the STAR MCOs for their provider response, without mention of the 60% enrollee response rate, and made no negative findings regarding either provider or enrollee response rate, the Court accepts Defendants' and Dr. Shenkman's assessment that the data used to calculate statistics contained in the Chart Book is reasonably accurate.

### 2. EQRO Findings

The Court first notes that Defendants failed to offer evidence directly comparing Urban Areas of Texas to non-Urban Areas. Similarly, Defendants failed to offer evidence directly comparing Urban Areas of Texas to the overall performance of Texas Health Steps. Instead, Defendants' offered the EQRO Chart Book as evidence of significant changed circumstances, which contains, *inter alia*, statistics for: each individual STAR MCO; the average of all STAR MCOs for each measurement ("All STAR MCOs"); the national average of other States' MCOs (the "HEDIS Mean"); primary care case management for Texas' Temporary Aid To Needy Families program ("PCCM–TANF"); and fee-for-service for Texas' Temporary Aid To Needy Families program ("FFS–TANF").

Comparison of All STAR MCOs to other States' MCOs (the HEDIS Mean) is irrelevant for purposes of Defendants' Rule 60(b) Motion.[102] Additionally, PCCM–TANF statistics do not necessarily reflect the performance of Texas Health Network, Defendants' only PCCM program. As there is no evidence directly permitting either of the relevant comparisons, Defendants have failed to satisfy their burden to prove significant changed factual circumstances warranting modification of the Consent Decree, unless the Court determines that any of the statistics in the EQRO's Chart Book may otherwise aid in the Court's inquiry as to whether significant changed factual circumstances exist

study about medical checkup completeness since 2001 to determine whether STAR MCOs currently provide complete Texas Health Steps checkups. Tr. Vol. VI, pp. 35–36 (testimony of Dr. Shenkman). These findings bolster the Court's finding that "well child" checkup statistics are inflated.

**102.** *See* discussion *supra* pp. 79–80.

with respect to Defendants' managed care program.

The Court finds the FFS–TANF statistic to be the most relevant comparison for purposes of Defendants' Rule 60(b) motion, though it is not necessarily representative of traditional fee-for-service Medicaid in the non-Urban Areas of Texas.[103] While it represents statistics for Texas' Temporary Aid to Needy Families program, *not* Defendants' non-managed care EPSDT program, the Court finds that it is the statistic most representative of a direct comparison between the Urban and non-Urban Areas of Texas. The Court thus accepts the EQRO's determination that TANF and TANF-related recipients "are the most comparable to those served under the STAR MCO Program." D. Ex. 82 at 3. Recognizing that FFS–TANF statistics may not directly reflect the performance of fee-for-service Medicaid in non-Urban Areas of Texas, the Court, nevertheless, proceeds with its analysis to determine whether a comparison of All STAR MCOs to FFS–TANF statistics, imperfect as it is, supports Defendants' assertion of significant changed factual circumstances warranting modification of the Consent Decree. *Rufo*, 502 U.S. at 392, 112 S.Ct. 748.

While the Court relies primarily on STAR MCO averages and FFS–TANF statistics in its analysis, it is additionally noted that the average for STAR MCOs is not necessarily indicative of STAR MCOs' performance in each city in Texas. Indeed, as discussed below, statistics for individual STAR MCOs occasionally vary widely.

### a. Quality of Care

The EQRO uses multiple HEDIS statistics to measure the overall STAR MCO Program Quality of Care.[104] *See* D. Ex. 82 at Chart 7–19. The Court details the EQRO's findings, comparing All STAR MCOs to FFS–TANF, below.

Even when combining less comprehensive "well child" checkups with Texas Health Steps checkups, fewer STAR MCO members receive the required six checkups in the first 15 months of life. D. Ex. 82 at 12. Only 40.86% of STAR MCOs' enrollees received six or more "well-child" checkups, as compared to 47.17% of FFS–TANF enrollees. *Id.* STAR MCOs varied from 20.25% (Texas Children's) to 52.21% (First Care) for this statistic, thus revealing a significant disparity among STAR MCOs. *Id.* STAR MCO members also received fewer "well-child" checkups in the 3rd, 4th, 5th, and 6th years of life than did FFS–TANF recipients. Approximately 64% of children in this age group enrolled in STAR MCOs received "well-child" visits, whereas approximately 69% of children in this age group under FFS–TANF received them. D. Ex. 82 at 14. The variance among STAR MCOs was only slight with respect to this statistic, with Community First performing most poorly at 59.32% and El Paso First providing the most "well child" checkups at 69.66%. *Id.*

---

103. *See* P.Ex. 7, 8 (explaining traditional, fee-for-service Medicaid and Medicaid managed care).

104. Specifically, with respect to STAR MCO Program Quality of Care, the EQRO compiles statistics for: "HEDIS Well–Child Visits in the First 15 Months of Life;" "HEDIS Well–Child Visits in the 3rd, 4th, 5th, and 6th Years of Life;" "HEDIS Adolescent Well–Care Visits;" "HEDIS Prenatal Care;" "HEDIS Post-

partum Care;" "HEDIS Breast Cancer Screening;" "HEDIS Cervical Cancer Screening;" "HEDIS Use of Appropriate Medications for People with Asthma;" "HEDIS Follow–Up After Hospitalization for Mental Illness;" "Readmission Within 30 Days After Inpatient Stay for Mental Health;" "HEDIS Comprehensive Diabetes Care;" and "HEDIS Appropriate Testing for Children with Pharyngitis." D. Ex. 82 at Chart 7–19.

The disparity between STAR MCOs and FFS–TANF recipients was more marked when analyzing adolescent "well-child" visits. Approximately 43% of adolescents in STAR MCOs received "well-child" visits, as compared to approximately 51% of FFS–TANF recipients. D. Ex. 82 at 15. The variability among STAR MCOs was pronounced in this statistic as well, the results varying from 39.06% (Superior) to 54.08% (First Care). *Id.*

FFS–TANF recipients also fared better with respect to continuity of care and providing follow-up care in the community after inpatient stays for mental illness.[105] While only 34.51% of STAR MCO members received 7–day follow-up after hospitalization for mental illness, and only 62.80% received 30–day follow-up, 42.88% of FFS–TANF recipients received 7–day follow-up and 68.6% received 30–day follow-up.[106] D. Ex. 82 at 24. Other statistics in which FFS–TANF recipients received higher quality of care than STAR MCO members include breast cancer screening, cervical cancer screening, and appropriate testing for children with Pharyngitis. *Id.*

Still, FFS–TANF recipients receive inferior quality of care as compared to STAR MCO members with respect to pre-natal care and postpartum care. D. Ex. 82 at 16–17. While STAR MCOs provided first trimester prenatal care to 84.48% of enrollees, only 61.98% of FFS–TANF recipients received first trimester prenatal care. *Id.* at 16. Whereas STAR MCOs' performance on this HEDIS measure varied significantly, all STAR MCOs exceeded that of FFS–TANF. *Id.* Additionally, STAR MCOs provided postpartum care services to 53.93% of its enrollees, while only 49.67% of FFS–TANF recipients received postpartum care services. *Id.* at 17. The variance among STAR MCOs for this measure is somewhat alarming, as STAR MCO postpartum care provision varies from 41.72% (Parkland) to 57.08% (El Paso First). *Id.*

### b. Access to Care

To determine relative performance of different health care delivery plans with respect to access to care, as opposed to quality of care, the EQRO compiles four statistics relating to "ambulatory care sensitive conditions" ("ACSCs").[107] As stated in the EQRO's Chart Book, "ACSCs are those conditions ... that should not result in an inpatient stay or an emergency room visit, if there is good access to care in the

---

**105.** In response to STAR MCOs' poor results in this statistic, the EQRO recommended that Defendants evaluate barriers that inhibit use of mental health care in Defendants' managed care companies. Tr. Vol. VI, p. 43 (testimony of Dr. Shenkman).

**106.** The Court, however, notes that STAR MCOs have made significant improvement in the area of follow-up after hospitalization for mental illness. STAR MCOs improved from 16.16% to 34.51% and from 31.25% to 62.8% for 7–day and 30–day follow-up, respectively, over the course of two years. *Id.* at 24. But, STAR MCOs' current performance remains inferior to that provided for FFS–TANF recipients, thus failing to support a finding of significant changed circumstances warranting

revision of the Consent Decree or otherwise finding that STAR MCOs' performance is superior to non-managed care Medicaid in Texas.

**107.** Specifically, the EQRO compiles charts comparing the following measures: "Percent of Enrollees with One or More Hospital Stays Due to an Ambulatory Care Sensitive Condition;" Percent of Hospitalizations with a Primary Diagnosis of an Ambulatory Care Sensitive Condition; "Percent of Enrollees with One or More Emergency Department Visits Due to an Ambulatory Care Sensitive Condition;" and "Percent of Emergency Department Visits with a Primary Diagnosis of an Ambulatory Care Sensitive Condition." D. Ex. 82.

outpatient setting. Preventable hospitalizations and emergency room visits are costly and do not reflect good quality of or access to care for enrollees." D. Ex. 82 at 8. High numbers of ACSCs "could be an indicator that there's poor access to care. That's predominantly why we use this indicator as a measure of access to care." Tr. Vol. VI, p. 9 (testimony of Dr. Shenkman). ACSC is a nationally recognized measure recommended by the Institute of Medicine.[108] Tr. Vol. V, pp. 223–24 (testimony of Dr. Shenkman). As Defendants assert that one of their main purposes for employing the managed care model across the State is to save money by keeping class members out of the emergency room when care can be provided elsewhere, Tr. Vol. VI, pp. 37–38 (testimony of Dr. Shenkman), an analysis of emergency department visits and hospitalizations for ACSCs is particularly relevant to determine the degree to which STAR MCOs have experienced success.

First, each of Defendants' STAR MCOs had fewer than one percent of enrollees with one or more hospital stays due to an ACSC. D. Ex. 82 at 6. The average for All STAR MCOs was .66%; the EQRO Chart Book does not provide a relative comparison to other health care delivery models. *Id.* As Dr. Shenkman testified, however, when only one percent of enrollees in managed care is experiencing an inpatient stay due to an ambulatory care sensitive condition, this leads to the conclusion that access to care in an outpatient setting is very

good. Tr. Vol. VI, p. 9 (testimony of Dr. Shenkman). Plaintiffs do not rebut this statement; thus, the Court accepts Defendants' assertion. However, the inquiry at hand is not whether access to STAR MCO primary care is acceptable; instead, the inquiry is whether access to care for STAR MCO members is superior to non-managed care recipients, thus constituting significant changed circumstances warranting modification of the Consent Decree. Furthermore, Defendants do not provide a similar statistic for past years for purposes of arguing significant changed circumstances. Hence, the Court turns to a comparison of STAR MCO and FFS–TANF ACSC statistics to assess relative performance.

STAR MCOs have a smaller percentage of hospitalizations with a primary diagnosis of an ACSC than FFS–TANF (6.94% as compared to 9.51%, respectively). Tr. Vol. VI, p. 11 (testimony of Dr. Shenkman); *see* D. Ex. 82, pp. 6–7. The variability among STAR MCOs is also relatively minor-STAR MCOs vary from 6.29% (Amerigroup) to 9.58% (First Care), excluding Texas Children's, which was an outlier with 15.11% of hospitalizations with a primary diagnosis of ACSC. *Id.* at 7. When comparing percentages of emergency department visits with a primary diagnosis of an ACSC, as opposed to hospitalizations, though, STAR MCOs perform less well than FFS–TANF.[109] While 36.41% of STAR MCOs' emergency department vis-

---

108. The Court notes that ACSC is not a HEDIS statistic; thus, "national comparison data are not available for this measure." D. Ex. 82 at 8.

109. Defendants argue that this statistic is not indicative of STAR MCO members' access to care, because relatively small numbers of MCO members visit the hospital multiple times for ACSCs, thus inflating the statistic. *See* Tr. Vol. VI, p. 13 (testimony of Dr. Shenk-

man). Indeed, "on average each enrollee who experienced and [sic] ACSC [emergency department] visit had 1.42 [emergency department] visits during the measurement year." D. Ex. 82 at 10. While Defendants' assertion is supported by the evidence, members' multiple emergency department visits for ACSCs is not unique to STAR MCOs; thus, a relative comparison of STAR MCOs to FFS–TANF is unaffected by this phenomenon.

its had a primary diagnosis of an ACSC, only 30.57% of FFS–TANF members' emergency department visits were for an ACSC. *Id.* at 10.

E. CONCLUSIONS OF LAW: URBAN AREAS OF TEXAS

■ The Court, in its 2000 Opinion, found that class members enrolled in managed care received fewer checkups than those enrolled in traditional fee-for-service plans. *Frew,* 109 F.Supp.2d at 622. Defendants claimed that their managed care programs improve health care for class members through the application of the "medical home" model, while Plaintiffs responded that these concepts fail plaintiffs in their applications ·and prevent timely receipt of EPSDT services by class members enrolled in managed care plans. *See id.* Based on the evidence presented at the June Hearing, the Court finds that Defendants have failed to establish factual circumstances significantly different from those found in 2000 with respect to the provision of EPSDT services by STAR MCOs.

First, Defendants failed to present evidence directly comparing Urban Areas of Texas to non-Urban Areas, so as to distinguish superior performance of STAR MCOs. They also failed to present evidence relating to relative performance of STAR MCOs and Texas Health Steps as a whole. Defendants failed to present any evidence that establishes the superior performance of STAR MCOs and, consequently, failed to establish significant changed factual circumstances warranting revision of the Consent Decree. *See Rufo,* 502 U.S. at 392, 112 S.Ct. 748.

Defendants, in their presentation of evidence at the June Hearing, relied chiefly on those in charge of the STAR MCOs to prove their superior performance. The Court does not accept the subjective opinion of those in charge of STAR MCOs to objectively evaluate their performance. While testimony of representatives of STAR MCOs is informative and explicates how the MCOs intend to function, it does not prove significant changed factual circumstances in Defendants' provision of EPSDT services.

The objective evidence on which Defendants chiefly rely, the EQRO's most recent Chart Book, also supports the Court's finding that no changed factual circumstances warranting modification of the Consent Decree exist. While Defendants insist that STAR MCOs' performance relative to other States' MCOs establishes compliance with federal law, the Court finds these comparisons irrelevant and rejects Defendants' legal argument that compliance with federal law warrants Rule 60(b) relief. *See* discussion *supra* Part I(B)(3)(c). Furthermore, the EQRO Chart Book evidences STAR MCOs' inferior performance relative to FFS–TANF recipients. Specifically, STAR MCOs performed less well than FFS–TANF with respect to "well child" checkups in the first 15 months of life, "well child" checkups in the 3rd, 4th, 5th, and 6th years of life, adolescent "well child" visits, both 7– and 30–day follow-up care for mental illness, breast cancer screening, cervical cancer screening and appropriate testing for children with Pharyngitis. *See* D. Ex. 82. As the Court finds that FFS–TANF is the statistic most relevant to the instant inquiry, and the comparison fails to evidence superior performance of Defendants' STAR MCOs, Defendants have failed to present any evidence that proves significant changed circumstances warranting revision of the Consent Decree with respect to the Urban Areas of Texas.

**PART FOUR: *RUFO* TAILORING REQUIREMENT**

■ "Once a court has determined that changed circumstances warrant a modifica-

tion in a consent decree, the focus should be on whether the proposed modification is tailored to resolve the problems created by the change in circumstances." *Rufo*, 502 U.S. at 391, 112 S.Ct. 748. *Rufo*'s second prong, then, places an additional burden on the moving party to show that, in addition to changed factual circumstances warranting modification of the consent decree, the proposed relief is suitably tailored to those changed circumstances. In the instant motion, Defendants demand only two alternative forms of relief, both of which are similarly cataclysmic with respect to the Texas Health Steps program.[110] To determine whether either of these extreme forms of relief is suitably tailored to the found facts, or even the alleged facts, the Court looks to the direction provided by the Supreme Court in *Frew*. 540 U.S. at 441, 124 S.Ct. 899. As explained in Part I(B)(2), the Supreme Court cited two cases as examples of Rule 60(b) application to consent decrees involving institutional reform. *Id.* In both cases, the defendants' motions to vacate or dissolve the consent decree in issue were denied as not being suitably tailored to the changed circumstances.

After the Supreme Court's *Rufo* decision, as stated previously, the case was remanded to the United States District Court for the District of Massachusetts, for reconsideration under the appropriate, flexible standard. 502 U.S. at 393, 112 S.Ct. 748. On remand, the defendants argued, *inter alia*, that the significant change in factual circumstances, an upsurge in the population of pretrial detain-

ees, warranted dissolution of the consent decree. *Inmates of Suffolk County Jail v. Rufo*, 148 F.R.D. 14, 23 (D.Mass.1993). So as to avoid the court's being unduly involved in the day-to-day implementation of the consent decree in response to the unanticipated increase in inmate population, the defendants argued, the court should "simply let the Sheriff have unfettered discretion to order double-bunking without any constraints or limitations as to criteria regarding associated conditions of confinement." *Id.* The district court found, in the process of denying the defendants' motion to vacate the consent decree, that this "hard-line approach is plainly incompatible with [the district court's] obligation, under the order of remand, to consider whether any proposed modification of the consent decree is suitably tailored to the changed circumstances." *Id.*

In *Shapp*, the defendants moved to vacate or modify the consent decree as a result of their inability to comply, after a good faith effort, with certain terms of the consent decree. 602 F.2d at 1120–21. Instead of vacating the consent decree in its entirety, the district court merely modified three provisions of the decree that were no longer realistically achievable. *Id.* at 1120. The Third Circuit praised the improvement in Pennsylvania's EPSDT program while recognizing that, after the modification of the consent decree in only three respects, "the decree continues in force most of the provisions ... which have produced one of the most successful EPSDT programs in the country." 602 F.2d at 1120. Although the *Shapp* Court

---

**110.** While Defendants' alternative demand for relief applies only to those areas covered by managed care, the ramifications of the demanded relief would be ubiquitous. Because a majority of Texas' EPSDT beneficiaries is located within the Urban Areas, the Court's granting of the alternatively demanded relief would effectively dissolve the Consent Decree for at least 57% of Texas Health Steps eligibles. D. Ex. 96. The Court notes the effect of the demanded relief to illustrate that Defendants' alternative forms of relief are essentially equally radical, and cannot be said to request minor changes in extraneous details. *See Rufo*, 502 U.S. at 383, n. 7, 112 S.Ct. 748.

found that Pennsylvania's EPSDT program had made vast improvements and was one of the best in the nation,[111] the decree was not dissolved; instead, only the few unattainable provisions were modified.

In the instant case, the Court finds that significant changed factual circumstances do not exist with respect to the most reliable indicators of the overall performance of Texas Health Steps. *See supra* Part II. As these indicators of Texas Health Steps' overall performance, such as medical checkups and provision of dental services, have experienced no significant changed factual circumstances, any remedy that would dissolve the Consent Decree in its entirety is grossly ill-tailored to the facts as found by the Court.

■■■ Defendants have also attempted to prove that Texas Health Steps is exemplary relative to other States, and/or in compliance with federal law, as support for dissolution of the Consent Decree in its entirety. Even assuming, *arguendo,* that Defendants proved that Texas Health Steps is exemplary relative to other States' EPSDT programs, *Shapp* demonstrates that dissolution of a consent decree is not necessarily a suitably tailored remedy, even for a State with one of the best EPSDT programs in the country. The district court's austere rejection of the defendants' motion to vacate the consent decree in *Rufo* also illustrates the radical nature of a court's dissolving a consent decree in its entirety, and it reiterates the Supreme Court's directive that "a consent decree is a final judgment that may be reopened only to the extent that equity requires." *Rufo,* 502 U.S. at 391, 112 S.Ct. 748.

With respect to the Urban Areas of Texas, Defendants have failed to prove that STAR MCOs achieve better results that traditional fee-for-service Medicaid. Instead, the evidence reveals that STAR MCOs are performing slightly *worse* that traditional fee-for-service Medicaid, thus failing to prove significant changed factual circumstances warranting modification of the Consent Decree. Furthermore, dissolution as to all Urban Areas would be highly ill-tailored to changed circumstances based on average STAR MCO performance. As detailed in Part II(C)(2)(a) and (b), performance of each individual STAR MCO varies from statistic to statistic, and there is often a wide variation among Defendants' MCOs for a single statistic. Defendants seemingly recognize the disparity among STAR MCOs, as their evidence at the June Hearing focused on STAR MCOs other than Superior, the second largest STAR MCO and one of the overall worst performing. *See* D. Ex. 82. Any remedy that does not take into account the particular circumstances of each individual MCO in modifying specific provisions of the Consent Decree would fail to be tailored to changed factual circumstances.

Finally, the Supreme Court's admonishment in *Frew* that, when a consent decree mandates a state to administer a federal program, "principles of federalism require that state officials with front-line responsibility for administering the program be given latitude and substantial discretion," 540 U.S. at 442, 124 S.Ct. 899, fails to provide solace for Defendants. As the Court has emphasized throughout this opinion, between (a) the bounds of the extensively-negotiated Consent Decree provisions and (b) any changed cir-

---

**111.** The *Shapp* Court reiterated that the evidence showed that "Pennsylvania performed the highest number of screens in absolute terms of any state in the nation, and ranked eighth in terms of the percentage of eligible persons screened .... [T]he Pennsylvania EPSDT program was among the 5 or 6 best programs in the country." 602 F.2d at 1118.

cumstances, Defendants have latitude and substantial discretion to administer Texas' EPSDT program. Unless Defendants can satisfy the appropriate Rule 60(b) standard, however, the Consent Decree remains enforceable, and "enforcing the decree [continues to] vindicate[ ] an agreement that the state officials reached to comply with federal law." *Frew*, 540 U.S. at 439, 124 S.Ct. 899.

Accordingly, the Court finds that Defendants have failed to satisfy *Rufo*'s tailoring requirement with respect to both forms of demanded relief.

### PART FIVE: DEFENDANTS' ATTEMPTS AT COMPLIANCE

In addition to *Rufo*'s requirements that a party seeking modification of a consent decree establish a significant change in facts or law warranting revision of a consent decree and that the proposed modification be suitably tailored to the changed circumstances, *Cooper* requires the party to show further that the changed factual circumstances affect compliance with, or the workability or enforcement of, the final judgment, and that they occurred despite the officials' reasonable efforts to comply with the judgment. *Cooper*, 33 F.3d at 544; *Rufo*, 502 U.S. at 392, 112 S.Ct. 748. Defendants have failed to meet their burdens under *Cooper*.

Defendants offered no evidence that the alleged changed factual circumstances affect compliance with, or the workability or enforcement of, the Consent Decree. In-

deed, Defendants rarely referred to Consent Decree provisions at the June Hearing, with the exception of ¶¶ 171 and 284, and, instead, focused on attempting to prove compliance with federal law. *See* discussion *supra* Part II(A)(3) (addressing Defendants' arguments with respect to Consent Decree ¶¶ 171 and 284). Defendants' evidence reveals that, rather than proving changed circumstances satisfying this portion of the *Cooper* standard, Defendants simply intended to re-litigate the Consent Decree's underlying claims. While the Court understands Defendants' preference not to be obligated to comply with the Consent Decree's plan for implementing the federal EPSDT statute, the Court finds that Defendants' evidence is insufficient satisfy this *Cooper* requirement.[112]

 The Court further finds that Defendants have not made reasonable efforts to comply with the judgment. *Cf. Cooper*, 33 F.3d at 543–44 (upholding the magistrate judge's finding that "the county officials had ceased making any attempt to abide by the conditions set out in the Final Judgment.") While the violations found in 2000 do not necessarily evidence a lack of Defendants' reasonable efforts to comply with the Consent Decree, Defendants have failed, and continue to fail, even to attempt compliance with certain provisions. Consent Decree ¶¶ 17, 35, 37, 171 and 223 are the subject of Plaintiffs' pending Motion for Sanctions. Docket No. 429. Defendants have unilaterally determined that these provisions are either

---

112. This finding is not necessarily independent of the Court's finding that the first *Rufo* requirement, significant changed factual circumstances warranting modification of a consent decree, is not satisfied. *See infra* Part II and III. *Cooper*'s requirement that a party show that the changed factual circumstances affect compliance with, or the workability or enforcement of, the final judgment, can be

interpreted as merely a restatement of *Rufo*'s requirement that a party show significant changed circumstances *warranting modification of a consent decree*. *See Cooper*, 33 F.3d at 544; *Rufo*, 502 U.S. at 392, 112 S.Ct. 748. The Court addresses *Cooper*'s iteration of the Rule 60(b) standard separately, however, in the spirit of full analysis of Defendants' claims under the applicable Fifth Circuit standard.

harmful or no longer desirable and have ceased complying with them without first requesting relief from the Court.[113] For example, Defendants discontinued complying with Consent Decree ¶ 17, which requires Defendants to send letters to recipients periodically due for medical and/or dental checkups, and Consent Decree ¶¶ 35 and 37, which require oral outreach units to contact all recipients who miss a medical or dental checkup "in the face of numerous complaints from recipients." [114] Defendants' Rule 60(b) Motion at 21. Complaints from class members is not a judicially cognizable justification for unilaterally determining that compliance with a Consent Decree provision is no longer necessary. Defendants must request relief from the Court, in order to alter or amend the obligations contained in the judicially-enforceable Consent Decree.

With respect to Consent Decree ¶¶ 171 and 223, requiring annual reports about class members' receipt of dental checkups and assessments of Defendants' Medical Transportation Program ("MTP"), Defendants have unilaterally determined that bi-annual reporting is more desirable. Furthermore, despite the Court's 2000 finding that Consent Decree ¶ 284 requires additional information beyond that reported on the CMS–416, see Frew, 109 F.Supp.2d at 612, Defendants continue to fail to comply with this provision of the Consent Decree. See discussion supra Part II(A)(3). In sum, Defendants have violated, and continue to violate, multiple Consent Decree provisions, without regard for the obligations contained therein, and the Court finds that they have not exerted reasonable efforts to comply with all, or substantially all, of the judgment.[115] See Cooper, 33 F.3d at 544.

**113.** The flexible standard for modification of consent decrees allows Defendants to prove less than would be required under a strict reading of Rule 60(b). For example, when a party seeks modification of a consent decree provision on the ground that the provision is unworkable because of unforeseen obstacles and cannot be reasonably satisfied, Rufo, 502 U.S. at 384, 112 S.Ct. 748, it is not necessary that the court have before it evidence of the precise circumstances that existed when the parties agreed to the provision. It is enough that when they agreed to the provision in question, the parties believed it would be possible to comply, but good faith effort and experience has proven that it is not. In other words, the fact that a provision of a consent decree has proven to be unworkable is itself a significant change in circumstances. See, e.g., Reynolds v. McInnes, 338 F.3d 1221, 1228–29 (11th Cir.2003). But, in the instant case, Defendants presented no evidence of even a minor attempt at compliance the above-listed provisions of the Consent Decree and have thus failed to prove that any provision is unworkable. Cf. id. at 1229.

**114.** Plaintiffs also assert that Defendants' justification for discontinuing the letters appears to be pre-textual. For example, argue Plaintiffs, although Defendants claim to have

received about 200 complaints, they only produced evidence of 110 complaints during discovery. P.Ex. O–13 (filed under seal); Defendants' Post–Hearing Brief at 16–17. When the complaints are broken down by topic, only 17 of them reported discomfort with the letters' language. The remaining 93 asked to have the letters stopped for other reasons, such as: the child had died (9); the child was adopted and lives elsewhere (3); the child does not have Medicaid (3); the child was not at that address or had moved (12); etc. P.Ex. O–13 at 1; Plaintiffs' Post–Hearing Brief at 14.

**115.** Additionally, Defendants were found to be in violation of multiple provisions of the Consent Decree in 2000. See Frew, 109 F.Supp.2d at 579. Therefore, Defendants could not even theoretically have been in compliance with the Consent Decree for more than five years (which, of course, the Court does not find). The Court, consistent with the Alexander Court's analysis, finds that such a short period of compliance would, nevertheless, be insufficient to warrant relief under Rule 60(b). See 89 F.3d at 201; see Harris, 215 F.3d at 36 ("While we agree that good faith compliance certainly matters, extended compliance alone does not compel the modification of a consent decree ...."). Plaintiffs

■ Defendants seemingly fail to recognize that "Rule 60(b)(5) provides that a party may obtain relief from a court order when 'it is no longer equitable that the judgment should have prospective application,' not when it is no longer convenient to live with the terms of a consent decree." *Rufo,* 502 U.S. at 383, 112 S.Ct. 748. As the Court finds that Defendants have failed to satisfy the applicable Rule 60(b) standard, it is equitable that the Consent Decree should have prospective application.

### Conclusion

To recapitulate, the Court finds that Defendants have failed to prove significant changed factual circumstances warranting revision of the Consent Decree with respect to Texas Health Steps as a whole or with respect to the Urban Areas of Texas; that Defendants have failed to prove that either form of demanded relief is suitably tailored to any changed circumstances; that Defendants have failed to show that the changed factual circumstances affect compliance with, or the workability or enforcement of, the final judgment; that Defendants have failed to prove that any changes occurred despite Defendants' reasonable efforts to comply with the judgment; and that the evidence adduced at the June Hearing does not compel the Court to *sua sponte* modify any provision of the Consent Decree. Accordingly, Defendants' Rule 60(b) Motion shall be, and is hereby, **DENIED**.

argue that Defendants continue to violate provisions of the Consent Decree not necessarily addressed by the Court's 2000 Opinion. *See* Plaintiffs' Post–Hearing Brief at 10–11. While the Court does not determine whether Plaintiffs' assertions are meritorious, it is sufficient, for purposes of Defendants' Rule 60(b) motion, to find that Defendants made no reasonable attempt to comply with the Consent Decree.